Tavare Harris
c/o 2460 17th ave. #1135
Santa Cruz, CA 95062
(831) 419-7319
Htavare@yahoo.com

Plaintiff, Pro Se

FILED
JUL 30 2026
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

CH (S) 155

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TAVARE HARRIS,<br><br>Plaintiff,<br><br>v.<br><br>NICHOLAS STOEBERL, in his individual and official capacity; SERGEANT SJON TOL, in his individual and official capacity; and THE CITY OF SCOTTS VALLEY,<br><br>Defendants. | Case No. C 26 07937 SVK<br><br>COMPLAINT FOR DAMAGES, DECLARATORY RELIEF, AND AND JURY TRIAL UNDER 42 U.S.C. § 1983<br><br>JURY TRIAL DEMANDED |

## I. PRELIMINARY STATEMENT

1. This is a civil rights action brought under 42 U.S.C. § 1983, Title II of the Americans with Disabilities Act (42 U.S.C. § 12132), and supplemental California statutory law. Plaintiff seeks compensatory damages, special economic damages, and statutory attorney fees arising from an unconstitutional pedestrian seizure, material report falsification, the injurious deployment of excessive force, intentional judicial deception through material omissions and misrepresentations presented during the criminal proceedings, and the systemic bad-faith administrative suppression, withholding, and spoliation of native exculpatory digital evidence material to Plaintiff's defense and subsequent civil claims, all under color of state law.

2. **Nature of the Action and Factual Allegations**

3. This civil rights action arises from an unlawful, escalating enforcement encounter wherein Defendant Officers transformed a purported routine vehicle equipment inquiry into an unconstitutional pedestrian seizure, retaliatory arrest, excessive force incident, warrantless search, and subsequent spoliation of material

electronic evidence. Plaintiff alleges that Defendant Officer Nicholas Stoeberl claimed to have initiated a lawful traffic stop on a public roadway by deploying required forward-facing overhead red lights pursuant to California Vehicle Code § 25252. However, objective digital evidence—including Computer-Aided Dispatch (CAD) logs, Mobile Data Terminal (MDT) activity, Body-Worn Camera (BWC) footage, Dash Cam video, and Scotts Valley Police Department (SVPD) policies—conclusively proves no lawful traffic stop was ever executed on the public thoroughfare. Instead, the official CAD chronology establishes that the enforcement event was first initialized at 15:40:34—9 seconds *after* Plaintiff had fully exited the public roadway, parked inside a private retail commercial lot, and transitioned into a stationary pedestrian on private property.

4. Plaintiff further alleges that Officer Stoeberl failed to document his alleged 1.3-mile surveillance through the MDT as required by SVPD policy, repeatedly refused Plaintiff's explicit requests to state his name and badge number in direct violation of SVPD Policy § 922.2.1(a), and impermissibly shifted the stated legal pretext from "black taillights" on the highway to a "broken taillight" inside a private lot where local moving-infraction jurisdiction was lacking (SVMC 10T-22, CVC § 21107.8). Throughout the encounter, Plaintiff explicitly stated on camera, *"I will comply under duress,"* requested the legal basis for the detention, and asked for a Watch Commander. Rather than transmitting Plaintiff's express statements of compliance, Officer Stoeberl omitted these material facts from radio communications and falsely broadcast that Plaintiff was a "sovereign citizen refusing to identify," intentionally baiting a hostile supervisory response.

5. Relying entirely on this false radio broadcast, Defendant Sergeant Sjon Tol arrived on scene with a pre-conditioned, aggressive posture. Sgt. Tol made no independent effort to verify the factual or legal basis for the detention, explicitly informed Plaintiff that the law *"didn't matter,"* issued immediate custodial ultimatums, and bypassed all mandatory de-escalation protocols under SVPD Policy § 300.3. While Plaintiff was unarmed, stationary, non-threatening, mid-sentence, and making no attempt to flee, Defendants executed an unwarned physical assault. Sgt. Tol forcefully hyperextended Plaintiff's right arm, tearing elbow joint ligaments and creating an audible "pop"—an injury Sgt. Tol explicitly acknowledged hearing in his own written police report.

6. Following the physical assault, Defendants conducted an unlawful, warrantless search of Plaintiff's locked

vehicle cabin that far exceeded any limited consent to retrieve legal paperwork, in direct violation of *Arizona v. Gant*. Defendant Stoeberl further unzipped Plaintiff's closed, private backpack and dumped its contents onto the pavement without a warrant, consent, or inventory justification. Despite Plaintiff's visible physical distress and explicit disclosures of acute trauma, Defendants ignored repeated requests for emergency medical evaluation and failed to reasonably accommodate Plaintiff's diagnosed Post-Traumatic Stress Disorder (PTSD) under Title II of the Americans with Disabilities Act.

7. Finally, Plaintiff alleges that official police reports and judicial Probable Cause Declarations submitted under penalty of perjury contained intentional, material misrepresentations (*Franks v. Delaware*), falsely claiming overhead emergency lights were activated, Plaintiff suffered "no injury," and no witnesses were present. Officer Stoeberl intentionally obstructed his BWC lens during critical force sequences, and the City of Scotts Valley subsequently failed to preserve or produce native .csv audit logs, MDT telemetry, and Axon light-activation logs despite formal *Trombetta/Youngblood* demands. On February 25, 2026, all retaliatory criminal charges (PC § 148(a)(1)) and underlying traffic citations were unconditionally dismissed in the interest of justice, fully satisfying *Heck v. Humphrey*. Plaintiff now seeks full compensatory damages, punitive damages, declaratory relief, and attorney's fees under 42 U.S.C. § 1983, Title II of the ADA, and California law for deliberate violations of his First, Fourth, and Fourteenth Amendment rights.

## II. JURISDICTION AND VENUE

7. This Court invokes original federal question jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a). This Court invokes supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367.

8. Venue is proper under 28 U.S.C. § 1391(b) because all unlawful acts, physical trauma, false reporting, retaliatory field actions, and evidence manipulation occurred entirely within the County of Santa Cruz, California, inside the geographic boundaries of the Northern District of California.

9. **Statutory Timeliness and Exhaustion of Administrative Remedies (See Exhibit A):** Plaintiff fully

exhausted all administrative obligations under the California Government Tort Claims Act by timely filing a formal Administrative Tort Claim with the City of Scotts Valley on January 15, 2026. In said claim, Plaintiff explicitly placed the City and its insurers on notice regarding physical injury, criminal-defense-related economic losses, ongoing electronic evidence spoliation, withholding of native Axon BWC system logs, and related municipal misconduct. The City formally rejected the claim and mailed an official "Notice of Action on Claim" on February 5, 2026. This Complaint is timely filed within the six-month statutory window mandated by California Government Code § 945.6.

## III. PARTIES

10. Plaintiff **TAVARE HARRIS** is, and at all times mentioned herein was, a citizen of the United States and a resident of the County of Santa Cruz, State of California.

11. Defendant **CITY OF SCOTTS VALLEY** is a municipal corporation organized and existing under the laws of the State of California, maintaining administrative oversight over the Scotts Valley Police Department ("SVPD") as a public entity.

12. Defendant **OFFICER NICHOLAS STOEBERL ("Stoeberl")** was, at all times relevant herein, a sworn peace officer employed by the Scotts Valley Police Department, acting under color of state law in both his individual and official capacities.

13. Defendant **SERGEANT SJON TOL ("Tol")** was, at all times relevant herein, a sworn peace officer and designated field supervisor employed by the Scotts Valley Police Department, acting under color of state law in both his individual and official capacities.

**14.** Plaintiff is informed and believes, and on that basis alleges, that Defendants DOES 1 through 10 participated in, directed, ratified, concealed, reviewed, altered, preserved, withheld, or were otherwise legally responsible for the acts and omissions alleged herein.

## IV. Factual Allegations Organized by Constitutional and Statutory Violation


- A. Background, Setting, and Pre-Incident Facts [page 5]
  - § 15: Vehicle Compliance (CHP Salvage Certificate) & Qualified Disability (PTSD)
  - § 16: Location & Structural Setting (Target Shopping Center Lot)
- B. Fourth Amendment — Unlawful Seizure, Failed Vehicle Stop, Private-Property Detention, and False Arrest [page 6]
  - § 17–24: Lack of Statutory Jurisdiction Past Public Thoroughfare (CVC §§ 400, 530, 555, 21107.8, 24002; SVMC 10T-22)
  - § 25–27: Pretextual & Shifting Equipment Violation Justifications
  - § 28–39: Uncommunicated Stop, Emergency Light Deactivation, & Failed Continuity
  - § 40–43: Broken Tracking Continuity, Cad/MDT Timestamp Telemetry Disproof
  - § 44–47: Pedestrian Status, Contradictory Identity Mandates, & Policy Breaches
  - § 48–49: Absence of Flight/Evasion Allegations & Total Absence of Probable Cause
- C. First Amendment — Retaliation, Radio Defamation, and Punishment for Protected Speech [page 23]
  - § 50–54: Coerced Compliance, Radio Defamation ("Sovereign Citizen" Label), Bias Profiling, & Withheld Instructions
  - § 55–58: Supervisory Failure, Rank Misrepresentation, & Obstructed Body-Worn Camera
- D. Fourth Amendment — Excessive Force [page 33]
  - § 59–59.5: Unreasonable Force Escalation & Medical Evidence of Orthopedic Trauma
  - § 60–64: Impermissible Regulatory Escalation, Policy/Training Violations, & Unwarned Joint Dislocation
- E. Fourth Amendment — Unreasonable Search of Vehicle and Private Containers [page 38]
  - § 65–68: Warrantless Vehicle Intrusion (Arizona v. Gant) & Coerced Search of Backpack
- F. Title II ADA — Failure to Accommodate Known Disability [page 41]
  - § 69–69.5: Failure to Accommodate PTSD During Enforcement Encounter
- G. Fourteenth Amendment — Deliberate Indifference to Serious Medical Needs [page 42]
  - § 70–71: Denial and Delay of Emergency Medical Attention
- H. Fourteenth Amendment — Judicial Deception, Deliberate Fabrication, and Suppression of Material Exculpatory Evidence [page 43]
  - § 72–74: Sworn Report Fabrication & False Judicial Probable Cause Declarations
  - § 75–80: Digital Spoliation, CAD Back-Editing, Metadata Muting, & Inter-Agency Data Laundering
  - § 81–84: Fleet Tracking Concealment & Defiance of RIPA/DOJ Mandates
  - § 85–87: MDT Inception Void, Off-Dispatch Surveillance, & Favorable Termination (Heck v. Humphrey)
- I. Monell Liability — Municipal Custom, Ratification, Audit Failure, and Evidence Suppression [page 59]
  - § 88–96: Supervisory Ratification, Failure to Audit, Systemic Data Concealment, & Corporate Policy Breaches


**15. This action turns on whether Defendants complied with the objective statutory, constitutional, and departmental prerequisites required to conduct a lawful traffic stop before detaining Plaintiff on private property.**

**Plaintiff alleges Defendants lacked lawful authority to continue a traffic stop after Plaintiff entered private property, failed to comply with mandatory signaling and documentation requirements, escalated the encounter into an unconstitutional pedestrian detention, and later generated reports and electronic records inconsistent with the objective evidence.**

**16. Plaintiff alleges that the objective digital evidence including CAD records, MDT activity, body-worn camera recordings, dash-camera footage, official departmental policies, and other electronically stored information must be evaluated collectively to determine whether Defendants' asserted justification for the detention and subsequent use of force is supported by the contemporaneous record.**

---

**Section B: Fourth Amendment — Unlawful Seizure, Failed Vehicle Stop, Private-Property Detention, and False Arrest**

**17. Complete Lack of Statutory Enforcement Jurisdiction Past the Thoroughfare Boundary**

The curved ingress lane, crosswalk apron, and entry driveways leading into the Target commercial center constitute a private road and lateral driveway structure under California Vehicle Code § 400. Under California law, a curved entry indentation engineered to facilitate commercial ingress belongs to the lateral boundaries of the private lot (*Blaine v. City of Los Angeles*, 214 Cal.App.2d 280; *Caruso v. Marceo*, 117 Cal.App.2d 517). Because Defendant Officer Stoeberl failed to communicate a statutory show of authority via a steady-burning forward-facing red lamp under CVC § 25252 while Plaintiff operated on the straight thoroughfare of the public highway, the enforcement tracking sequence within this private driveway structure lacked statutory jurisdiction *(See Exhibits A-1, A-2)*.

**The Officer's Traffic-Enforcement Authority Ended at the Private Property Boundary**

**18. Physical and Structural Roadway Terminus via Inseam and Markings**

Defendant Officer Stoeberl's traffic enforcement authority terminated at the structural boundary transitioning into the private commercial lot. This boundary consists of a distinct structural concrete inseam and a painted white line separating the dark public asphalt from the light concrete crosswalk corridor. Pursuant to California Vehicle Code §§

530 and 555, this crosswalk corridor is a designated pedestrian sanctuary and legally constitutes a portion of the sidewalk corridor—not the roadway. Defendant Stoeberl failed to initiate an electronic MDC log across five public intersections in flagrant violation of **SVPD Policy 419.6 (a) and (c) (Documentation of Activity)**, and failed to deploy front-facing red emergency lighting on the public highway under CVC § 2800.1(a)(1) and (a)(2) prior to Plaintiff crossing this structural line. Because the vehicle had fully cleared the roadway boundary before any enforcement signal was deployed, the subsequent field interception lacked statutory authorization and violated the Fourth Amendment.

**...Simply put, red is red and black is black; a structural line in the concrete is a legal wall, and an officer cannot drive past his roadway boundary line to execute a moving traffic stop inside a non-roadway pedestrian corridor where his operational traffic code power equals zero."**

**19. The Defiance of Territorial Constraints & Ordinance 10T-22**

Under Scotts Valley Municipal Ordinance 10T-22, municipal law enforcement officers lack jurisdiction to execute summary traffic detentions for minor equipment infractions on vehicles parked or idling within private retail commercial lots. In violation of this local territorial limit and SVPD Policy 307.2.2(h) *(Extended pursuits of violators for misdemeanors not involving violence, risk of serious harm, or weapons (independent of the pursuit) are generally discouraged)*, the individual defendants executed an extraterritorial enforcement action. Because the stop was initiated outside the officer's statutory territorial jurisdiction, the subsequent seizure was void ab initio (*People v. Rogers*, 21 Cal.3d 542).

**20. The Initial Inception Void inside the Sidewalk Corridor**

Pursuant to California Vehicle Code § 24002, municipal law enforcement authority to enforce vehicle equipment infractions is strictly confined to vehicles actively operating "upon a highway." Objective video telemetry from Defendant Stoeberl's Axon Fleet 3 camera confirms that at timestamp 15:40:25, Plaintiff's vehicle was positioned entirely within the private commercial driveway, past the sidewalk corridor line. Concurrent CAD logs confirm that the enforcement event data track was not initialized or "Received" by dispatch until 15:40:34. Because the enforcement

tracking sequence was initiated exactly nine (9) seconds after Plaintiff's vehicle had completely exited the public thoroughfare and come to a rest on private property, no lawful Fourth Amendment traffic stop ever commenced while the vehicle was in motion.

**Simply put, turning on a camera is not the same thing as starting a lawful traffic stop. The camera began recording as Plaintiff crossed onto private property, but the City's own dispatch records show the official enforcement event did not begin until nine seconds later, after Plaintiff was already parked. Plaintiff alleges the government's own timestamps show the stop began after the drive was over—not while he was driving on the public road.**

**21. Transition into the Target Ingress Corridor and Broken Continuity**

Plaintiff's entry into the Target shopping center ingress corridor constituted a physical break in the continuity of the public roadway. This ingress corridor forms part of the commercial center's internal circulation system rather than a public thoroughfare. Because Plaintiff neither submitted to nor was aware of any objectively communicated police signal prior to leaving the public travel lanes of Mt. Hermon Road, the officer cannot retroactively characterize the subsequent private property encounter as a single, uninterrupted roadway stop.

**Reduced to its essentials, once Plaintiff turned into the Target entrance, he was no longer traveling along the public roadway but had entered the shopping center's private access system. Just as a driver leaves the street when turning into a private driveway—even before reaching a parking space—Plaintiff had already left the public thoroughfare before any lawful traffic stop was objectively communicated. Plaintiff alleges the continuity of any roadway stop was therefore broken and could not be revived after he entered private property.**

**22. Direct Violation of Private Property Traffic Enforcement Limitations**

Under California Vehicle Code § 21107.8, municipal police departments are legally barred from enforcing moving vehicle code infractions on private commercial property unless the city council has enacted a specific enabling ordinance and posted conspicuous signage giving notice of such enforcement at all entrances. As documented by the entrance signage *(See Exhibit C)*, this commercial property is governed strictly under Scotts Valley Municipal Codes (SVMC 10.08.070, 10.08.080, 10.09.030, 10.16.010) and CVC § 22658A. These regulations restrict municipal authority

at this location solely to stationary parking control and towing. Because the City has not enacted a CVC § 21107.8 moving traffic declaration for this property, Defendant Stoeberl lacked all statutory jurisdiction to execute an infraction seizure once Plaintiff's vehicle departed the public thoroughfare.

**23. Signalized Intersection Approvals and Absence of Evasive Probable Cause**

Objective traffic signal telemetry and scene geometry refute any defense claims of an active roadway flight or motorist non-compliance. Plaintiff executed the 45-degree turn into the commercial ingress corridor under an authorized, active green traffic signal.

**24. Statutory Termination of Highway Jurisdiction Under CVC §§ 530, 555, and 24002**

Pursuant to CVC § 530, a roadway is defined strictly as a zone designated for vehicular travel, whereas CVC § 555 designates a painted pedestrian crosswalk intersecting a driveway apron as a legal extension of the sidewalk corridor. Under CVC § 24002, routine equipment enforcement is strictly confined to vehicles actively operating "upon a highway." Because video telemetry and CAD logs establish the tracking sequence was initialized at 15:40:34—after Plaintiff's vehicle departed the public thoroughfare to operate past the crosswalk lines—Plaintiff was entirely outside Vehicle Code jurisdiction. Defendants cannot weaponize a minor equipment infraction to execute a vehicle intercept within a signalized pedestrian safety zone.

**Reduced to its essentials, routine equipment enforcement under CVC § 24002 applies to vehicles operating upon a highway. Plaintiff alleges that the continuous video record first depicts Plaintiff's vehicle already within the ingress lane leading to private property, not upon the public roadway, before continuing across the driveway apron into the parking lot. The evidentiary continuity begins in the ingress lane. Plaintiff contends that initiating a traffic stop under these circumstances is analogous to observing an equipment violation only after a vehicle has entered a private driveway and then using that observation to justify a highway equipment stop absent evidence that the violation was observed while the vehicle was operating upon a highway.**

**The Asserted Equipment Violation Was an Objectively Unreasonable and Shifting Pretext**

**25. The Total Failure of the Equipment Pretext and Shifting Pretextual Justifications**

Defendant Officer Stoeberl initiated a non-consensual pedestrian seizure completely unsupported by objective reasonable suspicion under *Hiibel v. Nevada*. Defendant Stoeberl's official police report asserts that he tracked and initiated a traffic stop for a suspected "black taillights" violation under California Vehicle Code § 25950(b) and a "broken left brake light" under CVC § 24603(b). This structural pretext is completely disproved by official state automotive compliance records. Plaintiff's vehicle possessed a prior, certified State of California Department of Consumer Affairs Certificate of Compliance (License No. A 2468662) issued directly under the California Highway Patrol salvage verification process, proving that state inspectors officially tested and certified the vehicle's rear lamps, stop lamps, and reflectors as fully compliant with all state safety standards *(See Exhibit A-3)*. Under *People v. Humfress*, an officer cannot manufacture a regulatory equipment violation that is directly contradicted by official state automotive compliance records to establish *Terry* reasonable suspicion.

**Plaintiff's vehicle utilized a compliant three-lamp configuration displaying two fully operational, active lamps in perfect compliance with the statutory minimums of CVC § 24600(b), backed by a prior, certified California Highway Patrol (CHP) salvage compliance approval *(See Exhibit A-3)*. Once the continuity of the roadway encounter had been broken, Defendant Stoeberl regained only a brief, limited view of Plaintiff's vehicle as it entered private property. Plaintiff alleges the objective circumstances—including the limited observation time, distance, viewing angle, and rapid progression of events—did not permit a reliable determination that a statutory equipment violation existed before the seizure was initiated.**

**26. Objective Equipment Defect Insufficiency and Shifting Pretext**

Defendant Officer Stoeberl lacked objective, articulable reasonable suspicion to initiate an emergency traffic stop on the public roadway. While Defendant Stoeberl initially asserted a broken rear lens, a defense expert analysis confirms that ambient daylight conditions washed out the camera frame, stating: "It is unclear from the video if the taillight is in fact broken *(See Exhibit A-4)*." Because an articulable equipment infraction was physically impossible to observe

from a distance, the shifting mechanical assertions fail to satisfy the objective standards of *Terry v. Ohio*.

**27. Post-Facto Fabrication and Shifting Pretextual Justifications**

Enforcement logs document that while operating on the public highway, Defendant Stoeberl allegedly tracked Plaintiff's vehicle under the narrative that the taillights were "black" pursuant to California Vehicle Code § 24600(e). The continuous video evidence does not depict Plaintiff operating upon the highway. However, upon entering the private commercial property perimeter, the defendants shifted their mechanical narrative on camera, asserting instead that Plaintiff was being detained for a "broken" taillight housing structure. A structural casing fracture represents an entirely distinct physical condition from a lens dimmed by tinting modifications, and it is physically impossible to observe a minute casing fracture from an active driving distance in public traffic. Under *Franks v. Delaware*, 438 U.S. 154, this shifting justification demonstrates that Defendant Stoeberl did not observe the alleged equipment defect on the public roadway, but invented a post-facto narrative to justify an extraterritorial parking lot detention barred by CVC § 21107.8.

**Simply put, if someone gives one reason at first but later switches to a different reason, it's fair to ask whether they really knew the reason from the beginning. Plaintiff alleges Defendant Stoeberl first claimed the vehicle had "black taillights," but later changed that explanation to a "broken left brake light" and then simply a "broken brake light." Plaintiff alleges those are different conditions, and changing the explanation after the encounter moved onto private property suggests the claimed defect was not actually identified before the detention began.**

**No Constitutional Vehicle Stop Was Ever Initiated or Successfully Communicated**

**28. Absence of Statutory Exemptions on Private Property**

Under California Vehicle Code § 21055, law enforcement personnel are exempt from standard traffic regulations and local ordinances only when actively deploying a forward-facing red lamp and a siren. Defendant Stoeberl utilized lower grille lighting and an air horn tap, which fail to meet these statutory notification requirements. Furthermore, objective video logs confirm that all primary overhead emergency lighting was entirely deactivated and extinguished

prior to face-to-face pedestrian contact at 15:41:05. Under SVPD Policy Section 308.2, ***"the use of any other warning equipment without a red light and siren does not provide any exemption from the Vehicle Code."*** Because the statutory signaling array was non-compliant and voluntarily terminated, the vehicle tracking sequence lacked lawful authority from its inception.

**29. The Deactivation Termination and Failed Continuity Theory**

Under *California v. Hodari D.*, 499 U.S. 621, and *Brendlin v. California*, 551 U.S. 249, a vehicle stop requires an active show of authority coupled with physical submission. Because Plaintiff maintained a normal driving course, safely parked, and exited his vehicle completely unaware of a patrol presence, no vehicle seizure commenced while the vehicle was in motion. Objective video telemetry documents that within eighteen (18) seconds of logging the CAD "On Scene" timestamp, Defendant Officer Stoeberl's primary overhead emergency light bar was completely deactivated, rendering the signaling environment dark by timestamp 15:41:05. Pursuant to California Vehicle Code § 25252, an officer possesses zero statutory traffic enforcement privileges in the absence of a steady-burning forward-facing red lamp.

By voluntarily shutting down the vehicle-centric signaling commands, the individual defendants operationally dissolved their emergency authority. This terminal discontinuation of emergency operations is conclusively governed by SVPD Policy Manual Section 308.7 (Supervisory Responsibilities) on Page 97 and **Section 308.8 (Failure of Emergency Equipment)** on Page 98 . Section 308.8 explicitly commands that **"If the emergency equipment on the vehicle should fail to operate, the officer must terminate the Code-3 response and respond accordingly."**

The objective video telemetry establishes that if the individual defendants did not intentionally deactivate their primary roof lights to end the traffic stop perimeter, they operated with non-functional or unlit signaling hardware. Because Section 308.8 strips an officer of emergency operational status the exact second emergency equipment fails to properly illuminate, the individual defendants were under an absolute mandate to terminate their Code-3 response and respond accordingly. Consequently, Plaintiff's status on the pavement was purely that of a pedestrian under *United States v. Mendenhall*, requiring independent, specific, and articulable reasonable suspicion of active criminal conduct under *Hiibel v. Nevada*.

**30. The Technical Signaling Defect and Sworn Report Contradiction**

Defendant Officer Stoeberl failed to deploy a forward-facing, steady-burning red warning lamp in violation of California Vehicle Code § 25252. Axon Body 3 X60AE032J camera capture at timestamp 15:59:24 confirms the patrol vehicle's primary overhead emergency light bar remained completely deactivated throughout the encounter. Defendants' reliance on intermittent, lower-mounted flashing grille lighting fails to satisfy the explicit front-facing steady-burning red lamp mandate of CVC § 25252. Officer Stoeberl's police report asserts he executed a lawful vehicle stop using overhead emergency red lights. This assertion is directly refuted by the objective video telemetry, establishing a material misrepresentation under *Franks v. Delaware*, 438 U.S. 154.

**Simply put, if the rules say you must use a special red stop light to pull someone over, you can't later say you used it if the video shows it wasn't on. It's like a crossing guard saying they held up the stop sign when the camera shows the sign was down. Plaintiff alleges Defendant Stoeberl's report claims he conducted a lawful traffic stop using the required overhead emergency red lights, but the objective video shows the primary overhead light bar was not activated during the encounter. Plaintiff therefore alleges the required red traffic-stop signal did not exist in the manner Defendant Stoeberl reported, meaning the claimed vehicle stop lacked the signaling required by law.**

**31. Surveillance Tracking versus Constitutional Seizure Command and Mistake of Identity**

Defendant Officer Stoeberl followed Plaintiff's vehicle on the public roadway without initiating an objective, statutory show of authority under CVC § 25252. Plaintiff maintained an absolute right to navigate a public thoroughfare, enter a commercial lot, park, and exit his vehicle. A motorist's passive awareness of a trailing patrol vehicle does not constitute a traffic stop, nor does it establish subjective submission. An officer's failure to provide clear, statutory, objective notice prior to a pedestrian encounter cannot be retroactively cured by a citizen's general awareness of a police presence under *United States v. Mendenhall*, 446 U.S. 544, and *California v. Hodari D.*, 499 U.S. 621. After the continuity of the roadway encounter was broken, Defendants could not later claim the earlier surveillance had actually been a lawful vehicle stop or the identical vehicle asset.

Plaintiff continued driving normally, entered the shopping center, parked, and exited his vehicle without any

objectively communicated traffic stop. Because Defendant Stoeberl completely lost visual line-of-sight contact with the moving target due to intervening traffic flow, the pre-existing reasonable suspicion was severed as a matter of law. Under the Fourth Amendment, a generic visual profile of a mass-produced consumer asset cannot bridge a tracking void to validate a subsequent seizure where tracking continuity has been broken (*United States v. Jones*, 242 F.3d 215).

Pursuant to the strict reasonable suspicion thresholds established in *United States v. Hensley*, 469 U.S. 221, an officer lacks specific and articulable facts to execute a detention if an interruption in tracking leaves open the structural probability of a mistake of identity. Consequently, Defendants could not later claim the earlier public roadway surveillance had actually been a completed, lawful vehicle stop or the identical vehicle asset.

**32. Numerical Disproof of Roadway Continuity and Failed Stop Sequence**

Contemporaneous CAD Incident Report No. 2508130050 *(See Exhibit H-4)* and objective video telemetry establish that no continuous vehicle stop occurred. While tracking Plaintiff's vehicle at the "Received" timestamp of 15:40:34, the patrol vehicle's overhead emergency light bar remained deactivated. Officer Stoeberl deployed an air horn burst at 15:40:38 after Plaintiff executed a 90-degree turn into a commercial parking aisle, structurally breaking straight line-of-sight alignment. Plaintiff did not perceive this signal. Officer Stoeberl sounded a secondary siren tap at the "On Scene" timestamp of 15:40:47 *(Exhibit H-4)*, after Plaintiff's vehicle had departed the dashcam line of sight to execute a localized parking maneuver. Because the officer failed to deploy a steady-burning red light under CVC § 25252 while behind the moving vehicle, no Fourth Amendment vehicle seizure commenced.

**Simply put, if a teacher quietly calls your name while you're around the corner and you never hear it, the teacher can't later say you disobeyed because you didn't stop. Plaintiff alleges the timeline shows Officer Stoeberl never clearly stopped Plaintiff while he was driving. Instead, the officer sounded an air horn as Plaintiff was navigating into a parking aisle, and another brief siren—also never perceived by Plaintiff—after Plaintiff had already disappeared from the officer's direct view while parking. Plaintiff alleges that because no required steady-burning red emergency light was used while Plaintiff's vehicle was still on the roadway, no lawful vehicle stop ever began.**

**33. Absence of Lawful Audible Command**

Defendant Stoeberl later criticized Plaintiff for exiting the vehicle without permission. Yet Defendant never issued a lawful audible command directing Plaintiff to stop, remain in the vehicle, or otherwise recognize that a detention had been initiated. No loudspeaker, bullhorn, public address announcement, or other unmistakable verbal command preceded Plaintiff's exit. Plaintiff alleges that a person cannot be expected to obey an order that was never given. No objective show of authority was given that would communicate to a reasonable person that they were not free to leave under *United States v. Mendenhall*, 446 U.S. 544 (1980). If Defendant believed a lawful vehicle stop had been initiated, ordinary police practice would have been to communicate that command before faulting Plaintiff for failing to comply. The absence of any such command undermines Defendants' assertion that Plaintiff knowingly disregarded a lawful show of authority or that a constitutional vehicle seizure had been clearly communicated before Plaintiff exited the vehicle.

**34. Deactivation of Signaling Authority and Identification Failure**

Defendant Officer Stoeberl's primary overhead emergency red light bar was deactivated and dark at timestamp 15:41:05, converting the vehicle tracking sequence into a field contact. Under SVPD Policy Section 308.2, secondary warning equipment without an active forward-facing red light carries no legal authority and provides "no exemption from the Vehicle Code." By turning off the primary roof lights, Officer Stoeberl discontinued his emergency vehicle authority pursuant to SVPD Policy Sections 308.5 and 308.8. Furthermore, Officer Stoeberl operated without active statutory lighting arrays and refused to provide his name or badge number upon explicit request, prompting Plaintiff to request an on-scene commanding officer.

**35. Direct Violation of Traffic Enforcement Equipment Mandates**

During a non-emergency traffic stop, a law enforcement vehicle possesses no exemptions under California Vehicle Code § 21055 and must obey standard rules of the road. The activation of an overhead red warning signaling array is the exclusive legal mechanism to communicate a continuous compliance directive to a motorist. Because Defendant Officer Stoeberl's primary overhead red light bar was deactivated prior to face-to-face contact, the individual

defendants extinguished their statutory enforcement authority under CVC § 25252, rendering the subsequent private property seizure unconstitutional.

**Simply put, police cannot create a high-stress tactical confrontation after turning off the very emergency lights that tell everyone an official traffic stop is taking place. Plaintiff alleges the overhead red emergency lights exist to communicate official police authority, provide notice to motorists and the public, and identify an active vehicle stop. By allegedly discontinuing that signaling before the pedestrian encounter, Plaintiff alleges Defendants abandoned the objective basis for continuing a traffic stop while simultaneously exercising traffic-stop authority on private property, raising material questions as to the continuity of the asserted stop, the scope of Defendants' authority, and the objective reasonableness of the ensuing seizure under the Fourth Amendment.**

**36. Inapplicability of the Tactical Parking Phase Exception**

The individual defendants cannot claim a non-emergency "parking phase" lighting exemption to justify extinguishing their statutory signaling array. A transition from steady-burning red lights to amber flashers or grille aesthetics requires a pre-existing, constitutionally completed vehicle seizure under *California v. Hodari D.* Because Plaintiff parked independently without submitting to a roadway directive, no joint parking phase maneuver commenced, and the parking phase exemption is inapplicable to justify the subsequent detention.

**Simply put, police cannot claim they were in the "parking phase" of a traffic stop if the driver parked on his own before any lawful stop occurred. Plaintiff alleges he independently completed his parking maneuver outside the officer's direct view, exited his vehicle, and only afterward did Officer Stoeberl arrive, positioning his patrol vehicle behind Plaintiff's parked car without the primary overhead red emergency light bar activated. Plaintiff therefore alleges Defendants cannot retroactively transform an independently completed parking event into the continuation of a lawful traffic stop.**

**37. Terminal Discontinuation of Enforcement Continuity Regardless of Boundary Character**

Any continuous vehicle enforcement authority was terminated by the individual defendants' tactical choices. Defendant Officer Stoeberl logged an "On Scene" status at 15:40:47, after Plaintiff’s vehicle had broken line-of-sight

alignment to navigate a commercial parking aisle. Objective video telemetry establishes that by timestamp 15:41:05, the individual defendants had completely extinguished the patrol vehicle's primary overhead emergency light bar. Under SVPD Policy Sections 308.5 and 308.8, the selective deactivation of a primary signaling array constitutes a formal choice to discontinue vehicle stop authority, severing any claim of continuous enforcement.

**38. Premature Signaling Deactivation and Abandonment of Statutory Authority**

Objective video telemetry confirms that during the active, unresolved field interaction, the individual defendants completely deactivated their overhead red and blue emergency lighting. Pursuant to California Vehicle Code § 25252 and standard California Law Enforcement Master Policy guidelines, emergency lighting systems must remain continuously illuminated throughout the duration of a traffic enforcement stop to preserve scene safety and maintain statutory authority. By extinguishing the primary steady-burning red lamp while continuing to detain Plaintiff, the officers terminated their statutory traffic enforcement authority on camera.

**39. The Procedural Conflict and Tactical Blockade Paradox**

The individual defendants cannot retroactively alter their operational classification to evade civil liability. If the interaction was a minor equipment infraction executed under non-emergency parking protocols, defendants lacked legal authority to disrupt standard traffic patterns, execute tactical vehicle blocks, or enter private commercial property under California Vehicle Code § 21055 CVC. § 21055(b) conditions all emergency vehicle operational exemptions on the officer actively deploying specific objective warnings, explicitly requiring that the vehicle ***"sounds a siren as may be reasonably necessary and the vehicle displays a lighted red lamp visible from the front as a warning to other drivers and pedestrians."*** Conversely, if defendants assert a continuous, emergency roadway tracking sequence justified their private property entry, they were bound by SVPD Policy Section 308.2 and CVC § 25252, which condition enforcement authority on the continuous deployment of a steady-burning forward-facing red lamp. **Simply put, Defendants cannot change the rules after the fact to make every action appear lawful. Plaintiff alleges that if this was only a routine equipment violation, Defendants had no authority to execute a high-stress tactical blockade on private property. But if they claim they were continuing an emergency traffic stop onto private**

**property, Plaintiff alleges they were required to continuously display the overhead red emergency lights that communicate and authorize that stop. Plaintiff therefore alleges Defendants cannot retroactively switch between two different sets of legal rules—discarding the requirements of each while simultaneously claiming the authority of both.**

---

**Defendants' Claimed Continuous Pursuit Was Factually and Constitutionally Broken**

**40. Break in Visual Tracking Continuity and Vehicle Identification**

Plaintiff alleges Defendant Stoeberl did not maintain continuous visual observation of Plaintiff's vehicle throughout the claimed 1.3-mile tracking sequence. Intervening traffic caused Defendant to lose sight of the vehicle before later encountering a vehicle within the shopping center's private ingress lane. Once continuous visual observation was broken, Defendant could no longer rely upon uninterrupted identification to establish that the vehicle later encountered was the same vehicle previously observed on the public roadway. Simply put, if an officer loses sight of a vehicle in busy traffic, the officer cannot later assume that a similar vehicle is the same vehicle without additional specific and articulable facts establishing its identity. Plaintiff therefore alleges that the interruption in visual continuity undermines Defendants' assertion that the subsequent detention was based upon continuous observation rather than assumption, rendering the ensuing seizure unsupported by individualized reasonable suspicion.

**41. The Loss of Visual Contact and Broken Stop Chronology**

Prior to private lot entry, Defendant Officer Stoeberl fell behind intervening traffic and lost visual line-of-sight contact with Plaintiff's vehicle, breaking the continuous observation trail. While Plaintiff's vehicle had fully exited the public thoroughfare and was navigating the dedicated Target ingress lane, Defendant Stoeberl's patrol vehicle remained in a separate travel lane on Mt. Hermon Road, physically unable to project notice or command a traffic yield.

---

**Objective CAD, MDT, and Video Evidence Refute Defendants' Timeline**

**42. The MDT Time-Stamp and Operational Sequence**

Certified CAD logs document that Defendant Stoeberl's Mobile Data Terminal (MDT) field tracking interface was initialized only while Plaintiff was already executing a parking maneuver inside the commercial lot. Defendant Stoeberl possessed no active emergency dispatch, no exigent circumstances, and no ongoing public hazard. **The officer executed emergency positioning tactics and blocked commercial traffic flow without maintaining a forward-facing red emergency light in violation of California Vehicle Code § 25252.**

**43. Database Disproof of Continuous Roadway Narrative**

Contemporaneous CAD Incident Report No. 2508130050 establishes that a continuous public roadway traffic stop never occurred. The City's official records document that the incident's creation, dispatch, and on-scene arrival occurred concurrently at the identical second of 15:40:46, anchored exclusively to the location of "Target, 270 Mt Hermon Rd." The complete absence of any preceding roadway dispatch log or tracking telemetry confirms that Defendant Officer Stoeberl initialized enforcement actions only after Plaintiff had navigated the shopping center, parked, and exited his vehicle, refuting the "Incident Comments" narrative that a completed vehicle stop had already occurred before the pedestrian encounter.

---

**Plaintiff Was a Pedestrian, Not a Motorist**

**44. The Transformed Pedestrian Encounter and Refusal of Identification**

Plaintiff turned off his engine, exited, locked the cabin, and was walking across the commercial pavement as a pedestrian four to five feet from his vehicle when Defendant Officer Stoeberl positioned his patrol unit and issued a vocal command to stop. Plaintiff stated he did not consent to a voluntary encounter and was currently a pedestrian on foot. Officer Stoeberl demanded that Plaintiff produce a driver's license and registration for a suspected broken taillight. Plaintiff stated that as a non-motorist pedestrian, he was under no legal obligation to surrender identification

for an inactive vehicle equipment investigation under *Hiibel v. Nevada*. Officer Stoeberl then threatened Plaintiff with immediate custodial arrest for obstruction under California Penal Code § 148(a)(1), but immediately minimized the threat by stating he was merely "advising" Plaintiff.

**Simply put, once someone parks, locks the car, and walks away, they're no longer driving—they're walking. Plaintiff alleges he had already become a pedestrian when Officer Stoeberl demanded a driver's license and vehicle registration for an inactive equipment investigation and threatened arrest after Plaintiff contested the stop. Plaintiff therefore alleges Defendants treated a pedestrian as though he were still driving, without a new constitutional basis to do so.**

**45. The Contradictory Identity Mandate**

The individual defendants repeatedly demanded physical motor vehicle operation documents from Plaintiff while he was functioning purely as a pedestrian away from a locked and secured vehicle. Because Plaintiff's vehicle was already locked, compliance with defendants' simultaneous demands for registration would have required Plaintiff to re-enter a secured vehicle while under active detention. These conflicting commands created a contradictory mandate that demonstrates the detention was not a routine traffic infraction investigation, but a suspicionless custodial seizure in violation of the Fourth Amendment. Plaintiff's peaceful requests for officer identification—mandated by **SVPD Policy 922.2.1(a)** ***(The Department issues each employee an official department identification card bearing the employee's name, identifying information and photo likeness. Employees shall display their department issued identification or badge in a courteous manner to any person upon request and as soon as practical)***—were met with immediate, retaliatory force escalation rather than administrative clarification, directly violating Plaintiff's protected First Amendment speech rights. Plaintiff repeatedly requested Defendant Stoeberl's official identification and specifically asked how Plaintiff could know Defendant was who he claimed to be. Defendant did not identify himself by name or badge number. Instead, Defendant merely referenced that he was driving a marked patrol vehicle and wearing a badge. Defendant's own report likewise does not state that he provided his name or badge number in response to Plaintiff's requests.

**46. Arbitrary Transformation of Field Contact, Pavement Seizure, and Policy 416 Breach**

The individual defendants' field conduct violated the non-discretionary operational boundaries established under SVPD Policy Manual Chapter 4, Section 416.1.1 (Definitions)

- **Temporary detention:** Defined as "**When an officer intentionally, through words, actions, or physical force, causes an individual to reasonably believe he/she is required to restrict his/her movement without an actual arrest."**
- **Consensual encounter**: Defined as "**When an officer contacts an individual but does not create a detention through words, actions, or other means. In other words, a reasonable individual would believe that his/her contact with the officer is voluntary."**

Section 416.1.1 explicitly separates field operations into mutually exclusive categories, defining a **"Consensual encounter"** as one where an officer **"does not create a detention through words, actions, or other means... a reasonable individual would believe that his/her contact with the officer is voluntary,"** while defining a **"Temporary detention"** as occurring **"When an officer intentionally, through words, actions, or physical force, causes an individual to reasonably believe he/she is required to restrict his/her movement without an actual arrest."** Objective video telemetry confirms that Defendant Sergeant Tol bypassed these operational definitions. When Plaintiff questioned the validity of the private property intercept, Sergeant Tol declared on camera, "Yes he does, and you don't get to decide that right now!", explicitly barring Plaintiff from declining the interaction. By deploying physical positioning and vocal commands to block Plaintiff's movement without articulating specific, independent facts indicating criminal activity was afoot, Sergeant Tol transformed a voluntary field contact into an unauthorized **"Temporary detention."** Because this pavement intercept lacked independent reasonable suspicion, it violated the mandatory provisions of SVPD Policy Section 416.1.1 and the Fourth Amendment.

**Reduced to its essentials, if a new officer takes over an encounter, that officer must have—and be able to explain—a lawful reason for detaining someone before using force or preventing questions. Plaintiff alleges Sergeant Tol entered the encounter as a new decision-maker, immediately barred Plaintiff from questioning the detention, and physically seized Plaintiff without first identifying any independent, specific facts that criminal activity was afoot. Plaintiff therefore alleges Sergeant Tol transformed a field contact into a physical detention**

**unsupported by the Fourth Amendment. Plaintiff alleges Defendant Sergeant Toi ended any consensual nature of the encounter by telling Plaintiff he "didn't get to decide" whether it would continue, while lacking independent reasonable suspicion to justify a detention. Plaintiff therefore alleges Defendants converted a voluntary encounter into an unlawful seizure through assertion of authority alone, in violation of SVPD Policy § 416.1.1 and the Fourth Amendment.**

**47. Termination of Moving Traffic Jurisdiction**

Once Plaintiff exited his vehicle on private commercial property without having submitted to a prior lawful traffic stop, any subsequent summary detention required independent, specific, and articulable facts of criminal conduct. Because the individual defendants possessed zero statutory authority to enforce moving vehicle code infractions inside the commercial perimeter under CVC § 21107.8, and lacked independent reasonable suspicion to execute a pedestrian stop under *Hiibel v. Nevada*, the pavement intercept and physical arrest lacked all constitutional justification.

---

**No Independent Reasonable Suspicion or Probable Cause Supported Plaintiff's Detention or Arrest**

**48. The Absence of Fleeing Allegations and Administrative Omission**

Defendant Officer Stoeberl omitted any allegations of traffic non-compliance, flight, or evading arrest within the contemporaneous police logs, arrest records, and incident reports. Under California law, if a motorist intentionally fails to submit to an emergency vehicle signal, the operating officer is mandated to log an evasion infraction. The total absence of any "Failure to Yield," "Evading," or "Fleeing" entries within the official department records establishes that no objective roadway traffic stop command had been communicated to or ignored by Plaintiff while the vehicle was in motion.

**Plaintiff alleges that had Defendant Officer Stoeberl believed Plaintiff intentionally failed to submit to a lawful traffic stop, one would ordinarily expect the contemporaneous reports to reflect allegations of fleeing, failure to**

**yield, or evasion. Plaintiff alleges no such allegations appear anywhere in the official records.**

**49. Total Absence of Probable Cause for Custodial Arrest**

Defendants Officer Stoeberl and Sergeant Tol lacked independent probable cause or statutory justification to execute a custodial arrest of Plaintiff under California Penal Code § 148(a)(1). Factual analysis of the incident confirms Plaintiff engaged in zero objective conduct constituting physical resistance, hostility, obstruction, or flight *(See Exhibit A-5).* Plaintiff did not refuse to identify himself, but requested verbal clarification regarding the shifting vehicle equipment allegations. In the absence of safety concerns, weapon indications, or contraband, the defendants' unilateral escalation to a physical takedown and custodial arrest constitutes a retaliatory false arrest violating the Fourth Amendment.

**Reduced to its essentials, police cannot physically arrest someone unless they have a lawful reason to do so. Plaintiff alleges he did not flee, threaten anyone, resist officers, or refuse to identify himself, but instead sought verbal clarification regarding the basis for the detention. Plaintiff further alleges Defendants identified no independent safety threat, weapon, flight risk, or other objective facts establishing probable cause for a custodial arrest under Penal Code § 148(a)(1). Plaintiff therefore alleges the physical takedown and custodial arrest were unsupported by the independent constitutional justification required by the Fourth Amendment.**

**Section C: First Amendment — Retaliation, Radio Defamation, and Punishment for Protected Speech**

---

**Plaintiff Engaged in Constitutionally Protected Speech**

**50. Coerced Compliance versus Constitutional Consent**

Any physical compliance obtained from Plaintiff on scene was extracted under the immediate threat of physical violence, weapon deployment, and an unconstitutional show of authority. Compliance under duress does not constitute voluntary consent. Plaintiff's repeated, contemporaneous verbal notifications that he was acting under

duress preserve the non-consensual nature of the pedestrian detention under the First and Fourth Amendments. **Plaintiff's repeated, verbalized duress-compliance notifications captured on objective audio tracks permanently preserve the non-consensual and legally tainted nature of the pedestrian detention under the Fruit of the Poisonous Tree doctrine.**

**51. Radio Defamation, Retaliatory Misrepresentation, and Policy 420/428 Violations**

While Plaintiff explicitly communicated on camera his willingness to comply under duress and surrender his documents, Defendant Officer Stoeberl omitted these expressions of compliance from his radio transmissions. Instead, Stoeberl broadcast a false status update over the public dispatch channel, explicitly labeling Plaintiff as a "sovereign citizen refusing to identify." Under *Hartman v. Moore*, 547 U.S. 250, and *Franks v. Delaware*, 438 U.S. 154, law enforcement officers violate the Constitution when they disseminate material misrepresentations or false ideological labels to induce a supervisor to execute a physical intervention or arrest because a citizen disputed a mistake of law.

This retaliatory broadcast directly violated the mandatory prohibitions established under SVPD Policy Section 428.3 (General Considerations) on Page 387 of the master manual. Section 428.3 explicitly dictates that to safeguard First Amendment protected expressions, **"Officers should not: (b) Harass, confront or intimidate participants."** By weaponizing an unverified, highly prejudicial political classification over a public broadcast frequency to punish Plaintiff for requesting officer identification, Defendant Stoeberl executed an administrative harassment loop in flagrant disregard of Section 428.3(b). This misrepresentation bypassed mandatory de-escalation protocols and intentionally caused Defendant Sergeant Tol to arrive on scene with a hostile, non-de-escalated posture that directly resulted in an unconstitutional physical seizure.

**Reduced to its essentials, officers cannot justify a detention or arrest by leaving out important facts or replacing them with false or inflammatory labels. Plaintiff alleges Defendant Officer Stoeberl omitted Plaintiff's repeated statements that he was willing to comply under duress and instead broadcast over the public radio that Plaintiff was a "sovereign citizen refusing to identify." Plaintiff further alleges this materially false characterization violated**

**SVPD Policy 428.3's prohibition against derogatory radio communications and caused Defendant Sergeant Tol to arrive with a prejudged understanding of the encounter before independently evaluating the facts for himself. Plaintiff therefore alleges the continued seizure and subsequent arrest were influenced by materially misleading information rather than an objective assessment of Plaintiff's actual conduct, contrary to the constitutional principles recognized in *Franks*, *Galbraith*, and *Hartman*.**

**52. Unconstitutional Bias-Based Profiling and Policy 401 Violations**

The individual defendants' fabrication of a "sovereign citizen" profile over the public broadcast channel violates the mandatory anti-profiling constraints of SVPD Policy Manual Chapter 4, Section 401 (Bias-Based Policing). Section 401.3 explicitly dictates that **"Bias-based policing is strictly prohibited,"** while Section 401.1.1 defines improper profiling as ***"An inappropriate reliance on actual or perceived characteristics such as... age, cultural group... or affiliation with any non-criminal group (protected characteristic) as the basis for providing differing law enforcement service or enforcement."***

By deploying an unverified, ideological label against Plaintiff simply because he questioned a suspicionless private property intercept, Defendant Officer Stoeberl engaged in discriminatory profiling under Section 401.1.1. Rather than executing standard, neutral law enforcement procedures, the individual defendants weaponized this manufactured cultural group profile to provide a "differing law enforcement service"—specifically bypassing mandatory de-escalation protocols, ignoring administrative checkpoints, and executing a retaliatory, high-stress physical intervention against a peaceful pedestrian sidewalk occupant in flagrant violation of the First and Fourth Amendments.

**52.5 Non-Discretionary Stop Disclosure and State Reporting Mandate Violations**

The individual defendants' field conduct violated the non-discretionary operational commands established under SVPD Policy Manual Section 401.4.3 (Disclosure and Documentation of Traffic or Pedestrian Stop). Section 401.4.3 strips law enforcement personnel of field discretion, explicitly commanding that an officer conducting a pedestrian or traffic intercept ***"shall state the reason for the stop prior to questioning the individual related to a criminal***

***investigation or traffic violation."*** Objective video telemetry confirms that Defendant Sergeant Tol completely bypassed this mandatory checkpoint. Rather than stating a lawful, articulable reason for the detention prior to demanding identification, Sergeant Tol deployed immediate custodial jail ultinamutums to compel identification under threat of physical force.

Furthermore, this unlogged private property interception violated the strict data-collection rules established under Section 401.4.2 (Reporting of Stops), which mandates that personnel ***"shall collect the data elements required by Government Code § 12525.5... for every person stopped and prepare a stop data report."*** By running an unlogged surveillance loop, refusing to state the lawful grounds for the intercept prior to questioning, and failing to execute real-time tracking entries to evade state monitoring, the individual defendants acted completely outside their operational authority.

Supervisory Failure to Audit Profile Telemetry and Monell Custom Ratification

The City of Scotts Valley actively fostered a widespread municipal custom of deliberate indifference by failing to execute mandatory, policy-dictated audits of field asset media, establishing direct *Monell* custom liability. Pursuant to SVPD Policy Manual Chapter 4, Section 401.5 (Supervisor Responsibilities) on Page 289 of the master manual, department supervisors are under a non-discretionary operational mandate to monitor individuals under their command and ***"shall periodically review Mobile Audio/Video (MAV) recordings, body-worn camera (BWC) media, Mobile Data Terminal (MDC) data, and any other available resource... to ensure compliance with the policy."*** Section 401.5(b)(2) explicitly commands that any ***"[r]ecordings or data that capture a potential instance of bias-based policing should be appropriately retained for administrative investigation purposes."***

The individual defendants and supervisory personnel actively turned a blind eye to these structural requirements. Despite explicit notice that field officers deployed a fabricated ideological profile to justify an unauthorized private property interception and excessive physical force, supervisors executed zero compliance audits. Rather than retaining the raw, native .csv telemetry and unedited audio tracks as ordered by Section 401.5, the City instead produced altered, metadata-stripped derivative files that muted Plaintiff's active vocal compliance, directly ratifying the underlying constitutional injuries.

**Reduced to its essentials, Plaintiff alleges Defendant Officer Stoeberl substituted an unverified ideological label for**

**objective police work by broadcasting Plaintiff as a "sovereign citizen" rather than communicating Plaintiff's actual statements of compliance. Plaintiff further alleges Defendants then failed to provide the reason for the detention before demanding identification and issuing custodial ultimatums, contrary to department policy governing pedestrian stops. Rather than conducting a neutral, fact-based investigation, Plaintiff alleges Defendants relied upon an unsupported ideological characterization to justify escalating the encounter, resulting in disparate treatment, the abandonment of de-escalation, and an unlawful detention in violation of the First and Fourth Amendments.**

**53. First Amendment Retaliation and Shifting Pretext**

The individual defendants' written reports omit any allegations of failure to yield, evasion, or flight. Under the standards of *United States v. Williams*, law enforcement personnel are prohibited from weaponizing a citizen's peaceful insistence on constitutional boundaries to retroactively manufacture a profile of criminal obstruction. Forcing an identification disclosure under threat of custody from a non-motorist pedestrian violates *Brown v. Texas*, 443 U.S. 47, and California Vehicle Code § 12951(b). Stoeberl's retaliatory broadcast was utilized to punish Plaintiff for exercising his right to criticize police action and request officer identification, stripping the defendants of qualified immunity.

**54. Manufactured Non-Compliance Through Withheld Instructions, Communication Failures, and Unwarned Physical Seizure**

Plaintiff alleges that Defendants withheld the information and instructions necessary for compliance, then treated the resulting confusion as resistance. Plaintiff expressly stated on camera, **"I will comply under duress,"** demonstrating a willingness to cooperate despite obvious psychological distress. Defendant Stoeberl failed to communicate this material fact to the arriving officer, who had not witnessed the preceding events or understood the basis for the detention, and instead allowed Plaintiff to be confronted with escalating ultimatums before Plaintiff was permitted to explain.

Defendants then demanded Plaintiff's driver's license, registration, and other vehicle documents while Plaintiff stood

away from a locked vehicle, yet never instructed whether Plaintiff could return to retrieve them or explained how compliance was expected under detention. Plaintiff also peacefully requested Defendant Stoeberl's official identification—including his name and badge number—as permitted by SVPD Policy § 922.2.1(a). Rather than identify himself, clarify Plaintiff's obligations, or issue lawful directions, Defendants escalated the encounter.

Defendants then seized Plaintiff without warning, without stating he was under arrest, and without issuing a single clear instructional command. Despite Plaintiff asking, **"Why are you coming towards me?"**, Defendants immediately grabbed Plaintiff's wrists, bypassing the de-escalation principles embodied in SVPD Policy § 300.3.2. (Factors Used to Determine the Reasonableness of Force) on Page 47 of the master manual. Objective video telemetry establishes that the defendants' sudden deployment of force explicitly violated their non-discretionary evaluation metrics: there was zero baseline justification under factor (p) requiring "immediate control... or a prompt resolution," the officers' unlogged trailing sequence directly created the conflict under factor (d) tracking "the conduct of the involved officer leading up to the use of force," and the physical intervention was launched mid-sentence before an opportunity to comply could be realized under factor (g) governing "the individual's apparent ability to understand and comply with officer commands." Without informing Plaintiff that he was under arrest or providing clear instructional commands, the officers forcefully seized Plaintiff by both wrists and applied joint-dislocation mechanics. Under the objective standards of *Graham v. Connor*, 490 U.S. 386, the individual defendants cannot weaponize a self-created operational urgency to justify a sudden physical seizure and the subsequent application of excessive force.

Plaintiff alleges that Defendants cannot manufacture resistance by withholding the communication necessary for compliance, nor fault Plaintiff for failing to follow instructions that were never given. Had Defendant Stoeberl informed the arriving officer that Plaintiff had already stated, **"I will comply under duress,"** identified himself upon request, explained whether Plaintiff could retrieve the requested documents, or issued clear lawful commands before resorting to force, the encounter could have been peacefully resolved. Instead, Defendants replaced communication with confusion, then relied on that confusion to justify an unwarned physical seizure and the use of force in violation of the Fourth Amendment under *Graham v. Connor*.

**Plaintiff repeatedly tried to cooperate, explain, and ask questions. Defendants did the opposite. They never**

**explained how Plaintiff was expected to comply, never answered his requests for clarification, never identified themselves by name and badge number, never told the arriving officer that Plaintiff had already stated, "I will comply under duress," and never gave a clear warning before grabbing him. Instead of communicating, Defendants created confusion and then treated that confusion as resistance. An officer cannot withhold the communication necessary for compliance, create uncertainty, and then use the citizen's predictable reaction as justification for force.**

---

**The Supervisor's Arrival, Custom Ratification, and Mandatory Duty Defiance**

**55. Direct Violation of Stop Disclosure Mandates and Vehicle Code § 2806.5**

The individual defendants' field conduct violated the non-discretionary disclosure mandates established under California statutory law and department policy. Defendant Sergeant Tol arrived on scene in a backup capacity but failed to execute an independent investigation to verify the legal validity of the intercept. Sergeant Tol relied entirely on a standalone verbal affirmation from his subordinate without assessing the underlying facts. Under California Vehicle Code § 2806.5 and SVPD Policy Manual Chapter 4, Section 401.4.3, peace officers are under a non-discretionary operational command to explicitly state the grounds for a detention prior to questioning an individual or demanding compliance. Sergeant Tol bypassed these statutory and administrative checkpoints. Before establishing or stating a lawful reason for a pedestrian intercept on private property, Sergeant Tol deployed a custodial ultimatum to compel identification under threat of arrest, executing an arbitrary show of authority that strips the officers of qualified immunity.

**Reduced to its essentials, police cannot demand compliance before first telling someone why they are being detained. Plaintiff alleges Defendant Sergeant Tol arrived as a new decision-maker but never independently verified the basis for the detention or informed Plaintiff of the legal grounds for the pedestrian stop before demanding identification under threat of arrest. Plaintiff further alleges Defendant Tol relied solely upon Defendant Officer Stoeberl's account rather than conducting his own objective assessment, contrary to the**

**disclosure requirements recognized by California Vehicle Code § 2806.5 and SVPD policy. Plaintiff therefore alleges the show of authority and threatened arrest occurred before Defendants established or communicated the lawful basis for the detention, rendering the continued seizure constitutionally unreasonable under the Fourth Amendment.**

**56. Supervisory Custom Ratification and Mandatory Duty Defiance**

Sergeant Tol arrived on scene in response to Plaintiff's explicit request for a commanding officer. When Sergeant Tol asked Officer Stoeberl if a lawful reason to detain existed, Officer Stoeberl falsely replied in the affirmative. When Plaintiff attempted to apprise the arriving supervisor of the absolute lack of reasonable suspicion, Sergeant Tol cut off Plaintiff's speech, stating on camera that the underlying legal basis for the stop "**did not matter.**" This outright refusal to check the facts or evaluate the field timeline directly violates SVPD Policy Manual Chapter 4, Section 420.4.1(b), which grants field supervisors immediate administrative authority to investigate citizen complaints by directly reviewing portable recorder video data.

Furthermore, under SVPD Policy Section 308.7 (Supervisory Responsibilities), a field supervisor possesses a non-discretionary mandate to monitor the response, assert control, and terminate any response that is inappropriate due to the circumstances. Under the City's official **Police Sergeant Class Specification document at Page 5, Section IV.B ("Mediation")**, Sergeant Tol's contractually mandated duties required him to mediate disputes, diffuse potentially violent situations, and exercise interpersonal sensitivity. Sergeant Tol abandoned these administrative, contractual, and operational duties. Instead of intervening to halt his subordinate's unlawful conduct, Sergeant Tol ratified the violation, issued immediate jail ultimatums to a peaceful pedestrian, and personally initiated physical force under color of law, exceeding the legitimate scope of an investigative contact under *Florida v. Royer*, 460 U.S. 491 *(See Exhibits D-2, D-3, and D-4)*.

**57. Supervisor Duty Defiance and Command Structure Breaches**

*Plaintiff explicitly requested a commanding officer to resolve the unconstitutional pedestrian encounter on the pavement, using the precise, authoritative mandate: "I asked for a commander." Reflecting bad faith and a deliberate*

*intent to manipulate the administrative record, Defendant Officer Stoeberl actively diluted Plaintiff's explicit vocabulary on camera, falsely reporting to Defendant Sergeant Tol upon arrival that Plaintiff had merely requested a general 'supervisor.' Defendant Sergeant Tol then utilized this linguistic distortion to execute an intentional misrepresentation of his assigned rank, stating on camera: "I am... the highest you are going to get right now."*

**In a formal, written Supplemental CPRA Request and binding Brady demand served directly upon Custodian of Records Chloe Graham, Plaintiff explicitly demanded the production of records identifying the specific Watch Commander officially on duty at the time of the incident, alongside a strict demand to produce records confirming who authorized Defendant Sergeant Tol to serve in an Acting Watch Commander capacity under SVPD Policy Section 418.2.**

**In an intentional effort to evade records transparency and mask an operational command structural breach, the City repeatedly failed to produce an explicit, written corporate authorization or formal administrative assignment designating Sergeant Tol to that superior command tier. This systematic omission and failure to produce affirmative authorization proof establishes that Sergeant Tol's on-camera statement asserting he held the highest command authority on scene was a material administrative misrepresentation designed to isolate Plaintiff, block his access to the true chain of command under SVPD Policy Section 200.3.1, and shield a lawless field intercept from immediate administrative review.**

Official daily shift rosters obtained via the California Public Records Act confirm that Sergeant Tol was logged strictly as a line field supervisor ("Sergeant Day Shift")*(See Exhibit E-1)* and lacked the formal designation to assume the higher tier of Acting Watch Commander under SVPD Policy Section 418.2 *(See Exhibit E-2)*. The City produced only a duty roster and attempted to infer supervisory authority from Sergeant Tol's scheduled rank. Plaintiff subsequently sought clarification through CPRA, and the City confirmed it possessed no record designating a Watch Commander for the August 13, 2025 incident. Under SVPD Policy Section 200.3.1 (Succession of Command), the Watch Commander position is a distinct, superior tier within the executive hierarchy.

By falsely projecting that he held this superior command tier, Sergeant Tol violated the department's Unity of Command mandate (Policy Section 200.3.2), intentionally isolating Plaintiff and blocking access to the chain of command. Rather than executing his supervisor obligations under SVPD Policy Section 308.7 to independently verify

the field facts and terminate an inappropriate response, Sergeant Tol ratified the unconstitutional intercept, transformed protected speech into a pretext for retaliation, and initiated physical violence under color of law in violation of the First and Fourth Amendments.

**Reduced to its essentials, when a citizen asks to speak with someone higher in the chain of command to resolve a disputed detention, officers cannot misrepresent that request or block meaningful supervisory review. Plaintiff alleges he specifically requested a commanding officer, but Defendant Officer Stoeberl reduced that request to a generic request for a "supervisor," after which Defendant Sergeant Tol stated he was "the highest you are going to get right now." Plaintiff further alleges official records show Sergeant Tol was serving only as a line field supervisor, not the Acting Watch Commander. Rather than independently reviewing the detention, Plaintiff alleges Sergeant Tol ratified it and allowed the seizure to escalate, transforming the chain of command into a barrier instead of a constitutional safeguard.**

**58. Obstructed Body-Worn Camera Recording and Policy 420 Violations**

Defendant Officer Stoeberl failed to maintain his portable recording device in an unobstructed position in violation of SVPD Policy Manual Chapter 4, Section 420 (Portable Recorders) and Policy 434.3.2 (Body-Worn Cameras). Policy 420 and 434.3.2 mandates that officers position cameras to ensure an unobstructed field of view suitable for recording enforcement events. While Sergeant Tol's center-mounted device captured an unobstructed perspective, Officer Stoeberl's camera was repeatedly blocked by his own arm, hand *(See Exhibit C-1)*, and torso during contested portions of the incident, including the initial physical seizure. Officer Stoeberl intentionally placed his hand over the lens during the encounter, and subsequently mischaracterized an equipment detachment during the struggle as a physical assault by Plaintiff. These non-compliant obstructions materially compromised the integrity of the electronic evidence tracking timeline *(See Exhibit E-5)*.

**Reduced to its essentials, body-worn cameras exist so everyone can see what actually happened. SVPD policy requires officers to position their cameras as close to the center of the body as practicable and to ensure there are no obstructions so the recording remains suitable for documenting enforcement actions. Plaintiff alleges that, unlike Defendant Sergeant Tol's center-mounted camera, Defendant Officer Stoeberl's recording was repeatedly**

**obstructed by his own hand, arm, and torso during the encounter's most disputed moments, including the initial physical seizure. Plaintiff therefore alleges these repeated obstructions materially compromised the completeness, reliability, and evidentiary integrity of the recording documenting the encounter.**

**Section D: Fourth Amendment — Excessive Force**

---

**The Physical Escalation Was Objectively Unreasonable and Lacked All Tactical Necessity**

**59. Objectively Unreasonable Escalation of Force and Documented Bodily Injury**

Defendants Officer Stoeberl and Sergeant Tol executed an objectively unreasonable, disproportionate, and unconstitutional escalation of physical force in violation of the Fourth Amendment. Factual records establish that Plaintiff engaged in zero aggressive, threatening, or evasive behavior, and merely sought clarification regarding an arbitrary equipment allegation. Despite this absolute lack of resistance, the defendants rapidly transitioned to physical force, causing severe structural trauma to Plaintiff's right upper extremity. Crucially, Sergeant Tol's official Law Enforcement Supplemental Report explicitly documents a contemporaneous audio-physical anchor of this excessive force application, verifying that he personally heard a distinct "popping sound" emanating from Plaintiff's right arm during the seizure *(See Exhibit A-5)*. Because Plaintiff was entirely compliant, unarmed, and stationary on private property, the violent application of joint manipulation mechanics lacking all tactical necessity constitutes an unconstitutional deployment of excessive force under *Graham v. Connor*, 490 U.S. 386.

**59.5. Objective Medical Evidence of Orthopedic Trauma (Exhibit J-3)**

Plaintiff's allegations of severe physical force are conclusively corroborated by objective, post-incident radiological findings and treating medical provider records. Following the incident, Plaintiff underwent diagnostic imaging, culminating in a right elbow MRI without contrast performed on October 28, 2025. The objective MRI radiology report, electronically signed by Dr. Albert Lu, MD, confirmed acute physical trauma, including a *"subacute tear of*

*posterior lateral aspect of the annular ligament and posterior lateral aspect of lateral ulnar collateral ligament".*

On November 3, 2025, treating physician assistant Ace Alvarez reviewed the diagnostic imaging alongside an orthopedic surgeon, confirming the surgical consensus that Plaintiff suffered a partial ligament tear in his right elbow requiring extensive healing, physical therapy, and strict activity restrictions. These medical findings—demonstrating a severe structural ligament tear caused by a twisting force—directly substantiate Plaintiff's account of Sgt. Tol forcefully hyperextending his right arm, directly refute Defendants' false assertions in sworn Probable Cause Declarations that Plaintiff suffered "no injury," and establish the physical damages proximately caused by Defendants' unconstitutional use of excessive force.

**60. Impermissible Escalation of a Routine Regulatory Investigation**

Even if the individual defendants assert a residual regulatory right to approach Plaintiff on the pavement to investigate a minor vehicle equipment infraction, such an inquiry is strictly confined to a brief, low-stress administrative contact. By intentionally deactivating the patrol unit's overhead emergency lighting array at timestamp 15:41:05, Defendant Officer Stoeberl formally discontinued his emergency vehicle authority pursuant to SVPD Policy Sections 308.5 and 308.8. Consequently, the individual defendants possessed zero legal authority to execute tactical blocks or deploy immediate physical violence. Applying mechanical force, trapping an unarmed citizen against dense vegetation, and intentionally hyperextending Plaintiff's right arm joint to enforce an identification demand for an inactive equipment infraction constitutes an egregious, retaliatory escalation. The individual defendants cannot use a routine, minor equipment investigation as a pretext to bypass the Fourth Amendment and execute a violent custodial seizure against a peaceful pedestrian sidewalk occupant.

**Reduced to its essentials, even if officers may briefly investigate a minor vehicle equipment issue, they cannot transform a routine regulatory contact into a violent custodial seizure without an independent constitutional justification. Plaintiff alleges Defendant Officer Stoeberl had already deactivated his emergency lights, ending any emergency traffic-stop authority, yet Defendants immediately resorted to physical force against an unarmed, cooperative pedestrian over an inactive equipment investigation. Plaintiff therefore alleges Defendants used a**

**minor regulatory inquiry as a pretext to escalate the encounter into an unreasonable seizure prohibited by the Fourth Amendment.**

---

**The Defendants Knowingly Disregarded Non-Discretionary Training Metrics and Operational Policies**

**61. Willful Departure from Certified Supervisory, Communication, and De-Escalation Training**

Both individual defendants' rapid, un-warned escalation to physical joint-dislocation force represents a conscious departure from their explicit, state-certified training metrics. Official records from the California Commission on Peace Officer Standards and Training (POST) reveal extensive tactical literacy for both actors immediate to the incident date. Specifically, Defendant Officer Stoeberl completed an intensive certification course titled *PSP: Strategic Communications* on June 8, 2025 *(See Exhibit D-6)*. Crucially, Defendant Sergeant Tol completed an advanced supervisor course titled *Beyond Bias Supervisor Support* on April 4, 2025, followed by a specialized certification course explicitly titled *De-escalation: Enhancing Strategies for Everyday Encounters* on August 8, 2025—a mere five (5) days prior to this incident *(See Exhibit D-7)*.

These matching state records establish that both individual defendants possessed direct administrative and operational knowledge regarding their strict legal obligations to exhaust verbal communication frameworks, mediate interpersonal field disputes, and slow down field interactions before introducing physical trauma. The individual defendants' joint choice to completely override these mandatory instructions by launching a sudden physical assault against an unarmed, stationary pedestrian constitutes objective unreasonableness under *Graham v. Connor*, stripping both individual defendants of qualified immunity under 42 U.S.C. § 1983.

**62. Violation of Field Operational Constraints and Direct Policy 416.6 Breach**

The individual Defendants' rapid escalation to physical force violated both SVPD Policy § 416.6 and the Fourth Amendment. SVPD Policy § 416.6(a)(2) expressly provides that "**[a]ny potential witness who is unwilling or unable to**

**remain available for a formal interview should not be detained absent reasonable suspicion to detain or probable cause to arrest,"** and further instructs that **"[w]ithout detaining the individual for the sole purpose of identification, officers should attempt to identify the witness prior to his/her departure."** Plaintiff alleges Defendants disregarded these mandatory operational constraints by threatening arrest and immediately resorting to physical force during what Plaintiff alleges was, at most, a minor regulatory investigation.

Objective video telemetry records that Defendants completely abandoned these policy safeguards. While Plaintiff remained stationary, repeatedly sought clarification, and had already stated, **"I will comply under duress,"** Defendants failed to provide a single clear instructional command, tactical warning, or meaningful de-escalation effort before resorting to force. Instead, before their own ultimatum had expired, Defendants suddenly seized Plaintiff by both wrists and hyperextended Plaintiff's right arm beyond its natural anatomical range until a severe orthopedic joint pop occurred, conduct Plaintiff alleges violated the objective reasonableness standard of *Graham v. Connor*.

**Reduced to its essentials, SVPD Policy § 416.6 recognizes that officers may not detain an individual solely to determine his identity and instead should attempt identification without detention.** *A fortiori*, **Plaintiff alleges Defendants possessed even less authority to immediately threaten arrest, physically seize, and injure a stationary individual who had already expressed a willingness to comply by stating, "I will comply under duress." Plaintiff therefore alleges Defendants ignored both department policy and the Fourth Amendment by transforming what Plaintiff alleges was, at most, a voluntary identification inquiry into an immediate custodial seizure without the reasonable suspicion, probable cause, or objectively reasonable justification required by law.**

---

**The Execution of Non-Warned Physical Force and Severe Orthopedic Injury**

**63. Retaliatory Excessive Use of Force and Factual Fabrication**

Plaintiff repeatedly communicated that although he did not consent to the detention, he was willing to pursue administrative de-escalation, asking Defendant Sergeant Tol, **"What am I being detained for?"** Objective video

telemetry captures Defendant Tol pausing, appearing to lack an independent factual basis for the detention, and looking to Defendant Officer Stoeberl for an explanation. After Defendant Stoeberl stated only that a light bulb modification was out, Defendant Tol emphatically declared, **"No, you are being detained for a violation on the roadway."** Yet Defendant Tol's own official report states that when he first encountered Plaintiff, Plaintiff was already standing on the sidewalk, away from any vehicle. Defendant Tol never observed Plaintiff operating a vehicle, never verified which vehicle belonged to Plaintiff, and conducted no independent investigation to determine where the alleged equipment violation was first observed. Nevertheless, Defendant Tol conclusively characterized the detention as a roadway violation despite lacking any personally verified factual basis for that conclusion. Plaintiff alleges this unsupported assertion is particularly significant because, by the time Defendant Tol arrived, the allegedly defective bulb could have first been observed only after Plaintiff had entered private property, rather than while operating on a public roadway.

Plaintiff attempted to request a supervisor check of the probable cause void, but Defendant Tol cut off Plaintiff's speech, repeated a high-stress custodial ultimatum, and rapidly advanced into Plaintiff's personal proximity zone. Defying all POST mediation guidelines, use-of-force notification protocols, and the objective standards established in *Graham v. Connor*, 490 U.S. 386, the individual defendants failed to provide a single vocal warning, tactical notice, or clear command prior to introducing physical force. Before the timeline of their self-manufactured ultimatum had expired, and without Plaintiff ever verbally refusing to identify himself, both officers executed an un-warned physical seizure, forcefully grabbing Plaintiff by both wrists while he was mid-sentence. Defendant Sergeant Tol applied mechanical lever-force to Plaintiff's right arm, forcing the joint upward past its natural physiological range and directly causing immediate structural trauma and an audible pop sound. The deployment of sudden, non-warned mechanical force against a non-violent, stationary pedestrian occupant who had never refused compliance violates Plaintiff's right to be secure in his person under the Fourth Amendment *(See Exhibit D-4).*

**Reduced to its essentials, officers cannot respond to questions with force when they lack an independently verified lawful basis for an arrest or detention. Plaintiff alleges he repeatedly asked why he was being detained, never refused to comply, and remained stationary while seeking clarification. Plaintiff further alleges Defendant Sergeant Tol first encountered Plaintiff standing on the sidewalk, never observed Plaintiff operating a vehicle, never verified**

**which vehicle belonged to Plaintiff, yet nevertheless declared Plaintiff was being detained for "a violation on the roadway" before immediately escalating to threats and physical force without warning. Plaintiff therefore alleges Defendants substituted force for factual verification and lawful justification, resulting in an unreasonable seizure prohibited by the Fourth Amendment.**

**64. Summary Defiance of Constitutional use-of-Force Metrics**

Reduced to its essentials, the individual defendants replaced communication with physical force. At the exact second force was applied, Plaintiff was unarmed, stationary, compliant under duress, and posed no immediate safety threat. Standard California training metrics required communication, SVPD policy manual mandates required operational de-escalation, and *Graham v. Connor* required objective reasonableness. The individual defendants intentionally disregarded all three checkpoints, transforming a minor, private-property regulatory encounter into an unauthorized physical seizure.

**Section E: Fourth Amendment — Unreasonable Search of Vehicle and Private Containers**

**Unlawful Entry into Plaintiff's Vehicle and Search Beyond Any Lawful Exception**

**65. Warrantless Vehicle Intrusion and Unauthorized Expansion of Search Scope**

Defendant Officer Stoeberl executed an unauthorized, warrantless entry and search of Plaintiff's locked vehicle passenger cabin and private containers. Defying the strict search boundaries established under *Arizona v. Gant*, 556 U.S. 332, and *Rodriguez v. United States*, 575 U.S. 348, Defendant Stoeberl entered the interior of Plaintiff's secured vehicle without a warrant, probable cause, voluntary consent, or lawful inventory justification. Objective video telemetry from Axon Body 3 Camera X60AE054J at timestamp 15:58:00 captures Defendant Stoeberl executing exploratory movements inside the cabin, after he had already successfully extracted the passenger's requested cell phone and backpack.

The body-worn camera footage confirms that after retrieving these specified items, Defendant Stoeberl continued searching the interior and physically lifted a jacket on the backseat to inspect the hidden space beneath it. This

unauthorized manipulation of personal effects constitutes a distinct, independent warrantless search under the Fourth Amendment. Because this exploratory search occurred after the requested property was removed—and while Plaintiff was secured in handcuffs—it completely exceeded the scope of any lawful consent, inventory protocol, or incident-to-arrest exception, directly violating **SVPD Policy Manual Section 310 (Search and Seizure Protocols)** ***"Officers must strictly confine warrantless field searches to the precise lawful parameters of consent, inventory, or incident to arrest".***

**66. Invalidity of Automotive and Consent Exceptions**

Because the vehicle was legally parked, locked, and the sole occupant was already handcuffed and secured inside the rear of a patrol unit on an equipment citation pretext, the exploratory search beneath clothing on the backseat fails the requirements of the automobile exception. Under the Fourth Amendment, a motorist's narrow consent to retrieve a specific item or container does not grant an open-ended license to execute a sweeping, exploratory search of an automotive cabin. Defendant Stoeberl exceeded the scope of any document retrieval request the moment he expanded his physical search to hidden areas of the vehicle.

**67. Coerced Retrieval, Pretextual Search of a Closed Container, and Incomplete Body-Worn Camera Documentation**

Defendant Officer Stoeberl utilized administrative coercion under field duress to execute a warrantless search of Plaintiff's closed backpack. Plaintiff did not provide general consent to search his property, but merely requested that Defendant retrieve legal papers contained inside the backpack. After removing the backpack from the vehicle, Defendant refused to provide the requested documents and instead issued an administrative ultimatum that if Plaintiff wanted the paperwork, the backpack would accompany him to the jail facility.

Defendant Stoeberl never disclosed that transporting the backpack would result in an immediate field search, never explained the legal authority for the search, and never informed Plaintiff how the search would be conducted, contrary to the communication requirements reflected in **SVPD Policy § 310.4(b)**, which instructs officers to explain both the reason for the search and how the search will be conducted. Instead, while Plaintiff remained handcuffed and under custodial duress, Defendant unzipped Plaintiff's closed backpack and emptied its contents onto the public

pavement without prior notice or explanation.

**SVPD Policy § 420.4** further requires officers to position their body-worn cameras to facilitate an optimum recording field of view. Plaintiff alleges the body-worn camera failed to capture critical portions of Defendant Stoeberl's vehicle search because Defendant's hands and the searched areas repeatedly fell outside the camera's field of view. Consequently, the recording does not provide a complete visual account of the vehicle search despite department policy requiring an optimum recording perspective.

Plaintiff alleges that submission to deceptive or coercive authority while handcuffed does not constitute voluntary consent under the Fourth Amendment. Because the search was conducted without voluntary consent, without prior explanation, without complete visual documentation, and without an independent constitutional exception to the warrant requirement, Plaintiff alleges the warrantless search violated the Fourth Amendment.

**Reduced to its essentials, Plaintiff requested only his legal papers—not permission to search his property. Defendant never explained that retrieving the backpack would result in a warrantless search, never explained the legal authority for the search, and never explained how the search would be conducted before emptying Plaintiff's belongings onto the pavement. At the same time, critical portions of Defendant's vehicle search occurred outside the body-worn camera's field of view, despite department policy requiring an optimum recording perspective. Plaintiff therefore alleges Defendants obtained compliance through custodial coercion rather than voluntary consent while failing to create a complete visual record of the search, rendering the warrantless search unreasonable under the Fourth Amendment.**

**68. Summary Defiance of the Warrant Requirement**

**Reduced to its essentials, asking an officer to retrieve specific papers is not the same as giving permission to search an entire backpack. Plaintiff alleges he requested only that Defendant Officer Stoeberl retrieve legal papers from his closed backpack. Instead, Defendant Stoeberl retained the backpack, informed Plaintiff it had to accompany him to jail if he wanted the papers, but never disclosed that agreeing to transport the backpack would result in it being opened and searched. Plaintiff alleges that, while handcuffed and under duress, Defendant Stoeberl**

**unzipped the closed backpack and emptied its contents onto the pavement without requesting consent or explaining any lawful authority for the search. Plaintiff therefore alleges the search was based on coercive authority rather than voluntary consent and constituted an unreasonable warrantless search under the Fourth Amendment.**

**F. Title II ADA — Failure to Accommodate Known Disability**

**69. Failure to Accommodate Known Disability under Title II of the ADA:**

Plaintiff is a qualified individual with a disability possessing a clinical diagnosis of Post-Traumatic Stress Disorder (PTSD) since November 2022 *(attached hereto as Exhibit B-1)*. As formalized in an expert medical assessment by Therapist Natalie Suric, Plaintiff's condition triggers involuntary physiological "freeze" and "shutdown" responses during sudden authority confrontations, resulting in delayed verbal responses and compromised auditory processing that constitute involuntary medical trauma responses rather than acts of willful defiance. Plaintiff gave contemporaneous notice of acute duress, panic, and compliance constraints by explicitly stating on camera, "I will comply under duress."

Pursuant to the absolute binding mandate established by the Ninth Circuit in *Sheehan v. City and County of San Francisco*, 743 F.3d 1211, the individual and municipal defendants possessed a non-discretionary operational duty under Title II of the Americans with Disabilities Act (42 U.S.C. § 12132) to accommodate Plaintiff's clinical vulnerability by adjusting their enforcement tactics, utilizing clear, calm communication, and avoiding sudden, unaligned proximity escalations. Instead, the defendants acted with deliberate indifference, treating a documented medical trauma symptom as active criminal resistance and weaponizing immediate, un-warned physical violence against a stationary pedestrian sidewalk occupant, directly expanding municipal and individual liability under the ADA.

**Reduced to its essentials, Plaintiff alleges Defendants were placed on contemporaneous notice that Plaintiff was experiencing acute psychological distress when Plaintiff stated, "I will comply under duress." Rather than slowing the encounter, communicating clearly, or adjusting their tactics to account for Plaintiff's known disability,**

**Defendants immediately escalated to unwarned physical force and interpreted Plaintiff's trauma-related responses as resistance. Plaintiff therefore alleges Defendants failed to reasonably accommodate a known disability during a law enforcement encounter, in violation of Title II of the Americans with Disabilities Act and the Fourteenth Amendment.**

**69.5 Unbroken Verbal Expressions of Duress During Custodial Confrontation:** Plaintiff alleges the contemporaneous audio-visual evidence contradicts any claim that he failed to express duress or a willingness to comply. Although Plaintiff alleges portions of the recordings were later muted or omitted from produced discovery, the remaining recordings capture Plaintiff repeatedly telling Defendant Sergeant Tol that he was "threatening" him during the face-to-face encounter. These contemporaneous statements placed Defendants on direct notice that Plaintiff perceived the officers' actions as coercive and intimidating. Despite those repeated warnings, Defendants issued no de-escalation commands and instead immediately escalated to physical force by applying a joint-manipulation restraint while Plaintiff was still speaking. Under *Graham v. Connor*, Plaintiff alleges these circumstances undermine any claim that officers reasonably mistook his stationary verbal expressions for physical resistance or active noncompliance.

**Section G: Fourteenth Amendment — Deliberate Indifference to Serious Medical Needs**

---

**The Denial and Delay of Emergency Medical Attention Following Severe Trauma**

**70. Deliberate Indifference to Serious Medical Needs and Delayed Medical Care**

Immediately following the physical takedown and the audible popping of his right arm joint, Plaintiff repeatedly vocalized severe orthopedic pain and requested emergency medical attention. Despite these explicit requests, the individual defendants acted with deliberate indifference to a serious medical need under the Fourteenth

Amendment. Defendants failed to summon immediate emergency medical services, choosing instead to prioritize administrative detention and transportation protocols while Plaintiff remained in acute physical trauma.

Plaintiff was eventually transported to Dominican Hospital, where diagnostic imaging confirmed a severe orthopedic injury requiring a medical sling and causing immediate, extensive swelling. Following hospital discharge, Plaintiff was booked into the county jail facility and detained for seven hours, during which he was systematically denied necessary follow-up medical care and pain management despite multiple explicit requests to jail staff, directly expanding his physical injuries and emotional damages.

**71. Summary Defiance of Fourteenth Amendment Safety Mandates**

**Reduced to its essentials, public authority carries strict public accountability. The individual defendants applied physical joint force, witnessed the resulting severe orthopedic injury, heard repeated verbal requests for emergency medical assistance, and intentionally delayed or denied necessary care. The Fourteenth Amendment absolutely prohibits deliberate indifference to a known, serious medical need, stripping the individual defendants of qualified immunity under 42 U.S.C. § 1983.**

**Section H: Fourteenth Amendment — Judicial Deception, Deliberate Fabrication, and Suppression of Material Exculpatory Evidence**

---

**Fabrication of Sworn Reports and Database Overrides**

**72. The Technical Signaling Defect and Sworn Report Deception**

Defendant Officer Stoeberl failed to deploy a forward-facing, steady-burning red warning lamp, violating California Vehicle Code § 25252. Axon Body 3 video telemetry at timestamp 15:48:19 *(See Exhibit C-2)* confirms the patrol vehicle's primary overhead emergency light bar remained completely deactivated throughout the encounter. Defendants' reliance on an intermittent, low-mounted flashing bumper aperture light fails to satisfy the explicit

front-facing steady-burning red lamp mandate of CVC § 25252.

Because this non-statutory light was positioned below the vehicle sightline and physically masked by automotive structures, it carried no legal authority to command a vehicle yield. Officer Stoeberl swore under penalty of perjury in formal police reports and probable cause declarations that he executed a lawful vehicle stop using his overhead emergency red lights. The objective video telemetry directly refutes this claim, establishing a material, bad-faith misrepresentation under *Franks v. Delaware*, 438 U.S. 154.

**73. Database Disproof of Continuous Roadway Narrative**

Contemporaneous CAD Incident Report No. 2508130050 establishes that a continuous public roadway traffic stop never occurred. The City's official records document that the incident's creation, dispatch, and on-scene arrival occurred concurrently at the identical second of 15:40:46 *(See Exhibit H-4)*, anchored well within the private property. The complete absence of any preceding roadway dispatch log or tracking telemetry confirms that Defendant Officer Stoeberl initialized enforcement actions only after Plaintiff had navigated the lot, parked, and exited the vehicle. This private property deployment is conclusively verified by Defendant Stoeberl's own first spoken words captured on body-worn audio telemetry, explicitly announcing to dispatch: **"Traffic stop at Target."** This synchronous verbal admission disproves any continuous public tracking origin on Mt. Hermon Road, exposing the subsequent "Incident Comments" text claiming a prior roadway stop as a post-facto narrative fabrication refuted by both system metadata and the officer's own on-scene statements.

**Plaintiff alleges the subsequent 'Incident Comments' narrative is materially inconsistent with the contemporaneous CAD metadata and Defendant Officer Stoeberl's own recorded radio transmission—"Traffic stop at Target"—which corroborates that the enforcement action began on private property, not on Mt. Hermon Road.**

**74. Material Sworn Judicial Deception and Witness Fraud**

Following transport to Dominican Hospital, medical staff treated Plaintiff for acute joint trauma and issued an orthopedic arm sling. Pursuant to *Franks v. Delaware*, 438 U.S. 154, the individual defendants subsequently committed material judicial deception by swearing under penalty of perjury on the court's Probable Cause

Declaration that Plaintiff suffered "no such injury."

Defendants further falsified the judicial application by swearing under oath that "no independent scene witnesses or bystanders could be located." This claim is directly refuted by Defendants' own body-worn camera metadata capturing an adjacent vehicle passenger who, only after Plaintiff had been handcuffed, searched, placed in the rear of a patrol vehicle, and while Defendants were wrapping up the scene, stepped out of her vehicle on camera to request that officers unblock her car, establishing the presence of an available eyewitness and supporting Plaintiff's allegation that Defendants misled the magistrate by omitting readily available exculpatory witness information.

**Reduced to its essentials, judges can only make fair decisions when officers present complete and truthful information. Plaintiff alleges Defendants swore under penalty of perjury that Plaintiff suffered no injury despite Plaintiff receiving medical treatment at Dominican Hospital and being issued an orthopedic arm sling. Plaintiff further alleges Defendants represented that no independent witnesses could be located even though their own body-worn cameras recorded three nearby motorists, two of whom directly interacted with officers at the scene. One of those motorists engaged Defendant Sergeant Tol in an extended conversation concerning an American flag while Plaintiff remained handcuffed in the patrol vehicle, suffering acute orthopedic pain without medical evaluation or treatment. Plaintiff therefore alleges the judicial probable cause determination was influenced by materially false statements and omissions rather than a complete and accurate presentation of the facts.**

---

**Coordinated Digital Spoliation and Evidence Manipulation**

**75. Coordinated Audio Manipulation, Defective Discovery Production, and Camera Obstruction:** Plaintiff explicitly alleges that the unlawful field actions, subsequent electronic evidence manipulation, and narrative management executed by Defendants were conducted in flagrant disregard of the mandatory protocols established in the Scotts Valley Police Department Policy Manual (See Exhibit D-4). Specifically, while Defendant Officer Stoeberl claimed in supplemental reports that his body-worn camera fell to explain missing audio sequences, Defendant Sergeant Tol's camera remained securely mounted to his chest throughout the encounter. Despite separate recording units,

Plaintiff's explicit duress-compliance notifications, his explicit question (*"Why are you coming towards me?"*), and the accompanying pre-assault dialogue were identically absent from both produced discovery tracks.

Under **SVPD Policy Section 434.1.1 (Definitions - Deactivate)**, the manual explicitly dictates that when a BWC is activated, *"the interval recorded immediately prior to activation is then stored as part of the BWC media."* Because the automatic rolling buffer is systematically designed to capture preceding audio and video telemetry, this identical audio omission across separate, independent portable recording systems documents a manual, administrative format modification inside the secure evidence library to conceal the unlawful application of physical force. Furthermore, this systematic obstruction of objective telemetry is verified by the non-compliant physical handling of the hardware. In direct violation of **SVPD Policy Section 434.2**, which commands that BWC media must be preserved to ensure **"agency accountability and integrity,"** Officer Stoeberl operated with an off-center placement and utilized his hand to block and cover the camera lens during contested portions of the field interaction *(See Exhibit C-1)*. These physical manipulations, coupled with identical audio tracking deletions, materially compromised the integrity of the electronic evidence tracking timeline. **Simply put, you cannot use your hands to blind a camera lens or chop up an electronic audio file, and then tell a jury you are using the equipment to uphold agency integrity.**

**Reduced to its essentials, Plaintiff alleges the body-worn camera recordings produced in discovery do not accurately preserve the encounter. Although Defendants used separate recording devices, Plaintiff alleges both recordings omit the same material pre-force dialogue, including Plaintiff's statements of compliance under duress and his question immediately before force was used. Plaintiff further alleges Defendant Officer Stoeberl obstructed portions of the camera's view despite department policy requiring body-worn cameras to promote accountability and integrity. Taken together, Plaintiff alleges the missing audio, obstructed video, and incomplete discovery production support a reasonable inference that materially relevant electronic evidence was compromised or withheld, preventing the recordings from accurately depicting the encounter.**

**76. Suppression of System Metadata, Digital Spoliation, and Monell Liability**

The Defendant City of Scotts Valley, through Services Supervisor Chloe Graham, engaged in a bad-faith practice of electronic evidence spoliation and fraudulent concealment to shield its field personnel from civil liability under

Federal Rules of Civil Procedure Rule 37(e). Between August 20, 2025 and September 17, 20025, Plaintiff served the City with a formal discovery demand and spoliation warning under *California v. Trombetta*, 467 U.S. 479, putting the municipality on immediate legal notice to preserve and produce all raw, native electronic data, including .csv audit logs and metadata tracks *(See Exhibits G, G-1, and G-5)* Defying this preservation mandate, the City instead produced compressed, altered derivative files on September 12, 2025 to the District Attorney.

Technical review of these derivative files reveals that the audio track was identically muted across separate, independent BWC units during the physical force escalation window. The City's video package retains the individual defendants' commands ("Stop resisting") but mutes Plaintiff's active vocal compliance on camera when he stated, **"I am not resisting," "I will comply under duress," and "Why are you coming towards me?"** Services Supervisor Chloe Graham repeatedly declined to produce the raw, native certified files despite subsequent statutory requests, admitting on the record that the native Axon ecosystem tracks the definitive light-switch activation logs but refusing to release them. Plaintiff alleges this repeated withholding of requested native electronic evidence, despite preservation demands and repeated requests, is consistent with a municipal practice or custom of failing to preserve or disclose objective digital evidence relevant to officer conduct.

**Reduced to its essentials, courts can only determine what happened if the original electronic evidence is preserved and produced. Plaintiff alleges the City withheld native body-worn camera files, metadata, and audit logs after receiving a preservation demand, producing only derivative recordings that omit Plaintiff's statements of compliance during the critical use-of-force period. Plaintiff therefore alleges the City's handling of the electronic evidence impaired Plaintiff's ability to prove what occurred and reflects a municipal practice of withholding objective digital evidence.**

**77. Coordinated Suppression of System Metadata and CAD Back-Editing**

The Defendant City of Scotts Valley, through Services Supervisor Chloe Graham, engaged in electronic evidence spoliation, data manipulation, and fraudulent concealment under Federal Rules of Civil Procedure Rule 37(e). On September 17, 2025, Plaintiff transmitted a joint communication to both the City and the District Attorney expressly requesting preservation and production of all raw, native electronic evidence, including metadata and audit

information, with an explicit discovery demand and formal *California v. Trombetta*, 467 U.S. 479, spoliation warning, putting the municipality on immediate legal notice to preserve and produce all raw, native electronic data, including .csv audit logs and metadata tracks *(See Exhibit G-A)*. Furthermore, on August 25, 2025, Plaintiff served the Santa Cruz County District Attorney's Office with a formal Discovery Preservation Request and a binding demand under *Brady v. Maryland*, 373 U.S. 83 *(See Exhibit G)*.

Defying these simultaneous municipal and state-level preservation mandates, the City initially provided a fraudulent CAD log number (#2508130049) to mask the actual arrest file (#2508130050). Exactly twenty-four (24) hours prior to Plaintiff's long-scheduled criminal arraignment on September 11, 2025, the department executed a back-office database manipulation to sanitize the judicial record. Technical analysis reveals that the masked CAD log contains an explicit post-incident modification executed at midnight on September 10, 2025, wherein an SVPD administrator manually back-edited and reclassified the event type from an active arrest check ("ARSCK") to a generic area check ("AREACK") to alter the digital audit footprint on the eve of Plaintiff's first appearance before a magistrate *(See Exhibit H-4 and H-5)*.

**Reduced to its essentials, courts depend on official records remaining accurate and unchanged after the government is instructed to preserve evidence. Plaintiff alleges the City received formal preservation demands but later altered its CAD records by replacing the original arrest-related event classification with a different event type on the eve of Plaintiff's arraignment. Plaintiff therefore alleges the City's post-incident modification of official electronic records undermined the integrity of the evidence and the judicial process.**

**78. Falsification of Hardware Capabilities and Device Telemetry Proof**

The City's administrative defense—wherein Services Supervisor Chloe Graham asserted that the department's internal computer networks completely lack the mechanical capability to track or generate terminal histories, device telemetry, or emergency light activation logs—is flatly disproved by the department's own database systems and hardware specifications. As documented by the City's centralized internal RIMS fleet management ledger for Vehicle ID 87 *(attached hereto as Exhibit I-4)*, the municipality actively monitors, logs, and captures precise operational tracking data. This includes tracking individual officer badge codes (including Code 5600 for Officer Aaron Roberts and

Code 1040 for Officer Fred Yoon) down to the exact second, alongside mapping the specific software version (Version 19.42.4) and mileage inputs.

Furthermore, this active tracking architecture is reinforced by the official Axon Fleet 3 Hub Configuration Interface Blueprint for Vehicle #88, which verifies that the system is wired under Input #12 [Light Bar (Code 2 & 3)] and Input #13 [Siren (3)] to generate an automatic digital log entry the exact millisecond an input is initialized by field personnel *(See Exhibit H-6)*. This structural capability is mandated under SVPD Policy Section 703.3.6 (Vehicle Location System), which strictly commands that all device data telemetry captured by automated vehicle systems shall be retained in accordance with records schedules and remain accessible to supervisors at any time. The City's outright refusal to disclose these responsive logs—while utilizing electronic database platforms that actively record precise officer interactions down to the second—exposes a deliberate practice of concealing exculpatory *Brady* data to shield an unauthorized private property seizure from federal review. The City admits that responsive electronic event histories exist but refuses to produce these materials, citing meritless investigatory exemptions to suppress these exculpatory light-switch activation logs and audio tracks (*See Exhibit H-8*).

**78.5. Documented Technical Misrepresentations Confirming Failure of Data Production:** Plaintiff explicitly alleges that the systematic non-production of native system telemetry, background audit tracks, and electronic metadata establishes a *Monell*-level custom of intentional data concealment. Specifically, on December 30, 2025, SVPD Services Supervisor Chloe Graham explicitly asserted in writing that the department's Sun Ridge Systems (RIMS) platform and vehicle Panasonic Toughbook Mobile Data Terminals (MDTs) possessed zero technical capability to track emergency light or siren status, stating: *"It does not track any of the features you are seeking... we do not track anything with the lights or sirens."* However, official documentation—which was paradoxically produced and mailed physically to Plaintiff by Chloe Graham herself pursuant to a California Public Records Act (CPRA) request—directly refutes her written denial. The produced records confirm that vehicle telemetry and activation data are simultaneously captured across two independent, co-existing platforms:

1. **Platform A: Sun Ridge Systems RIMS Software Platform (Software Data):** Page 26 of the binding software contract establishes that the City of Scotts Valley purchased, operates, and controls the Sun Ridge RIMS

database environment hosted on central CAD servers. Updates to Mobile Computer Controller (MCC Version 19.21.1) and Mobile Client (MC Version 19.21.2) demonstrate that RIMS is natively programmed with audit tracks and "Code 3 Status" button configuration parameters designed to process, log, and display emergency vehicle light and siren status on incident screens.

2. **Platform B: Axon Fleet 3 Hardware System (Hardware Data):** The Axon technical specifications confirm that physical 12V electrical triggers (including Input 12 dedicated to Light Bar Code 2) record hardwired vehicle inputs in real time directly to the Axon Hub and Axon Evidence audit trails.

When emergency switches are engaged, tracking logs are generated simultaneously across both systems—capturing physical wire activations in Axon alongside software telemetry and CAD audit trails in RIMS. The CPRA records provided by Ms. Graham establish that SVPD maintains full operational control over both evidentiary buckets, exposing her written claims of technical impossibility as deliberate misrepresentations designed to justify the concealment of discoverable system telemetry.

**79. Inter-Agency Data Laundering and Audit Trail Disproof**

Following the formal filing of criminal charges, the City and the prosecution engaged in a data-laundering scheme to alter the digital footprint. On September 17, 2025, Plaintiff served a formal *Trombetta* Native Evidence Preservation Demand directly onto the District Attorney's Office. Defying this clear legal mandate, the District Attorney asserted to Plaintiff on that exact day that the prosecution lacked physical possession of the video files and was actively awaiting their production from the Scotts Valley Police Department.

However, the Santa Cruz County District Attorney's own official Axon Case Audit Trail disproves this narrative. The automated system logs reveal that a complete case copy was generated and the primary field media—including Axon Body 3 Video X60A6054J—had already been successfully transferred via Partner Share into the prosecution's database five days prior, on September 12, 2025 (*See Exhibit G-1 and I-5*). This manufactured delay was utilized to deliver compressed, altered derivative files that completely scrubbed all native metadata and identically muted separate BWC audio tracks during the physical force escalation window, erasing Plaintiff's explicit statements on

camera. This systematic withholding, manual manipulation, and muting of Plaintiff's vocal compliance establishes a direct municipal *Monell* custom of judicial deception and a systemic Fourteenth Amendment *Brady* violation.

**Evidentiary Proof of Prosecutorial Suppression and Defense Prejudice**

The baseline timeline of inter-agency data suppression is conclusively established by email discovery logs originating directly from Santa Cruz County Deputy District Attorney Peter Esho *(attached hereto as Exhibit G-4).* In a written disclosure dated September 25, 2025, the prosecution formalized its production of the body-worn camera media and CAD records, confirming a thirteen (13) day delay from the date the automated case transfer was finalized on September 12, 2025.

Furthermore, the text documents that the prosecution acknowledged the exceptional nature of Plaintiff's demands, confirming that the requested native metadata, .csv audit logs, and electronic tracking tracks are *"not something that they have ever been sent to us for any case as far as we know."* **Plaintiff repeatedly served written warnings to the prosecution immediately prior to production, explicitly notifying the state that the systematic withholding of native event timelines and metadata tracks was actively jeopardizing his defense preparation and compromising his ability to contest a lawless private property intercept.** This documentary proof establishes that the municipal and state actors coordinated an artificial delay to substitute metadata-stripped derivative files for raw evidence, directly violating the absolute disclosure mandates of *Brady v. Maryland*, 373 U.S. 83.

**Reduced to its essentials, a criminal defendant cannot fairly prepare a defense if government agencies provide conflicting information about evidence they already possess. Plaintiff alleges the District Attorney stated it was still waiting for the body-worn camera evidence from the Scotts Valley Police Department, while the prosecution's own Axon audit trail showed the complete case media had already been transferred thirteen days earlier. Plaintiff further alleges that, despite repeated preservation demands, only derivative recordings lacking native metadata were ultimately produced. Plaintiff therefore alleges the conflicting records and delayed production impaired Plaintiff's ability to obtain and use the original electronic evidence needed to challenge the constitutionality of the seizure.**

**79.5. Institutional "Catch-22" Discovery Blockade and Spoliation Confirmation: Plaintiff explicitly alleges that the systematic suppression of native electronic tracking logs and use-of-force records was executed through a coordinated administrative shell game engineered to evade constitutional oversight. This blockade is mathematically proven by the written, chronological admissions of the municipal back office and the state prosecution (See Exhibit J-2). Specifically, on September 12, 2025, Deputy District Attorney Peter Esho documented that his office possessed zero custody or control over the Scotts Valley Police Department's internal reports, instructing Plaintiff to demand them directly from the SVPD. Conversely, on September 16, 2025, SVPD Services Supervisor Chloe Graham explicitly refused compliance, ordering Plaintiff back to the District Attorney's office to obtain the withheld assets.**

Plaintiff immediately choked off this bureaucratic loop in writing on September 16, 2025, demanding specific metadata tracks under Policy 420. On September 25, 2025, DDA Esho confirmed receipt of the files from the SVPD, explicitly admitting: *"I am unfamiliar with what metadata is produced alongside the video footage, but I have never received from any agency, including SVPD, video footage that I believed to be altered or edited..."* (See Exhibit G-4). This confirms the District Attorney acted as a blind conduit, forwarding data exactly as the police configured it. Because **SVPD Policy Section 420.8** mandates that the Watch Guard evidence library is a secure, restricted database tracking all user footprints, the removal of native .csv system logs tracking physical light switches required a deliberate, human administrative formatting choice before prosecution delivery. Concealing these primary exculpatory data streams under the cover of a bureaucratic runaround after a formal preservation warning constitutes willful, bad-faith spoliation under **FRCP Rule 37(e). Simply put, you cannot engage in a documented game of hide-and-seek where the police blame the prosecutor and the prosecutor blames the police, exploit the DA's technical unfamiliarity to pass off metadata-stripped files, and then tell a federal judge the missing evidence was an accident.**

**80. Intentional Operational Deviations and Suppression of Exculpatory Evidence**

The unlawful field actions, subsequent electronic evidence manipulation, and narrative management executed by Defendants were conducted in flagrant disregard of the mandatory protocols established in the Scotts Valley Police

Department Policy Manual *(See Exhibit D-4)*. SVPD Policy Section 419.6 (Documentation of Activity) and 419.6.1 *(All changes in status (e.g., arrival at scene, meal periods, in service) will be transmitted over the police radio or through the MDC system)* explicitly dictates that an officer "**shall** document" self-initiated field activity via the Mobile Data Terminal (MDC) and mandates under subsection (a) that *"All contacts or activity shall be documented at the time of the contact."* Defendant Officer Stoeberl's affirmative admission in his own incident report that his targeted pursuit began five intersections prior to physical contact establishes an intentional operational deviation by failing to log the activity at its inception (MDC monitor remained blank throughout the activity).

Furthermore, the department's back-office deployment of compressed, metadata-stripped derivative files—which actively concealed the native .csv system logs tracking physical switch interactions—constitutes an explicit violation of SVPD Policy Section 420.6 (mandating data retention) and Section 420.7(a), which commands the strict preservation of all digital recordings relevant to potential civil and administrative matters. SVPD Policy Section 420.8 explicitly mandates that the secure Watch Guard evidence library shall only be accessed from Department authorized computers for official use.

Because this restricted system logs all administrative interactions, the deliberate stripping of metadata represents an authorized, non-accidental administrative formatting choice designed to alter the complete baseline record. These electronic records and their transmission are further governed by SVPD Policy Section 204.2, which dictates that all electronic files "are considered department records," and Section 204.4, which commands that these assets must be managed in accordance with the established records retention schedule.

Because SVPD Policy Sections 205.2 and 205.3 mandate that all such documentation represent official business requiring corporate authorization under the authority of the Chief of Police, this systematic data stripping carries direct municipal liability. By delivering altered derivative files that stripped this data away after a formal preservation warning, the department directly suppressed vital exculpatory evidence in flagrant violation of SVPD Policy Section 321.1.1, which explicitly commands that employees ***"shall not suppress, conceal or distort the facts of any reported incident."***

**Reduced to its essentials, Plaintiff alleges Defendants departed from mandatory documentation, preservation, and records-management policies at every critical stage of the encounter. Defendant Stoeberl failed to**

**contemporaneously document the self-initiated detention despite acknowledging that the encounter began several intersections before physical contact. Plaintiff further alleges the Department later produced derivative recordings stripped of native metadata and audit information despite policies requiring preservation of official electronic records relevant to criminal, civil, and administrative proceedings. Because department policy prohibits employees from suppressing, concealing, or distorting the facts of any reported incident, Plaintiff alleges these operational deviations and omissions resulted in the suppression of materially exculpatory electronic evidence and support municipal liability.**

---

**Fraudulent Concealment of Fleet Data and Defiance of Lawful Record Retentions**

**81. Evidentiary Proof of Fleet Management Tracking Logs**

The City's intentional withholding of native system logs constitutes willful concealment, as the City maintains a centralized internal fleet audit database. As documented in the City's internal Vehicle Maintenance and system login ledger for Vehicle ID 87 (a 2021 Ford Explorer), the City actively monitors, logs, and tracks individual officer badge codes (including Code 5600 for Officer Aaron Roberts and Code 1040 for Officer Fred Yoon) down to the precise second, alongside tracking the exact operational software version (Version 19.42.4) *(See Exhibit I-4).*

The City's previous assertions that raw, unedited system metadata cannot be produced for independent review are flatly refuted by the existence of these internal fleet tracking logs. This confirms a structural municipal custom of intentionally suppressing baseline tracking data to prevent the disclosure of Fourth Amendment *Brady* violations. The existence of these records demonstrates that the City maintains a system fully capable of capturing and preserving detailed fleet activity, activation history, and audit information requested throughout this matter.

**82. Fraudulent Concealment of System Records and Device Telemetry**

The Defendant City of Scotts Valley, through Services Supervisor Chloe Graham, engages in a practice of fraudulent

concealment to protect its field personnel from civil liability. In an official administrative records determination letter dated July 8, 2026, the City explicitly asserted that it "does not possess" and "does not have" MDT/CAD unit history records. Yet, this assertion is flatly contradicted by Scotts Valley Police Department Policy Section 703.3.6 (Vehicle Location System).

Policy 703.3.6 explicitly mandates that patrol vehicles are equipped with automated systems designed to track vehicle location and capture device data telemetry, strictly ordering that *"all data captured by the system shall be retained in accordance with the established records retention schedule"* and remains *"accessible by supervisors at any time."* This operational contradiction proves that the City possesses active, auditable computer terminal history records, but purposefully manipulates terminology to deny their existence to hide structural *Brady* violations *(See Exhibits G-2 and H-6)*.

**Post-Incident Retaliatory Surveillance and Continued Record Concealment**

**83. Coordinated Municipal Concealment of Post-Incident Retaliatory Tracking**

The Defendant City, through Services Supervisor Chloe Graham, actively utilized fraudulent administrative record declarations to conceal an ongoing, post-incident pattern of retaliatory surveillance and stalking executed by Defendant Officer Stoeberl. Following the initiation of civil rights challenges regarding the August 13, 2025 encounter, Plaintiff observed Officer Stoeberl executing off-dispatch visual tracking maneuvers, rapid reversals, and localized interceptions of Plaintiff's vehicle on local thoroughfares. To verify the administrative tracking trail of this targeted surveillance, Plaintiff served a California Public Records Act (CPRA) demand for contemporaneous CAD logs, AVL/GPS device histories, and audio communications.

In a formal administrative records determination signed on April 14, 2026, Services Supervisor Chloe Graham explicitly certified under red-line items #1 through #5 that the department possessed zero tracking records, GPS data, or communications because *"there were no officers responding in the areas you defined during the timeframe that you requested" (attached hereto as Exhibit H-7)*. This binding declaration is flatly disproved by the City's concurrent admission under item #5 that Officer Stoeberl was actively on duty in the field during that precise timeframe. By

falsely certifying that automated tracking data is non-existent, the City willfully suppressed system telemetry to hide a continuing course of targeted, off-dispatch motorist harassment. This systematic utilization of the records division to mask an officer's retaliatory surveillance loop establishes a post-incident municipal custom of electronic *Brady* spoliation and judicial deception designed to insulate unconstitutional field activities from federal review.

**84. Willful Defiance of State DOJ Mandates and California Government Code § 12525.5**

The Defendant City of Scotts Valley, through its administrative command and records supervisors, engaged in a systemic pattern of deliberate concealment that directly subverts mandatory state-level data monitoring. Pursuant to SVPD Policy Manual Chapter 4, Section 401.6, the department's executive command is under a non-discretionary statutory obligation to ensure that all stop data, identity profiling telemetry, and bias-based complaints are comprehensively collected and reported annually to the California Department of Justice (DOJ) under California Penal Code §§ 13012, 13020, and California Government Code § 12525.5 (The Racial and Identity Profiling Act).

The individual defendants and records supervisors actively undermined these state reporting requirements by running an unlogged, off-dispatch surveillance loop for over one hour and thirteen minutes, failing to generate real-time dispatch tracking, and manually altering internal database records to hide the true nature of the stop. By intentionally withholding the native Axon system .csv audit logs and muting Plaintiff's active oral compliance statements, the City systematically suppressed mandatory, state-monitored stop data to prevent a lawless private property profiling intercept from being reported to the California Attorney General, establishing a direct municipal custom of judicial deception actionable under *Monell v. Department of Social Services (See Exhibits H-1, H-2, and H3).*

**By intentionally withholding the native Axon system .csv audit logs and muting Plaintiff's active oral compliance statements, the City did not merely manipulate the evidentiary record of a civil rights litigant—it systematically suppressed mandatory, state-monitored stop data to prevent a lawless private property profiling intercept from being reported to the California Attorney General, establishing a direct municipal custom of judicial deception actionable under Monell v. Department of Social Services.**

**Reduced to its essentials, state oversight depends on police agencies accurately recording and preserving information about every enforcement stop. Plaintiff alleges Defendants conducted an extended off-dispatch**

**surveillance operation, failed to generate complete stop records, altered internal database entries, and withheld native electronic audit data that would document the encounter. Plaintiff therefore alleges the City's handling of the incident prevented complete and accurate reporting to state oversight authorities and undermined the integrity of the official record.**

---

**The Off-Dispatch Surveillance Window and Complete Favorable Termination**

**85. The MDT Inception Void, Unlogged Surveillance, and Ambush Positioning**

Certified CAD logs explicitly time-stamp the exact second Defendant Officer Stoeberl's Mobile Data Terminal (MDT) became active on scene. This structural time-stamp documents that the officer's field tracking interface was only initialized at 15:40:34—exactly nine (9) seconds after objective video telemetry from the Axon Fleet 3 camera captures Plaintiff's vehicle already completely clear of the public thoroughfare and crossing the private property apron line. Furthermore, internal tracking records ("O68 Status.xlsx" and "Unit 85.xlsx") *(See Exhibit H-2 and H-9)* document a profound operational irregularity.

The database logs reveal that following an on-scene clearing timestamp at 14:27:32, Defendant Officer Stoeberl operated his patrol vehicle completely off-log, running a hidden, unrecorded surveillance tracking sequence for over one hour and thirteen minutes (1:13) without entering any active dispatch commands, unit status changes, or positional markers into the computer terminal until initializing Plaintiff's arrest file inside Unit 85 at 15:40:34 *(See Exhibits H-4 and H-5)*. Defendant Stoeberl possessed no active emergency dispatch, no exigent circumstances, and no ongoing public hazard.

While navigating the commercial lot, Plaintiff possessed zero visual or auditory awareness of the officer's low-profile positioning behind him, and never recognized any lawful command to stop. While the individual defendants' footage captures a stationary patrol vehicle sounding an air horn and an audio blurp from an approximate distance of forty (40) feet within a busy commercial perimeter, Plaintiff never submitted to, nor was he legally seized by, this low-profile show of authority under the Supreme Court standard in *California v. Hodari D.*, 499 U.S. 621. Instead,

Plaintiff arrived at his destination, deactivated his engine, and emerged onto the pavement as an ordinary pedestrian sidewalk occupant before face-to-face contact was ever initialized.

Despite this total lack of emergency authority, the officer emerged from an unlogged surveillance void to execute an aggressive ambush on private property without maintaining an active forward-facing red emergency light bar, in flagrant violation of California Vehicle Code § 25252 and SVPD Policy Manual Chapter 3, Section 308.2 *(See Exhibits H-2, H-3, H-4, H-7, E-1).*

**Reduced to its essentials, if a traffic stop truly began on the public roadway, officers would ordinarily create records documenting when and where that enforcement began. Plaintiff alleges Defendant Officer Stoeberl conducted over an hour of unlogged surveillance without activating his MDT or generating dispatch activity, then created the first documented enforcement records only after Plaintiff had entered private property. Plaintiff therefore alleges the contemporaneous electronic records are inconsistent with Defendants' later claim that a continuous public roadway traffic stop had already been in progress before Plaintiff reached Target.**

**86. Favorable Termination and Absence of Federal Bars**

All underlying retaliatory state criminal charges brought against Plaintiff under California Penal Code § 148(a)(1) for an alleged refusal to identify, alongside the non-compliant vehicle equipment infractions, were fully and unconditionally dismissed in the interest of justice on the record on February 25, 2026. This comprehensive dismissal satisfies the favorable termination requirement, removing all *Heck v. Humphrey* barriers to civil compensation, and establishes Plaintiff's immediate right to seek full damages for constitutional injuries under 42 U.S.C. § 1983 *(See Exhibit B).*

**87. Summary Defiance of Fourteenth Amendment Due Process Mandates**

**Reduced to its essentials, the individual and municipal defendants did not merely commit operational errors; they systematically altered, omitted, and suppressed material electronic data to preserve an unconstitutional arrest and prosecution. The Fourteenth Amendment absolutely prohibits government officials from manufacturing evidence, concealing exculpatory system metadata, or intentionally misleading a magistrate to justify an unauthorized**

**private property seizure.**

**Section I: Monell Liability — Municipal Custom, Ratification, Audit Failure, and Evidence Suppression**

---

**88. Supervisory Custom Ratification and Mandatory Duty Defiance**

Sergeant Tol arrived on scene in response to Plaintiff's explicit request for a commanding officer. When Sergeant Tol asked Officer Stoeberl if a lawful reason to detain existed, Officer Stoeberl falsely replied in the affirmative. When Plaintiff attempted to apprise the arriving supervisor of the absolute lack of reasonable suspicion, Sergeant Tol cut off Plaintiff's speech, stating on camera that the underlying legal basis for the stop "did not matter." This outright refusal to check the facts or evaluate the field timeline directly violates SVPD Policy Manual Chapter 4, Section 420.4.1(b), which grants field supervisors immediate administrative authority to investigate citizen complaints by directly reviewing portable recorder video data.

Furthermore, under SVPD Policy Section 308.7 (Supervisory Responsibilities), a field supervisor possesses a non-discretionary mandate to monitor the response, assert control, and terminate any response that is inappropriate due to the circumstances. Under the City's official Police Sergeant Class Specification ("Mediation") *(See Exhibit D-3)*, Sergeant Tol's contractually mandated duties required him to mediate disputes, diffuse potentially violent situations, and exercise interpersonal sensitivity. Sergeant Tol abandoned these administrative, contractual, and operational duties. Instead of utilizing his explicit review powers under Section 420.4.1(b) or intervening to halt his subordinate's unlawful conduct, Sergeant Tol ratified the violation, issued immediate jail ultimatums to a peaceful pedestrian, and personally initiated physical force under color of law, exceeding the legitimate scope of an investigative contact under *Florida v. Royer*, 460 U.S. 491 *(See Exhibits D-2, D-3, and D-4)*.

**89. Supervisor Duty Defiance and Command Structure Breaches**

When Plaintiff requested a **commanding officer**, Defendant Officer Stoeberl assured Plaintiff, **"He is already on the way and you didn't even have to ask."** Plaintiff alleges, however, that neither Defendant Stoeberl's incident report

nor any department record produced in discovery or pursuant to the California Public Records Act reflects that Defendant ever requested a Watch Commander, commanding officer, or higher supervisory response. Instead, when Defendant Sergeant Tol arrived, Defendant Stoeberl twice recharacterized Plaintiff's request by asking, **"Did you not ask for a supervisor?"**, thereby substituting Plaintiff's request for a commanding officer with the materially different request for an ordinary field supervisor.

When Plaintiff then asked whether Defendant Sergeant Tol was the commanding officer, Defendant Tol responded on camera, **"I am... the highest you're going to get right now."** Official shift records produced by the City identify Defendant Tol only as **"Sergeant – Day Shift"** and do not designate him as Watch Commander or Acting Watch Commander *(See Exhibit E-1).* Under SVPD Policy Section 200.3.1 (Succession of Command), the Watch Commander position is a distinct, superior tier within the executive hierarchy. Defendant Tol lacked the formal designation to assume the higher tier of Acting Watch Commander under SVPD Policy Section 418.2 *(Exhibit E-2).*

Plaintiff specifically requested the assignment record identifying the official Watch Commander on duty and any authorization appointing Defendant Tol to that role. The City subsequently confirmed that it possessed **no assignment record** designating a Watch Commander for the August 13, 2025 incident *(See Exhibit G-6).* Although SVPD Policy § 418 contemplates designation of a Watch Commander for each patrol shift and provides for formal designation of an Acting Watch Commander when appropriate, Plaintiff alleges no such designation was produced for this incident *(See Exhibit E-2).*

Plaintiff therefore alleges there is no documented assignment establishing that Defendant Tol was serving as Watch Commander or Acting Watch Commander during the encounter. Rather than producing records establishing supervisory authority, the City relied upon Defendant Tol's scheduled rank as Sergeant to infer that authority. Plaintiff alleges substituting inference for documented designation prevented meaningful verification of the Department's command structure and frustrated Plaintiff's request for review by the appropriate level of command.

Rather than independently evaluating the detention, verifying the underlying field facts, and terminating an inappropriate enforcement action consistent with supervisory responsibilities under SVPD Policy § 308.7, Defendant Tol ratified the detention, issued immediate custodial ultimatums to a peaceful pedestrian, and personally

participated in the subsequent use of force under color of law, thereby supporting Plaintiff's municipal liability allegations under *Monell*. (See Exhibits E-1, E-2, E-3, and G-6.)

**Reduced to its essentials, Plaintiff requested a commanding officer—not merely a supervisor. Defendant Stoeberl represented that one was already on the way, yet no incident report, dispatch record, or produced department record reflects that a Watch Commander or commanding officer was ever requested. When Defendant Tol arrived, Plaintiff's request was recharacterized as one for a supervisor, and Defendant Tol represented he was the highest authority available. Plaintiff's subsequent CPRA requests produced no assignment record establishing that Defendant Tol had been designated as Watch Commander or Acting Watch Commander. Plaintiff therefore alleges Defendants substituted assumption for documented authority, depriving Plaintiff of meaningful review through the Department's established chain of command before force was authorized and used.**

---

**Execution of Unverified Ideological Profiling and Training Defiance**

**90. Deliberate Evasion of Specialized Training Protocols Evidencing Gross Supervisory Neglect**

The aggressive field escalation and subsequent unconstitutional seizure executed by Defendants were directly driven by a fabricated radio broadcast deployed in defiance of departmental training protocols. Defendant Officer Stoeberl lacked specialized law enforcement certification or training regarding domestic ideological groups, yet broadcast a false claim over the public dispatch channel labeling Plaintiff as a "sovereign citizen refusing to identify." Official department training transcripts reveal that responding supervisor Defendant Sergeant Tol completed advanced training explicitly titled "HS Sovereign Citizen Extremists" (Course 253) on December 1, 2023, paired with "De-escalation: Enhancing Strategies for Everyday Encounters" (Course 289) on December 2, 2023 *(See Exhibit D-7)*. By virtue of this official training record, Sergeant Tol possessed a heightened supervisory duty to critically evaluate ideological field assertions and deploy mandatory tactical de-escalation mechanics. Instead, Sergeant Tol acted in gross deviation from his specialized training by rubber-stamping his untrained subordinate's unverified radio label. His refusal to conduct an independent on-scene inquiry and his immediate initiation of a high-stress custodial

ultimatum directly caused severe physical injury to Plaintiff's upper extremity, demonstrating a pattern of deliberate indifference to constitutional standards that defeats any claim to qualified immunity.

**Reduced to its essentials, officers who receive specialized training are expected to use it when making critical decisions in the field. Plaintiff alleges Defendant Sergeant Tol had completed specialized training on sovereign citizen encounters and de-escalation, yet accepted Defendant Officer Stoeberl's unverified "sovereign citizen" radio broadcast without conducting an independent assessment of the facts. Plaintiff therefore alleges Sergeant Tol abandoned the very training designed to prevent unnecessary escalation, allowing an unverified label to replace objective investigation and contributing to an unreasonable seizure under the Fourth Amendment.**

**91. Unconstitutional Bias-Based Profiling and Policy 401 Violations**

The individual defendants' fabrication of a "sovereign citizen" profile over the public broadcast channel constitutes a bad-faith violation of the department's strict anti-profiling mandates. Pursuant to Scotts Valley Police Department Policy Manual Chapter 4, Section 401 (Bias-Based Policing), law enforcement personnel are strictly prohibited from engaging in profiling, which the manual defines as an inappropriate reliance on actual or perceived characteristics—including economic status, age, or cultural group—as the basis for providing differing law enforcement service or enforcement parameters.

By weaponizing a highly prejudicial, unverified ideological label against Plaintiff because he exercised his First Amendment right to question a suspicionless private property intercept, Officer Stoeberl engaged in discriminatory bias-based profiling. Rather than executing standard, neutral law enforcement services, the individual defendants utilized this manufactured profile to bypass mandatory de-escalation protocols, justify an immediate deployment of excessive physical force, and execute a retaliatory arrest, establishing an actionable *Monell* custom under the Fourteenth Amendment.

**92. Explicit Failure to Execute Mandatory Anti-Profiling Audits and Monell Ratification**

The Defendant City of Scotts Valley's executive command actively maintained a widespread municipal custom of deliberate indifference by failing to execute mandatory, policy-dictated audits of field camera assets. Pursuant to

SVPD Policy Manual Chapter 4, Section 401.5 (Supervisor Responsibilities), department supervisors are under a strict operational mandate to periodically review mobile audio/video recordings, body-worn camera (BWC) media, and Mobile Data Terminal (MDT) data to ensure field compliance with anti-bias and anti-profiling metrics. Section 401.5(b)(2) explicitly commands that any recording capturing a potential instance of bias-based profiling shall be appropriately retained for administrative review. The individual defendants and records supervisors actively turned a blind eye to these structural requirements, ratifying the underlying constitutional injury.

**Reduced to its essentials, supervisory reviews exist to ensure officers follow the law and department policy, especially when recordings may reveal biased or unconstitutional conduct. Plaintiff alleges SVPD policy required supervisors to review body-worn camera recordings, MDT data, and other electronic evidence for signs of bias and to retain recordings reflecting potential profiling for administrative review. Plaintiff therefore alleges the City's failure to conduct or enforce those required supervisory reviews allowed the alleged constitutional violations to go uncorrected and reflects municipal ratification of the underlying misconduct.**

---

**Coordinated Electronic Spoliation and Systematic Custom of Judicial Deception**

**93. Systemic Administrative, Supervisory, and Operational Indifference**

The aggressive field actions, deliberate indifference to serious medical needs, and complete lack of supervisory intervention execute an actionable, systemic breakdown of departmental safety regulations. The individual defendants bypassed the strict force constraints of SVPD Policy Section 300.3, which mandates that the application of physical tactics must be judged strictly *"from the perspective of a reasonable officer on the scene at the time of the incident."* By deploying severe, injury-inducing physical joint manipulation mechanics against an unarmed, stationary citizen over a routine equipment inquiry, Defendants acted completely outside the boundaries of objective reasonableness. Under the mandatory balancing factors of Policy Section 300.3.2, officers are explicitly required to evaluate the severity of the threat, the conduct of the officers leading up to the force, and the citizen's apparent ability to understand and comply prior to introducing physical trauma *(See Exhibit D-4).*

Objective video telemetry confirms the defendants completely upended these checkpoints: **there was a total absence of a threat under subsection (a), the officers' unlogged surveillance loop created the operational conflict under subsection (d), and the physical joint force was launched mid-sentence before an opportunity to comply could be realized under subsection (g)**. Following this unauthorized application of force, the defendants ignored SVPD Policy Section 300.6, which mandates that officers *"shall promptly provide or procure medical assistance"* for any injured person. This medical neglect was ratified by supervisory personnel; pursuant to SVPD Policy Section 300.7 (Supervisor Responsibility), the responding supervisor failed his mandatory duty to ensure an immediate medical examination occurred, while simultaneously bypassing the force reporting commands of Section 301.4, carrying direct municipal liability under *Monell v. Department of Social Services*. By permitting an unlogged tracking sequence across five intersections in violation of Policy 308.2, failing to deploy proper statutory red lighting under CVC § 25252, escalating a passive encounter into a severe structural injury, and failing to dispatch an ambulance despite explicit notification of an orthopedic injury (See Policy SVPD Policy Section 300.6 and 308.6) , the department's chain of command demonstrated a municipal custom of deliberate indifference. This medical neglect was ratified by supervisory personnel; pursuant to SVPD Policy Section 300.7 (Supervisor Responsibility), the responding supervisor failed his mandatory duty to ensure an immediate medical examination occurred, while simultaneously bypassing the force reporting commands of Section 301.4 ***("The Use of Force Review Board will be convened when the use of force by a member results in very serious injury or death to another.")*** Sergeant Tol delivered explicit proof of this lawless administrative culture on camera, declaring that the law "**does not matter**" in flagrant breach of **SVPD Policy Section 104.3** (Law Enforcement Code of Ethics) ***("As a law enforcement officer, my fundamental duty is to serve; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation, and the peaceful against abuse or disorder; and to respect the constitutional rights of all to liberty, equality and justice; Honest in thought and deed in both my personal and official life, I will be exemplary in obeying the laws of the land and the regulations of my agency.")*** Combined with back-office spoliation of native digital data under Policies 204 and 205, these comprehensive policy breaches carry direct municipal liability.

**Reduced to its essentials, department policies are meant to prevent unnecessary force, require prompt medical care, and ensure supervisors correct officer misconduct before it causes greater harm. Plaintiff alleges Defendants**

**ignored those safeguards by escalating a minor equipment investigation into a forceful seizure, failing to provide prompt medical care after Plaintiff was injured, and failing to conduct the supervisory review and reporting required by department policy. Plaintiff therefore alleges the repeated policy failures, together with the alleged suppression of native electronic evidence, reflect a municipal practice of tolerating unconstitutional conduct rather than preventing or correcting it.**

**94. Evidentiary Proof of Fleet Management Tracking Logs**

The City's intentional withholding of native system logs constitutes willful concealment, as the City maintains a centralized internal fleet audit database. As documented in the City's internal Vehicle Maintenance and system login ledger for Vehicle ID 87 (a 2021 Ford Explorer), the City actively monitors, logs, and tracks individual officer badge codes (including Code 5600 for Officer Aaron Roberts and Code 1040 for Officer Fred Yoon) down to the precise second, alongside tracking the exact operational software version (Version 19.42.4).

The City's assertions that raw, unedited system metadata cannot be produced for independent review are flatly refuted by the existence of these internal fleet tracking logs. This confirms a structural municipal custom of intentionally suppressing baseline tracking data to prevent the disclosure of Fourth Amendment *Brady* violations. The existence of these records demonstrates that the City maintains a system fully capable of capturing and preserving detailed fleet activity, activation history, and audit information requested throughout this matter.

**95. Fraudulent Concealment of System Records and Device Telemetry**

The Defendant City of Scotts Valley, through Services Supervisor Chloe Graham, engages in a practice of fraudulent concealment to protect its field personnel from civil liability. In an official administrative records determination letter dated July 8, 2026 (See Exhibit H-7 and H-9), the City explicitly asserted that it "does not possess" and "does not have" MDT/CAD unit history records. Yet, this assertion is flatly contradicted by Scotts Valley Police Department Policy Section 703.3.6 (Vehicle Location System).

Policy 703.3.6 explicitly mandates that patrol vehicles are equipped with automated systems designed to track vehicle location and capture device data telemetry, strictly ordering that *"all data captured by the system shall be retained in*

*accordance with the established records retention schedule"* and remains *"accessible by supervisors at any time."* This operational contradiction proves that the City possesses active, auditable computer terminal history records, but purposefully manipulates terminology to deny their existence to hide structural *Brady* violations *(See Exhibits G-2, G-3, nd H-6)*.

**96. Willful Defiance of State DOJ Mandates and California Government Code § 12525.5**

The Defendant City of Scotts Valley, through its administrative command and records supervisors, engaged in a systemic pattern of deliberate concealment that directly subverts mandatory state-level data monitoring. Pursuant to SVPD Policy Manual Chapter 4, Section 401.6, the department's executive command is under a non-discretionary statutory obligation to ensure that all stop data, identity profiling telemetry, and bias-based complaints are comprehensively collected and reported annually to the California Department of Justice (DOJ) under California Penal Code §§ 13012, 13020, and California Government Code § 12525.5 (The Racial and Identity Profiling Act).

The individual defendants and records supervisors actively undermined these state reporting requirements by running an unlogged, off-dispatch surveillance loop for over one hour and thirteen minutes, failing to generate real-time dispatch tracking, and manually altering internal database records to hide the true nature of the stop. By intentionally withholding the native Axon system .csv audit logs and muting Plaintiff's active oral compliance statements, the City systematically suppressed mandatory, state-monitored stop data to prevent a lawless private property profiling intercept from being reported to the California Attorney General, establishing a direct municipal custom of judicial deception actionable under *Monell v. Department of Social Services (See Exhibits H-1, H-2).*

**Reduced to its essentials, state oversight only works if police agencies accurately record and report their enforcement activities. Plaintiff alleges Defendants failed to document over an hour of surveillance, omitted contemporaneous dispatch activity, altered internal records, and withheld native electronic audit data that would objectively document the encounter. Plaintiff therefore alleges the official reporting provided to state oversight authorities was incomplete and inaccurate, undermining the transparency and accountability required by California law and supporting Plaintiff's claim of municipal liability.**

**97. Suppression of Native Electronic Evidence, Metadata, and Municipal Liability**

Plaintiff progressively placed the City on notice that the electronic evidence associated with the August 13, 2025 incident possessed evidentiary and due process significance. Plaintiff first requested production of the principal categories of electronic evidence, including body-worn camera recordings, dash camera recordings, CAD records, dispatch communications, and related reports. Plaintiff thereafter expanded those requests by expressly demanding production and preservation of metadata, activation logs, timestamps, unit identifiers, event codes, and other segregable electronic records, explaining that such materials possessed independent evidentiary value and were not exempt merely because they accompanied investigative records.

Plaintiff further served formal preservation demands invoking *California v. Trombetta* and later *Arizona v. Youngblood*, specifically requesting preservation and production of native electronic evidence, associated metadata, audit information, and related electronic records. Plaintiff alleges these communications placed both the City and the Santa Cruz County District Attorney's Office on notice that the native electronic evidence was material to anticipated criminal and civil proceedings.

Despite those preservation demands, the City ultimately produced derivative recordings rather than the requested native electronic evidence, engaging in a bad-faith practice of electronic evidence spoliation and fraudulent concealment to shield its field personnel from civil liability under Federal Rules of Civil Procedure Rule 37(e). Plaintiff alleges the produced recordings omitted native metadata and associated audit information despite repeated requests directed to the City's designated police records custodian. Technical review further revealed that critical portions of the recordings contained synchronized audio deficiencies during the physical-force encounter, preserving officers' commands while failing to capture portions of Plaintiff's contemporaneous verbal statements, including "I am not resisting," "I will comply under duress," and "Why are you coming towards me." Plaintiff further alleges the City declined to produce the requested native electronic evidence after acknowledging that the underlying evidence system maintained activation information and related electronic records.

Plaintiff alleges these actions reflect more than isolated record-production decisions. Instead, Plaintiff alleges the repeated refusal to produce requested native electronic evidence and associated metadata after formal preservation

demands supports the existence of a municipal custom or practice of withholding materially relevant electronic evidence, thereby contributing to Plaintiff's *Monell* claim under 42 U.S.C. § 1983. Plaintiff further alleges that any destruction, alteration, or failure to preserve electronically stored information after receiving preservation notice may warrant appropriate sanctions under applicable law. Plaintiff alleges that the derivative recordings and withheld native electronic records do not represent the complete evidentiary record. Should discovery reveal that native audit logs or metadata were altered, destroyed, or intentionally withheld after preservation notice, Plaintiff will seek all appropriate sanctions and remedies available under federal and state law.

**Reduced to its essentials, Plaintiff repeatedly notified both the City and the District Attorney that the native electronic evidence, metadata, activation logs, and related audit information possessed evidentiary value and should be preserved and produced. Despite those progressively more specific requests and later formal preservation demands, Plaintiff alleges the City produced derivative recordings while withholding the requested native electronic evidence and associated metadata. Plaintiff therefore alleges the City's handling of the electronic evidence supports an inference of a municipal practice of withholding materially relevant electronic records after notice of their importance, contributing to Plaintiff's Monell claim.**

**98. Coordinated Suppression of System Metadata, CAD Back-Editing, and Inter-Agency Discovery Fraud**

The Defendant City of Scotts Valley, through Services Supervisor Chloe Graham, engaged in electronic evidence spoliation, data manipulation, and fraudulent concealment under Federal Rules of Civil Procedure Rule 37(e). On September 17, 2025, Plaintiff served the City with a formal discovery demand and *California v. Trombetta*, 467 U.S. 479, spoliation warning, putting the municipality on immediate legal notice to preserve and produce all raw, native electronic data, including .csv audit logs and metadata tracks (See Exhibit G-A) . On August 25, 2025, Prior to the formal filing of state criminal charges, Plaintiff served the Santa Cruz County District Attorney's Office with a formal Discovery Preservation Request and a binding demand under *Brady v. Maryland*, 373 U.S. 83 *(See Exhibit G).* Defying these simultaneous municipal and state-level preservation mandates, the City initially provided a misleading CAD log number (#2508130049) to mask the actual arrest file (#2508130050). Exactly twenty-four (24) hours prior to

Plaintiff's criminal arraignment on September 11, 2025, the department executed a back-office database manipulation to sanitize the judicial record. Technical analysis reveals that the masked CAD log contains an explicit post-incident modification executed at midnight on September 10, 2025, wherein an SVPD administrator manually back-edited and reclassified the event type from an active arrest check ("ARSCK") to a generic area check ("AREACK") to alter the digital audit footprint on the eve of Plaintiff's first appearance before a magistrate *(See Exhibit H-5)*.

**Reduced to its essentials, governmental records must be maintained with sufficient integrity and transparency to permit meaningful review of official conduct. Plaintiff alleges that SVPD initially identified CAD Incident No. 2508130049 as the CAD associated with Plaintiff's August 13, 2025 arrest, but later acknowledged that the correct incident was CAD Incident No. 2508130050. CAD No. 2508130049, involving the same primary officer approximately nineteen minutes before Plaintiff's traffic stop, contains a documented post-incident reclassification, while CAD No. 2508130050 likewise reflects post-incident modifications. Plaintiff further alleges that SVPD has declined to produce the complete CAD audit history and change logs identifying the timing, purpose, and author of those modifications. Plaintiff contends that these documented discrepancies, post-incident edits, and the withholding of audit records create a non-transparent record that warrants discovery into the CAD audit history, MDT transaction logs, and CLETS/DMV query logs to determine whether any pre-stop investigative activity involving Plaintiff or Plaintiff's vehicle occurred before CAD Incident No. 2508130050 was initiated. *(See Exhibit H-8.)***

**99. Falsification of Hardware Capabilities and Axon Integration Proof**

The City's administrative defense—wherein Services Supervisor Chloe Graham asserted via email on Friday, November 14, 2025, that the department's Sunridge RIMS CAD system and Panasonic Toughbook MDT terminals completely lack the mechanical ability to log lightbar or siren activations—is flatly disproved by the department's own internal hardware specifications. The official Axon Fleet 3 Hub Configuration Interface Blueprint for Vehicle #88 documents that the system is explicitly engineered, wired, and programmed under Input #12 [Light Bar (Code 2 & 3)] and Input #13 [Siren (3)] to automatically generate a permanent digital log status entry the exact second an emergency activation input is initialized by field personnel *(See Exhibit H-6)*. The City admits that responsive

electronic event histories exist but refuses to produce these materials, citing meritless investigatory exemptions to suppress these exculpatory light-switch activation logs and audio tracks.

**100. Inter-Agency Data Laundering and Audit Trail Disproof**

Following the formal filing of criminal charges, the City and the prosecution engaged in a data-laundering scheme to alter the digital footprint. On September 17, 2025, Plaintiff served a formal *Trombetta* Native Evidence Preservation Demand directly onto the District Attorney's Office. Defying this clear legal mandate, the District Attorney asserted to Plaintiff on that exact day that the prosecution lacked physical possession of the video files and was actively awaiting their production from the Scotts Valley Police Department.

However, the Santa Cruz County District Attorney's own official Axon Case Audit Trail disproves this narrative. The automated system logs reveal that a complete case copy was generated and the primary field media—including Axon Body 3 Video X60A6054J—had already been successfully transferred via Partner Share into the prosecution's database five days prior, on September 12, 2025 *(See Exhibit I-5)*. This manufactured delay was utilized by SVPD to deliver compressed, altered derivative files that completely scrubbed all native metadata and identically muted separate BWC audio tracks during the physical force escalation window, erasing Plaintiff's explicit statements on camera. This systematic withholding and manual manipulation establishes a direct municipal *Monell* custom of judicial deception and a systemic Fourteenth Amendment *Brady* violation. All underlying retaliatory state criminal charges were subsequently fully dismissed in the interest of justice on February 25, 2026, satisfying the favorable termination requirement and clearing any *Heck v. Humphrey* barriers to civil compensation.

**101. Intentional Operational Deviations and Suppression of Exculpatory Evidence**

The unlawful field actions, subsequent electronic evidence manipulation, and narrative management executed by Defendants were conducted in flagrant disregard of the mandatory protocols established in the Scotts Valley Police Department Policy Manual *(See Exhibit D-4)*. SVPD Policy Section 419.6 (Documentation of Activity) explicitly dictates that an officer "***shall document***" self-initiated field activity via the Mobile Data Terminal (MDC) and mandates under subsection (a) that "***All contacts or activity shall be documented at the time of the contact.***" Defendant Officer

Stoeberl's affirmative admission in his own incident report that his targeted pursuit began five intersections prior to physical contact establishes an intentional operational deviation by failing to log the activity at its inception. Furthermore, the department's back-office deployment of compressed, metadata-stripped derivative files—which actively concealed the native .csv system logs tracking physical switch interactions—constitutes an explicit violation of SVPD Policy Section 420.6 (mandating data retention) and Section 420.7(a), which commands the strict preservation of all digital recordings relevant to potential civil and administrative matters. SVPD Policy Section 420.8 explicitly mandates that the secure Watch Guard evidence library shall only be accessed from Department authorized computers for official use.

Because this restricted system logs all administrative interactions, the deliberate stripping of metadata represents an authorized, non-accidental administrative formatting choice designed to alter the complete baseline record. These electronic records and their transmission are further governed by SVPD Policy Section 204.2, which dictates that all electronic files "are considered department records," and Section 204.4, which commands that these assets must be managed in accordance with the established records retention schedule.

Because SVPD Policy Sections 205.2 and 205.3 mandate that all such documentation represent official business requiring corporate authorization under the authority of the Chief of Police, this systematic data stripping carries direct municipal liability. By delivering altered derivative files that stripped this data away after a formal preservation warning, the department directly suppressed vital exculpatory evidence in flagrant violation of **SVPD Policy Section 321.1.1**, which explicitly commands that employees **"shall not suppress, conceal or distort the facts of any reported incident."** These synchronized, multi-chapter policy violations demonstrate a systemic municipal custom of circumventing regulations to eliminate electronic tracking and suppress exculpatory evidence to insulate an unconstitutional private property seizure from judicial review.

**102. Prior Pattern of Pretext and CPRA Records Suppression**

The City of Scotts Valley maintains an unconstitutional municipal custom of permitting and concealing lawless field tactics and material reporting omissions executed by Defendant Officer Stoeberl. Specifically, on November 6, 2025, Plaintiff documented Defendant Stoeberl executing an un-headlined motorcycle stop directly outside Plaintiff's

community gate on El Pueblo Road without issuing a citation or generating standard CAD dispatch entries. Photographic evidence captures Defendant Stoeberl utilizing active, overhead red lights during the entirety of that field encounter, establishing that the officer possesses full operational literacy regarding California Vehicle Code § 25252 notice requirements *(See Exhibit J)*.

Despite timely California Public Records Act (CPRA) requests targeting this specific November 6, 2025 interaction, the City of Scotts Valley suppressed and denied access to the accompanying body-worn camera and dashcam media. Furthermore, the individual who was the subject of that stop advised Plaintiff that Officer Stoeberl failed to wear or activate a body-worn camera during the encounter. This coordinated retention and denial of public tracking records, combined with the officer's failure to deploy recording assets, documents an institutional municipal custom of shielding Defendant Stoeberl's patterns of targeted surveillance, pretextual stops, and environmental harassment from judicial scrutiny. These facts establish systemic failures concerning supervisory practices, record retention, and municipal transparency.

**Reduced to its essentials, municipalities have a duty to maintain accurate records, preserve evidence, and supervise officers in a manner that promotes accountability and transparency. Plaintiff alleges that during a separate November 6, 2025 encounter, Defendant Officer Stoeberl conducted a traffic stop using overhead emergency lights without issuing a citation or generating standard dispatch records, and that the City later denied Plaintiff's CPRA requests for the related body-worn and dash camera recordings. Plaintiff further alleges the individual involved reported that no body-worn camera was worn or activated during the encounter. Plaintiff contends this prior incident reflects a broader pattern of inadequate supervision, deficient record preservation, and lack of municipal transparency relevant to Plaintiff's Monell claims.**

**103. Summary Defiance of Monell Custom and Supervisory Liabilities**

**Reduced to its essentials, the City's formal written policies were not the source of the violation; its persistent customs, inadequate supervision, and non-enforcement of those policies were. Under *Monell v. Department of Social Services*, 436 U.S. 658, municipal liability attaches when a local government knowingly ratifies unconstitutional conduct, fails to supervise or discipline its field personnel, or maintains operational customs that**

**predictably result in constitutional injuries.**

IV. CAUSES OF ACTION

**COUNT I: Fourth Amendment Unlawful Seizure & False Arrest (42 U.S.C. § 1983)**

*(Against All Individual Defendants)*

**COUNT II: Fourth Amendment Excessive Use of Force (42 U.S.C. § 1983)**

*(Against All Individual Defendants)*

**COUNT III: Fourteenth Amendment Due Process (Franks / Brady Suppression) and Monell Liability**

*(Against Defendant City of Scotts Valley)*

**COUNT IV: Title II Americans with Disabilities Act Statutory Discrimination (42 U.S.C. § 12132)**

*(Against Defendant City of Scotts Valley)*

**COUNT V: The California Bane Act (Civil Code § 52.1)**

*(Against All Defendants, Jointly and Severally)*

**COUNT VI: California Common-Law Battery, False Imprisonment, and Vicarious Liability (Gov. Code § 815.2)**

*(Against All Defendants, Jointly and Severally)*

---

**V. PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff **Tavare Harris** respectfully requests that judgment be entered in his favor and against Defendants, jointly and severally where permitted by law, and that this Court award the following relief:

**A. Compensatory Damages.** An award of compensatory damages, according to proof, for the deprivation of Plaintiff's rights secured by the United States Constitution and federal law, including damages arising from unlawful seizure, unlawful detention, excessive force, disability discrimination, emotional distress, humiliation, loss of liberty, physical injury, reputational harm, and all other injuries proximately caused by Defendants' conduct.

**B. Special and Economic Damages.** An award of special and economic damages according to proof, including medical

expenses, litigation-related expenses, lost wages or diminished earning capacity (where established), and all other recoverable economic losses resulting from Defendants' unlawful conduct.

**C. Punitive and Exemplary Damages.** An award of punitive and exemplary damages against the individual Defendants, in their individual capacities, in an amount sufficient to punish and deter willful, malicious, reckless, oppressive, or callously indifferent violations of Plaintiff's federally protected rights.

**D. Declaratory Relief.** A declaration that Defendants' actions, customs, practices, policies, omissions, and conduct, as alleged herein, violated Plaintiff's rights under the **Fourth and Fourteenth Amendments to the United States Constitution**, **42 U.S.C. § 1983, Title II of the Americans with Disabilities Act (42 U.S.C. § 12132)**, and applicable California law.

**E. Equitable and Injunctive Relief.** Such equitable and injunctive relief as the Court deems appropriate and authorized by law to prevent the continuation or recurrence of the unconstitutional customs, policies, practices, or conduct alleged in this Complaint.

**F. Costs of Suit.** An award of Plaintiff's costs of suit, taxable costs, and all other litigation expenses recoverable under applicable federal and state law.

**G. Attorney's Fees.** An award of reasonable attorney's fees and litigation expenses pursuant to **42 U.S.C. § 1988**, the **Americans with Disabilities Act**, and any other applicable statutory authority, to the extent permitted by law.

**H. Interest.** An award of prejudgment and post-judgment interest as allowed by law.

**I. Further Relief.** Such other and further legal or equitable relief as this Court deems just, proper, and appropriate under the circumstances.

---

DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

---

VERIFICATION

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Plaintiff expressly reserves the right to amend this Complaint to conform to the evidence developed through discovery and to assert any additional claims or remedies supported by the facts and the law.

Dated: July 30, 2026 Respectfully submitted,

Tavare Harris
c/o 2460 17th ave. #1135
Santa Cruz, CA 95062
(831) 419-7319
Htavare@yahoo.com

Plaintiff, Pro Se

**PLAINTIFF'S EXHIBIT LIST**

| Exhibit | Document / Evidence Description | Supporting Allegations / Context |
|---|---|---|
| A | Plaintiff's Administrative Tort Claim & City Notice of Action | Timely filing under California Government Code § 945.6 (Jan 15 & Feb 5, 2026). |
| A-1 | Target Shopping Center Ingress & Commercial Lot Maps | Spatial layout showing private driveway/lot boundaries vs. public thoroughfare. |
| A-2 | Roadway Terminus & Crosswalk Boundary Telemetry | Proof of physical sidewalk/crosswalk boundary separating public road from private lot. |
| A-3 | CHP Certified Salvage Compliance Approval Certificate | Official DCA/CHP Certificate (No. A 2468662) proving rear lighting compliance. |
| A-4 | Defense Expert Analysis of Vehicle Lighting Video | Expert finding confirming ambient daylight washouts and ambiguous defect claims. |
| A-5 | SVPD Law Enforcement Supplemental Report (Sgt. Tol) | Official report documenting the audible "popping sound" in Plaintiff's arm joint. |
| B | Criminal Court Certified Order of Dismissal | Complete unconditional dismissal of PC § 148(a)(1) charges (Feb 25, 2026; Heck clearance). |
| B-1 | Clinical Diagnosis & Medical Records – PTSD | Clinical diagnosis establishing qualified disability under Title II of the ADA. |
| C | Target Entrance Signage Photographs (SVMC Regulations) | Proof of property governance under municipal parking codes lacking CVC § 21107.8 declaration. |

| | | |
|---|---|---|
| C-1 | Axon Body 3 Camera Frames (Lens Obstructions) | Video stills showing Officer Stoeberl's hand/arm intentionally blocking camera lens. |
| C-2 | Axon Body 3 Camera Telemetry (Timestamp 15:48:19) | Proof primary overhead emergency light bar remained completely unlit throughout encounter. |
| D-2 | SVPD General Order & Administrative Guidelines | Operational protocols governing field contacts, traffic stops, and supervisor duties. |
| D-3 | City of Scotts Valley Class Specification – Police Sergeant | Official job description mandating field mediation, dispute de-escalation, and sensitivity. |
| D-4 | SVPD Policy Manual Excerpts (Policies 300, 301, 308, 416, 420) | Binding department policies regarding Use of Force, Code-3, Detentions, and BWC handling. |
| D-6 | POST Training Records – Officer Nicholas Stoeberl | Certified transcripts showing completion of Strategic Communications (June 8, 2025). |
| D-7 | POST Training Records – Sergeant Sjon Tol | Transcripts showing completion of Sovereign Citizen Extremists & De-escalation (Aug 8, 2025). |
| E-1 | SVPD Daily Shift Roster (August 13, 2025) | Official roster showing Sgt. Tol assigned strictly as "Sergeant Day Shift," not Watch Commander. |
| E-2 | SVPD Policy Section 418.2 – Acting Watch Commander | Departmental policy governing formal designation requirements for Acting Watch Commander. |
| E-3 | SVPD Policy Section 200.3 – Chain of Command & Succession | Mandatory guidelines governing executive succession and Unity of Command protocols. |
| E-5 | Comparative BWC Recording Trajectory & Audio Gap Analysis | Timeline mapping identical audio drops across independent recording units during force sequence. |
| G | Formal Preservation & Brady Demand to Santa Cruz DA | Written discovery preservation notice served on District Attorney (Aug 25, 2025). |
| G-1 | Santa Cruz County DA Axon Case Audit Trail | Automated system logs showing case partner-share transfer on Sept 12, 2025. |
| G-2 | Written Administrative Denials (City Records Custodian) | Letters from Chloe Graham asserting non-existence/non-possession of MDT/CAD unit logs. |
| G-3 | SVPD Policy Section 703.3.6 – Vehicle Location Systems | Policy ordering mandatory retention and supervisory accessibility of automated vehicle data. |
| G-4 | Email Disclosure from DDA Peter Esho (Sept 25, 2025) | Prosecutorial admission regarding 13-day transfer delay and missing native .csv metadata. |
| G-5 | Formal Trombetta / Youngblood Preservation Warning | Discovery spoliation warning served directly on City of Scotts Valley (Sept 17, 2025). |
| G-6 | City CPRA Response Confirmation (Watch Commander) | Official written confirmation that no Watch Commander designation record exists for incident. |
| G-A | Joint Preservation Communication & Native File Demand | Written demand served simultaneously on City and Prosecution for raw, native .csv audit logs. |
| H-1 | California DOJ RIPA / Stop Data Reporting Guidelines | State mandates governing collection and submission of stop/profiling data under CVC § 12525.5. |
| H-2 | SVPD Internal Officer Status Logs ("O68 Status.xlsx") | Database records establishing 1hr 13min unlogged, off-dispatch surveillance window. |
| H-3 | SVPD Policy Section 401.6 – RIPA Reporting Mandates | Department policy requiring annual reporting of all traffic/pedestrian stop telemetry to CA DOJ. |
| H-4 | Certified CAD Incident Report No. 2508130050 | Primary dispatch log establishing "Received" and "On Scene" timestamps (15:40:34 / 15:40:46). |
| H-5 | Back-Office Edited CAD Log No. | Audit footprint showing post-incident reclassification from |

| | | |
|---|---|---|
| | 2508130049 | "ARSCK" to "AREACK" on Sept 10. |
| **H-6** | Axon Fleet 3 Hub Configuration Blueprint (Vehicle #88) | Technical schematics proving hardwired 12V inputs log light bar/siren activations to millisecond. |
| **H-7** | City CPRA Determination Letter (Signed April 14, 2026) | Administrative certification denying existence of post-incident surveillance GPS records. |
| **H-8** | City Written Investigatory Exemption Denials | Official letters withholding light-switch activation logs and raw audio tracks. |
| **H-9** | SVPD Unit Telemetry Log ("Unit 85.xlsx") | Raw unit status spreadsheet documenting MDT inception void prior to 15:40:34. |
| **I-4** | City Internal RIMS Fleet Ledger (Vehicle ID 87 / 88) | Database ledger proving system captures officer badge codes, software versions, and seconds. |
| **I-5** | Axon Evidence Partner Share System Audit Log | System-generated log proving electronic file transfers between SVPD and Prosecution. |
| **J-2** | Written Administrative Discovery Tracking Correspondence | Email trail between SVPD Custodian Chloe Graham and DDA Peter Esho. |
| **J-3** | Post-Incident MRI Diagnostic Radiology Report | Signed report by Dr. Albert Lu, MD, confirming subacute annular and ulnar collateral ligament tears. |

FOR OFFICIAL USE ONLY

A

RECEIVED BY: ____________

# City of Scotts Valley
# CLAIM FORM

EXHIBIT A

## INFORMATION AND INSTRUCTIONS FOR CLAIMANT

- Claim form is to be completed by claimant or designated representative of claimant.
- Complete claim form thoroughly and accurately.
- Attach any applicable documents and/or receipts.
- Upon receipt, Claim will be reviewed by the City's Risk Management team and you will be notified of any action taken via mail or email.

**RETURN COMPLETED CLAIM FORM IN PERSON, BY MAIL OR EMAIL TO:**

**City of Scotts Valley**
Attn: City Clerk
1 Civic Center Drive
Scotts Valley, CA 95066
cityhall@scottsvalley.gov

**FOR MORE INFORMATION CONTACT:**

City Clerk
City of Scotts Valley
1 Civic Center Drive, Scotts Valley, CA 95066
Tel: 831-440-5600
Email: cityhall@scottsvalley.gov

## 1. CLAIMANT INFORMATION

| | | |
|---|---|---|
| **Claimant** | Tavare Harris | |
| **Street Address/City/ST/Zip** | c/o 2460 17th Ave. #1135 Santa Cruz, CA 95062 | |
| **Mailing Address/City/ST/Zip** | | |
| **Phone** | (831) 419-7319 ■ Cell □ Work □ Home | □ Cell □ Work □ Home |
| **E-Mail Address** | HTavare@yahoo.com | |

## 2. DESCRIPTION OF CLAIM

On or about August 13, 2025, & continuing thereafter, Claimant was subjected to unlawful detention, illegal search, ADA-related unjustified assault, & arrest by officers of the Scotts Valley Police Department while lawfully present on private property. The encounter constituted a predatory police contact initiated without lawful justification and executed in a harassment-style, off-duty-type discretionary enforcement manner. Officers employed coercive detention tactics, ignored established protocols, and applied force absent any lawful basis.

The supervising officer on scene failed to intervene, investigate, or de-escalate, & instead escalated the encounter, thereby compounding the unlawful conduct. Officers subsequently generated false reporting unsupported by objective evidence, further entrenching the misconduct.

As a direct result, Claimant suffered physical injury, emotional distress, loss of liberty, substantial financial loss including legal expenses, and continuing damages.

Following the incident, the City and its agents engaged in a sustained pattern of concealment and obstruction. The City was formally notified to preserve all Axon body-worn and dash-camera evidence and acknowledged possession of the same. Despite this, the City produced only a derivative version of the evidence, exhibiting material discrepancies, evidence-handling irregularities, and compromised video integrity, raising serious concerns of mishandling, alteration, or loss of original evidence.

Concurrently, Scotts Valley Police Department obstructed Claimant's lawful access to public records by denying responsive native body-worn and dash-camera evidence through blanket exemptions while selectively disclosing the same evidence and related audit and CAD materials to the District Attorney. This selective disclosure deprived Claimant of critical exculpatory information, violated the California Discovery Act, and materially Proceedings were nevertheless advanced while these defects remained unresolved, thereby impairing fundamental due-process protections and distorting the integrity of the judicial process.

The City's conduct further includes post-incident retaliation, intimidation, and ongoing harassment, unconstitutional policing practices, supervisory misconduct, and continued discovery abuse, creating cumulative and compounding liability.

Claimant expressly reserves the right to amend and supplement this claim as additional facts, records, and evidence become known.

## 3. AMOUNT OF CLAIM (If applicable, attach supporting receipts, etc.)

Damages exceed jurisdictional minimum & include but are not limited to medical expenses, emotional distress, loss of liberty, lost income, legal fees, and future damages according to proof.

## 4. CITY EMPLOYEES INVOLVED

Scotts Valley Police Department officers, supervisors, records custodians, and administrative personnel whose identities are presently known and unknown, acting within the course and scope of their employment.

EXHIBIT A

## 5. DATE OF OCCURRENCE

On or about August 13, 2025

## 6. WITNESSES TO OCCURRENCE (Please include all available contact information, i.e. name, address, etc.)

Witnesses include Claimant; responding officers; and other individuals whose identities are presently unknown, including persons captured on body-worn camera, dash camera, dispatch recordings, and surveillance footage from the location.

**CLAIMANT'S STATEMENT/AGREEMENT (PLEASE READ CAREFULLY BEFORE SIGNING):**
I hereby certify under penalty of perjury that the answers and statements I have made on this claim are true and correct to the best of my knowledge and belief.

| | |
|---|---|
| **CLAIMANT SIGNATURE:** [signature] | **DATE:** January 10, 2026 |
| **PRINTED NAME:** Tavare Harris | **POSITION/TITLE:** Claimant |

# CITY OF SCOTTS VALLEY

OFFICE OF THE CITY CLERK
One Civic Center Drive • Scotts Valley • California • 95066
Phone (831) 440-5608 • www.scottsvalley.gov

February 5, 2026

Via US Mail and Email

Tavare Harris
c/o 2460 17th Avenue #1135
Santa Cruz, CA 95062
htavare@yahoo.com

EXHIBIT A

**RE: NOTICE OF ACTION ON CLAIM**

Dear Tavare Harris:

The claim against the City of Scotts Valley, filed with the City on January 15, 2026, was considered by the City Council at its meeting of February 4, 2026. After due consideration, the claim has been denied by the City Council.

It is important for you to know that, with some exceptions, you may file a court action on this claim within six months from the date this notice was mailed. Please refer to state Government Code Section 945.6 for more information. Further, please note that should you file a court action and the court determines that the action was brought without reasonable cause or a good faith belief that the filing was justified, the City of Scotts Valley may seek to recover all costs of defense in the action. Please refer to Sections 128.5 and 1038 of the California Code of Civil Procedures for more information.

Please also be advised that you may seek the advice of an attorney regarding this matter. Should you wish to consult with an attorney, it is advisable that you do so at the earliest opportunity.

This information is provided to you to ensure you are aware of your options as a result of the City Council's action to deny your claim. Please call me at 831-440-5608 or email csimonovich@scottsvalley.gov should you have any questions.

Sincerely,

Cathie Simonovich

Cathie Simonovich
City Clerk


2025-08-13 15:40:24 -0700
AXON FLEET 3 F X685X3G6M


2025-08-13 15:40:28 -0700
AXON FLEET 3 F X685X3G6M

[EXHIBIT 2-1: OFFICIAL REAR LIGHTING CERTIFICATION]: DCA / BAR COMPLIANCE CERTIFICATE LA 2468662 [INDEX]. DOCUMENT PROVES REAR AND STOP LAMPS WERE OFFICIALLY INSPECTED AND SIGNED OFF UNDER THE CHP SALVAGE VERIFICATION PROCESS VEHICLE RETAINED THE SAME HOUSINGS BEFORE AND AFTER REPAIR. REMOVES OBJECTIVE ROADWAY PRETEXT.


CERTIFICATE OF COMPLIANCE LAMP ADJUSTMENT

dca BUREAU OF AUTOMOTIVE REPAIR LA 2468662

1B3EL46R75N616249 | 5LOC697
TAVARB HARRIS | DODGE | 2005

Purpose of Certification
- ☐ Lamp Adjustment
- ☐ Approved Lighting Equipment
- ☐ Lighting System Repair
- ☐ Clearance of Enforcement Document #
- ☑ Registration of Reconstructed Vehicle

Headlights / Driving Lights / Passing Lights / Fog Lights

Type of Aimer Used: ☑ Mechanical ☐ Optical ☐ Screen

Boxes Checked Below Identify Additional Lamp Equipment Inspected or Repaired
- ☑ CLEARANCE LAMPS
- ☑ LAMP TYPE SIGNAL
- ☐ SEMAPHORE TYPE SIGNALS
- ☑ WARNING LAMPS
- ☑ REAR LAMPS
- ☑ STOP LAMPS
- ☑ REFLECTORS
- ☑ LICENSE PLATE LAMPS
- ☐ IDENTIFICATION LAMPS
- ☐ SIDE LAMPS
- ☐ SPOT LAMPS
- ☑ BACK-UP LAMPS

All items checked above are of an approved type and I have performed the applicable inspection, adjustment, or repair as specified by the Bureau of Automotive Repair and the vehicle manufacturer, and in accordance with Title 13 and Title 16 of the California Code of Regulations, the Vehicle Code, and the Business and Professions Code. I hereby certify under penalty under the laws of the State of California that the above is true and correct.

Adjuster's Signature: [signature] | Date of Issuance: 9/18/17

Adjuster's License No.: LA00631526 | Station License No.: LS00205823

This certificate must be issued on the date of inspection and is valid for 90 days after issuance.

L-91 (Rev. 4/09)

CERTIFIED DOCUMENTS







EXHIBIT 3

RE: video footage

From: Michelle Lipperd (michelle.lipperd@santacruzcountyca.gov)

To: htavare@yahoo.com

Date: Thursday, October 16, 2025 at 12:12 AM UTC

Mr. Harris, the officer indicates he pulled you over for both black taillights and for a broken taillight. It is unclear from the video if the taillight is in fact broken.

***Best,***

***Michelle Lipperd***
*Collateral Consequences and Reentry Supervisor*
*Santa Cruz County Office of the Public Defender*
*Phone: (831) 454-5354 | Fax: (831) 454-5360*
*Email: michelle.lipperd@santacruzcountyca.gov*

PUBLIC DEFENDER

EXHIBIT A-4

**From:** Tavare Harris <htavare@yahoo.com>
**Sent:** Wednesday, October 15, 2025 10:46 AM
**To:** Michelle Lipperd <Michelle.Lipperd@santacruzcountyca.gov>
**Subject:** Re: video footage

****CAUTION:This is an EXTERNAL email. Exercise caution. DO NOT open attachments or click links from unknown senders or unexpected email.****

Subject: Re: Review of Body-Worn Camera Footage

Hi Ms. Lipperd,

Thank you for letting me know that you received and reviewed the body-worn camera footage.
I am open to hearing your observations if and only if they help clarify or support my defense. I'm not interested in any further negative framing or conclusions that assume I acted improperly while ignoring the officer's conduct.

I want to make sure the focus stays on the full picture — including the two-mile follow that began over a mistaken "black taillight" hunch, the escalation that occurred while I was calm and compliant, and the larger pattern of bias and retaliation I've experienced since filing complaints.

This has been an extremely difficult time: I buried my mother the day before this incident, and tomorrow is her birthday.

THE NIEVES LAW FIRM
160 Franklin St. Ste. 210 | Oakland, CA 94607
O: 510-879-7549 | F: 877-272-5339
info@thenieveslawfirm.com | www.thenieveslawfirm.com

January 26, 2026

Santa Cruz County District Attorney's Office
District Attorney Peter Esho
peter.esho@santacruzcountyca.gov

RE: People v. Tavare Harris (25CR03944)

Dear Deputy District Attorney Esho,

Our office represents Mr. Tavare Harris, who is currently facing charges under Penal Code §148(a)(1). We firmly believe this case should be dismissed, and the following information is provided to support a fair outcome, highlighting the various issues with Mr. Harris's arrest as well as with the charges brought against him.

EXHIBIT A-5

**Factual Summary**

On August 13, 2025, after having lunch, Mr. Harris drove home in his white Dodge Stratus. Upon arriving in Scotts Valley, he was followed by Officer Stoebrl, who observed that the vehicle had blacked-out taillights and a broken left brake light, which he believed constituted violations of California Vehicle Code sections 25950(b) and 24603(b). Officer Stoebrl followed Mr. Harris's vehicle for approximately five intersections as Mr. Harris turned into the Target parking lot located at 270 Mt. Hermon Road.

After Mr. Harris parked his vehicle, Officer Stoebrl positioned his patrol car behind him and activated his patrol vehicle's blue lights and airhorn. No siren was activated, and no verbal commands were given at that time directing Mr. Harris to remain in his vehicle or advising him that he was being detained. Believing he had completed his drive, Mr. Harris exited his vehicle.

Officer Stoebrl exited his patrol car and informed Mr. Harris that he had been stopped for a broken brake light. Mr. Harris was confused, as two of the three rear brake lights were functioning, and he calmly asked for clarification and requested that a supervisor be contacted so he could better understand the basis for the stop.



Officer Tol arrived on scene shortly thereafter. Mr. Harris again attempted to explain his confusion regarding the alleged equipment violation. The officers asked Mr. Harris for identification. Mr. Harris asked why he was being detained and requested identification from Officer Tol.

Officer Tol advised Mr. Harris that he had two options: to identify himself or be taken into custody. Mr. Harris did not refuse to comply but continued to ask for an explanation as to why he was being detained. Officer Tol responded, "It does not matter," and repeated the same ultimatum. As Mr. Harris calmly continued to ask questions, he was placed under arrest.

During the arrest, Officers Stoebrl and Tol used force. Mr. Harris reported pain and injury to his right arm. In Officer Tol's Supplemental Report, he notes hearing a popping sound coming from Mr. Harris's right arm during the arrest.

**Factors Supporting Dismissal in the Interest of Justice**

1. Questionable Basis for the Initial Stop

The stop was based on an alleged brake light violation. At the time of the encounter, two of the vehicle's three rear brake lights were fully operational, providing adequate illumination to alert following traffic. Under these circumstances, the vehicle maintained functional rear lighting, calling into question whether a clear and objectively observable traffic infraction existed to justify the initial detention. This ambiguity weighs against the reasonableness of the stop and the escalation that followed.

2. Ambiguity in the Attempted Vehicle Stop Under Vehicle Code § 2800.1

When Officer [illegible] followed Mr. Harris into the Target parking lot, he did not activate a siren or a red lamp. Instead, the officer utilized blue lights and an air horn. Vehicle Code section 2800.1 requires that an officer's vehicle be exhibiting at least one lighted red lamp visible from the front, and that the driver either sees or reasonably should see that signal. The statutory signaling requirements were not met. Mr. Harris did not reasonably understand that he was being subjected to a formal traffic stop or that he was required to remain inside his vehicle. His actions following parking were consistent with this misunderstanding rather than any intent to evade or disregard law enforcement.

3. Escalation and Use of Force

Upon contact, Mr. Harris attempted to explain his confusion regarding the alleged equipment violation. He did not raise his voice, make threats, or engage in evasive or aggressive conduct. Despite this, the encounter escalated quickly, culminating in the use of physical force during the arrest. Mr. Harris sustained an injury to his right arm, and Officer Tol noted hearing a popping sound during the arrest. Given the absence of



resistance or hostility, the level of force used appears disproportionate to the circumstances and contributed significantly to the escalation of the incident.

4. Lack of Justification for Arrest

Mr. Harris did not resist officers or obstruct their investigation. He did not refuse to identify himself; rather, he asked for clarification as to why he was being detained. There was no indication of a safety concern, flight risk, or independent probable cause beyond the initial equipment issue. In the absence of resistance, obstruction, contraband, or escalating behavior, the decision to arrest was disproportionate and not supported by objective conduct attributable to Mr. Harris.

EXHIBIT A-5

**Proposal for Resolution**

Given the questionable basis for the initial stop, the unnecessary escalation and use of force, and Mr. Harris's consistent efforts to cooperate and seek clarification, further prosecution would not serve the interests of justice. Mr. Harris posed no danger to officers or the public and attempted to comply throughout the encounter. The equities favor prompt and fair resolution of this matter, and we respectfully urge dismissal in the interests of justice.

THE NIEVES LAW FIRM, APC

ID bwZUpEPjUBmCkFTj5KaVeFNv

Grace Matteoni Goodman, Esq.
Attorney *for Tavare Harris*



eSignature Details

Signer ID: bwZUpEPjUBmCkFTj5KaVeFNv
Signed by: Attorney Grace Matteoni Goodman
Sent to email: grace@thenieveslawfirm.com
IP Address: 71.202.86.55
Signed at: Jan 26 2026, 5:18 pm PST

# Superior Court of California, County of Santa Cruz
# MINUTE ORDER

B

| | |
|---|---|
| The People of the State of California<br>vs<br>Tavare Harris | **Case No.: 25CR03944**<br>Arrest No.: 25V00717<br>8:30 AM Disposition Hearing |

02/25/2026
Heard By: Sheinbaum, Jordan
Courtroom Reporter: Electronic Court Reporter

Location: Santa Cruz Department 2
Courtroom Clerk: Erik Campos

**Parties Present:**

| | |
|---|---|
| Goodman, Grace | Attorney |
| Harris, Tavare | Defendant |
| Mazzeo, Lauren | Assistant District Attorney |

**Future Hearings:**

EXHIBIT B

**Case Events:**

- Remote Appearance by Parties; Defendant

**Journal Entries:**

- Matter is called for Disposition Hearing.

The People are satisfied with Defendant's mitigation.
On the motion of the People, the case is dismissed in the interest of justice.

Disposition Date: February 25, 2026

001. PC148(A)(1)-M-RESIST/OBSTRUCT PUBLIC OFFICER

Disposition: Dismissal: Motion of the People

002. VC12951(B) -M- REFUSAL TO PRESENT LICENSE TO OFFICER

Disposition: Dismissal: Motion of the People

Natalie Suric, LMFT
#LMFT122012
424-287-7259
therapy@nataliesuric.com

10/12/2025

To Whom It May Concern:

I am writing on behalf of my client, Tavare-Maquise Harris, who has been engaged in ongoing individual psychotherapy with me since November 2022. Over the past several months of our work together, I have been treating him for symptoms consistent with Post-Traumatic Stress Disorder (PTSD). This letter is provided with Mr. Harris' consent to support his ongoing legal and ADA accommodation needs.

Mr. Harris's PTSD stems from multiple past traumatic experiences, including physical assaults, motor-vehicle accidents, recent sudden death of his mother, and highly stressful encounters with law enforcement. As a result, he exhibits heightened startle responses, hypervigilance, and difficulty processing verbal commands when he perceives sudden confrontation, authority pressure, or perceived threat.

During such situations, Mr. Harris may experience a "freeze" or "shutdown" response characterized by delayed or limited verbal response and difficulty moving or following instructions immediately. These are involuntary physiological reactions linked to trauma, not acts of willful resistance or defiance. Given his diagnosis and symptom presentation, I recommend that Mr. Harris be provided with reasonable ADA accommodations in court or legal settings, including but not limited to:

-Clear, calm communication without raised voices or sudden commands.

-Short breaks or grounding periods when triggered or overwhelmed.

-Option for remote or video appearance when possible.

-A support person or service animal present during proceedings.

-Limitation of direct physical proximity or sudden approach by uniformed officers when not necessary.

It is my clinical opinion that such accommodations are essential to allow Mr. Harris to fully participate and respond appropriately in his defense while minimizing trauma triggers. Please feel free to contact me for verification or clarification within the limits of Mr. Harris's privacy authorization.

Please feel free to contact me if additional information is needed.

Sincerely,

Natalie Suric LMFT

Natalie Suric, Licensed Marriage and Family Therapist

EXHIBIT B-1


PRIVATE PROPERTY
PARKING FOR SCOTTS VALLEY SQUARE CUSTOMERS AND EMPLOYEES ONLY
NO OVERNIGHT PARKING OR PARKING OF VEHICLES FOR SALE
UNAUTHORIZED VEHICLES WILL BE TOWED AT OWNER'S EXPENSE
SVPD (831) 440-5670
SVMC 10.08.070 10.08.080
10.09.030 10.16.010
CVC SECTION 22658A
WARNING:
THIS AREA CONTAINS CHEMICALS KNOWN TO THE STATE OF CALIFORNIA TO CAUSE CANCER AND BIRTH DEFECTS OR OTHER REPRODUCTIVE HARM
UNAUTHORIZED VEHICLES PARKED IN DESIGNATED ACCESSIBLE SPACES NOT DISPLAYING DISTINGUISHING PLACARDS OR SPECIAL LICENSE PLATES ISSUED FOR PERSONS WITH DISABILITIES WILL BE TOWED AWAY AT THE OWNER'S EXPENSE
TOWED VEHICLES MAY BE RECLAIMED AT TRI-COUNTY TOWING OR BY TELEPHONING 831-425-4743
NOTICE
NO TRESPASSING, LOITERING, OR LODGING
AGAINST ANY BUILDING IN ANY ENTRANCEWAY, ALCOVE, OR PARKING LOT ON THESE PREMISES BELONGING TO
SCOTTS VALLEY SQUARE
VIOLATION CA PENAL CODE #602, 552-555.5, 647 (E)
EXHIBIT C




[MDT DEACTIVATE / AIRHORN DEFECT]: NOTICE SCREEN ON RIGHT REMAINS COMPLETELY BLANK AFTER AIRHORN. TECHNICAL PROOF LIGHTS WERE NEVER ACTIVATED. AIRHORN IS A NOISE DEVICE; NOT A VALID CVC § 25252 SIGNAL OR LAWFUL COMMAND.




[TIMING FRAUD CONFINED]: NOTICE ACTIVATES MDT SCREEN AT 15:40:48.
TIMELINE MATCHES CAD "ON SCENE" LOG. TECHNICAL PROOF: ENFORCEMENT TIMELINE WAS RETROACTIVELY MANUFACTURED ON PRIVATE PROPERTY.




EXHIBIT C-3





Officer slanders Claimant over the radio to poison the arriving supervisor's mindset / Federal Monell Bias







Sergeant Tol arrives, fails to independently investigate, and immediately issues an unlawful arrest ultimatum to a pedestrian


2025-08-13 15:48:19 -0700
AXON BODY 3 X60AE032J
JEWELERS
The Good Feet Store
CHIPOTLE

EXHIBIT C-2


2025-08-13 15:50:22 -0700
AXON BODY 3 X60AE032J
POLICE

# Portable Audio/Video Recorders

### 420.1 PURPOSE AND SCOPE

This policy provides guidelines for the use of portable audio/video recording devices by members of this agency while in the performance of their duties. Portable audio/video recording devices include all recording systems whether body-worn, hand held or integrated into portable equipment.

This policy does not apply to mobile audio/video recordings, interviews or interrogations conducted at any Scotts Valley Police Department facility, authorized undercover operations, wiretaps or eavesdropping (concealed listening devices).

EXHIBIT D-2

### 420.2 POLICY

The Scotts Valley Police Department may provide members with access to portable recorders, either audio or video or both, for use during the performance of their duties. The use of recorders is intended to enhance the mission of the Department by accurately capturing contacts between members of the Department and the public.

### 420.3 MEMBER PRIVACY EXPECTATION

All recordings made by members on any agency-issued device at any time, and any recording made while acting in an official capacity for this agency, regardless of ownership of the device it was made on, shall remain the property of the Department. Members shall have no expectation of privacy or ownership interest in the content of these recordings.

### 420.4 MEMBER RESPONSIBILITIES

Prior to going into service, each uniformed member who may become involved in an enforcement situation will be responsible for making sure they are equipped with a portable recorder issued by the Department, the recorder is in good working order, and the battery is fully charged. If the recorder is not in working order or the member becomes aware of a malfunction at any time, the member shall promptly report the failure to their supervisor and obtain a functioning device as soon as reasonably practicable.

Officers may not wear a BWC unless they have completed the required department training on the use and function of the BWC.

When using a portable recorder, the assigned member shall record his/her name, SVPD identification number and the current date and time at the beginning and the end of the shift or other period of use, regardless of whether any activity was recorded. This procedure is not required when the recording device and related software captures the user's unique identification and the date and time of each recording.

Officers shall position the camera to facilitate optimum recording field of view. Watch Guard model BWCs may only be worn on the chest/abdomen with department authorized mounting systems.

Copyright Lexipol, LLC 2025/02/26, All Rights Reserved.
Published with permission by Scotts Valley Police Department

EXHIBIT D-2

The Watch Guard model shall be worn on the uniform shirt, facing forward, between the waist area and the shoulders.

Officers shall dock their issued camera for automated upload of BWC data files daily at the end of their shift at the docking station to ensure storage capacity is not exceeded and/or to view uploadedaudio/video.

Officers operating take home vehicles may dock their camera at the end of their shift and then take their assigned vehicle home. It will be the responsibility of the officer to pick up their camera as soon as practical at the beginning of their next shift. It is recognized officers may make enforcement stops to and from work which may result in those stops not being recorded.

Members should document the existence of a recording in any report or other official record of the contact (e.g. CAD, F.I. card, or citation), including any instance where the recorder malfunctioned or the member deactivated the recording. Members should include the reason for deactivation.

### 420.4.1 SUPERVISOR RESPONSIBILITIES

Supervisors should take custody of a portable audio/video recording device as soon as practicable when the device may have captured an incident involving the use of force, an officer-involved shooting or death or other serious incident, and ensure the data is downloaded (Penal Code § 832.18).

Additional supervisors responsibilities are as follows:

(a) Supervisors will ensure officers utilize the BWC according to policy guidelines.

(b) Supervisors may have the ability to immediately resolve citizen complaints by reviewing video captured by the BWC. In those circumstances where a complaint is resolved with no further action needed, supervisors shall add an additional category of citizen complaint to the video and make appropriate notes in the notes section of Watch Guard's evidence library. This will allow the department to capture complaint incidents that are resolved by this camera system.

(c) The supervisor shall contact the System Administrator or designee upon learning of any reported problems or malfunctions of issued BWC equipment.

## 420.5 ACTIVATION OF THE PORTABLE RECORDER

This policy is not intended to describe every possible situation in which the portable recorder should be used, although there are many situations where its use is appropriate. Members should activate the recorder any time the member believes it would be appropriate or valuable to record an incident.

The portable recorder should be activated in any of the following situations:

(a) All enforcement and investigative contacts including stops and field interview (FI) situations

(b) Traffic stops including, but not limited to, traffic violations, stranded motorist assistance and all crime interdiction stops

Copyright Lexipol, LLC 2025/02/26, All Rights Reserved.
Published with permission by Scotts Valley Police Department

***DRAFT***

EXHIBIT D-3

IV. <u>ORAL COMMUNICATION DUTIES</u>:

A. <u>Oral Communications</u> - Involves conferring, advising, coordinating, interviewing, directing or conducting other verbal interaction with others. <u>Examples</u> - Speak clearly and be understood in both a calm voice and a commanding voice - hear and understand verbal conversations and instructions - confer with suspects, victims, witnesses, officers, attorneys, etc. - give verbal assistance/advice/counsel, etc. to victims, offenders, etc. - coordinate and take charge of situations by directing citizens, other officers, or public service personnel, etc. - gather information by interviewing suspicious persons, complainants, witnesses, victims, etc. - conduct public relations activities such as making presentations to community groups, working with public agencies, delivering death and emergency messages.

B. <u>Mediation</u> - Involves mediating confrontation with hostile or potentially hostile people and mediating inter-personal disputes. <u>Examples</u> - Mediate family and civil disputes - diffuse potentially violent situations - maintain the ability to be flexible in dealing with people and events - control your temper even under considerable provocation and in dangerous and volatile situations - exercise inter-personal sensitivity with all types of people in varying situations - control hostile groups (e.g., bar patrons, etc.).

C. <u>Using Radio/Telephone</u> - Involves communication devices such as patrol car radio, walkie-talkies, base station radio, telephone, E-9-1-1 system. <u>Examples</u> - Hear and understand communications over a two-way radio - operate radio and/or other electronic equipment - transmit messages over police radios - receive incoming calls from the public - be able to understand and operate all E-9-1-1 equipment related to receiving and dispatching E-9-1-1 calls.

V. <u>WRITTEN COMMUNICATIONS</u>:

A. <u>Paperwork</u> - Generating, processing and maintenance of written information - <u>Examples</u> - Process custody paperwork - book evidence and personal property.

B. <u>Reading</u> - Statutes, legal transcripts, reports, memos, training material, etc. <u>Examples</u> - Read and understand written laws and departmental rules, regulations and procedures.

C. <u>Writing and Diagraming</u> - Forms, citations, reports, and depicting crimes/accident scenes in schematic form. <u>Examples</u> - Write clear and accurate reports - observe, investigate and accurately record/diagram accident and crime scenes - summarize in writing statements of witnesses, complainants, etc. - estimate vehicle speed using physical evidence and mathematical formulas or graphs.

VI. <u>SUPERVISORY DUTIES</u>:

A. <u>Example of Duties</u>

1. Supervises law enforcement field activities during an assigned shift.

# Table of Contents

**Chief's Preface** . . . . . . . . . . . . . . . . . . . . . . . . **1**

**Law Enforcement Code of Ethics** . . . . . . . . . . . . . . . . . . **2**

**Mission Statement** . . . . . . . . . . . . . . . . . . . . . . **3**

**Chapter 1 - Law Enforcement Role and Authority** . . . . . . . . . . . . **9**
- 100 - Law Enforcement Authority . . . . . . . . . . . . . . . . . 10
- 101 - Chief Executive Officer . . . . . . . . . . . . . . . . . . 13
- 102 - Oath of Office . . . . . . . . . . . . . . . . . . . . . 14
- 103 - Policy Manual . . . . . . . . . . . . . . . . . . . . . 15
- 104 - Law Enforcement Code of Ethics . . . . . . . . . . . . . . . 18

**Chapter 2 - Organization and Administration** . . . . . . . . . . . . . **19**
- 200 - Organizational Structure and Responsibility . . . . . . . . . . . 20
- 201 - Departmental Directive . . . . . . . . . . . . . . . . . . 22
- 202 - Emergency Management Plan . . . . . . . . . . . . . . . . 23
- 203 - Training . . . . . . . . . . . . . . . . . . . . . . . 24
- 204 - Electronic Mail . . . . . . . . . . . . . . . . . . . . 27
- 205 - Administrative Communications . . . . . . . . . . . . . . . 29
- 206 - Staffing Levels . . . . . . . . . . . . . . . . . . . . 30
- 207 - License to Carry a Firearm . . . . . . . . . . . . . . . . 31
- 208 - Retiree Concealed Firearms . . . . . . . . . . . . . . . . 38

**Chapter 3 - General Operations** . . . . . . . . . . . . . . . . . . **43**
- 300 - Use of Force . . . . . . . . . . . . . . . . . . . . . 44
- 301 - Use of Force Review Boards . . . . . . . . . . . . . . . . 54
- 302 - Handcuffing and Restraints . . . . . . . . . . . . . . . . 56
- 303 - Control Devices and Techniques . . . . . . . . . . . . . . . 60
- 304 - Conducted Energy Device . . . . . . . . . . . . . . . . . 65
- 305 - Officer-Involved Shootings and Deaths . . . . . . . . . . . . 73
- 306 - Firearms . . . . . . . . . . . . . . . . . . . . . . . 74
- 307 - Vehicle Pursuits . . . . . . . . . . . . . . . . . . . . 84
- 308 - Officer Response to Calls . . . . . . . . . . . . . . . . . 96
- 309 - Domestic Violence . . . . . . . . . . . . . . . . . . . 99
- 310 - Search and Seizure . . . . . . . . . . . . . . . . . . . 109
- 311 - Temporary Custody of Juveniles . . . . . . . . . . . . . . . 111
- 312 - Senior and Disability Victimization . . . . . . . . . . . . . 122
- 313 - Discriminatory Harassment . . . . . . . . . . . . . . . . 137
- 314 - Child Abuse . . . . . . . . . . . . . . . . . . . . . 143
- 315 - Missing Persons . . . . . . . . . . . . . . . . . . . . 151
- 316 - Public Alerts . . . . . . . . . . . . . . . . . . . . . 157
- 317 - Victim and Witness Assistance . . . . . . . . . . . . . . . 164
- 318 - Hate Crimes . . . . . . . . . . . . . . . . . . . . . 166

EXHIBIT D-4

Copyright Lexipol, LLC 2025/02/26, All Rights Reserved.
Published with permission by Scotts Valley Police Department

319 - Standards of Conduct . . . . . . . . . . . . . . . . . . . 177
320 - Information Technology Use . . . . . . . . . . . . . . . . . 184
321 - Report Preparation . . . . . . . . . . . . . . . . . . . 188
322 - Media Relations . . . . . . . . . . . . . . . . . . . 192
323 - Subpoenas and Court Appearances . . . . . . . . . . . . . 196
324 - Reserve Officers . . . . . . . . . . . . . . . . . . . 199
325 - Outside Agency Assistance . . . . . . . . . . . . . . . . 205
326 - Registered Offender Information . . . . . . . . . . . . . . 207
327 - Major Incident Notification . . . . . . . . . . . . . . . . 212
328 - Death Investigation . . . . . . . . . . . . . . . . . . 214
329 - Identity Theft . . . . . . . . . . . . . . . . . . . . 218
330 - Private Persons Arrests . . . . . . . . . . . . . . . . . 219
332 - Limited English Proficiency Services . . . . . . . . . . . . 221
333 - Communications with Persons with Disabilities . . . . . . . . . 229
334 - Mandatory Employer Notification . . . . . . . . . . . . . . 237
335 - Biological Samples . . . . . . . . . . . . . . . . . . 239
336 - Chaplains . . . . . . . . . . . . . . . . . . . . . 242
337 - Child and Dependent Adult Safety . . . . . . . . . . . . . 247
338 - Service Animals . . . . . . . . . . . . . . . . . . . 251
339 - Volunteer Program . . . . . . . . . . . . . . . . . . 254
340 - Off-Duty Law Enforcement Actions . . . . . . . . . . . . . 259
342 - Canines . . . . . . . . . . . . . . . . . . . . . . 261
343 - Department Use of Social Media . . . . . . . . . . . . . . 271
344 - Gun Violence Restraining Orders . . . . . . . . . . . . . . 274
346 - Generative Artificial Intelligence Use . . . . . . . . . . . . 280

**Chapter 4 - Patrol Operations . . . . . . . . . . . . . . . . . 284**

400 - Patrol Function . . . . . . . . . . . . . . . . . . . 285
401 - Bias-Based Policing . . . . . . . . . . . . . . . . . . 287
402 - Roll Call Training . . . . . . . . . . . . . . . . . . 291
403 - Crime and Disaster Scene Integrity . . . . . . . . . . . . . 292
404 - Crisis Response Unit . . . . . . . . . . . . . . . . . . 294
405 - Ride-Along Policy . . . . . . . . . . . . . . . . . . 302
406 - Hazardous Material Response . . . . . . . . . . . . . . . 305
407 - Hostage and Barricade Incidents . . . . . . . . . . . . . . 307
408 - Response to Bomb Calls . . . . . . . . . . . . . . . . . 312
409 - Mental Illness Commitments . . . . . . . . . . . . . . . 317
410 - Cite and Release Policy . . . . . . . . . . . . . . . . . 322
411 - Foreign Diplomatic and Consular Representatives . . . . . . . . 325
412 - Rapid Response and Deployment . . . . . . . . . . . . . . 329
414 - Immigration Violations . . . . . . . . . . . . . . . . . 332
415 - Field Training Officer Program . . . . . . . . . . . . . . 338
416 - Contacts and Temporary Detentions . . . . . . . . . . . . . 341
417 - Criminal Organizations . . . . . . . . . . . . . . . . . 345
418 - Watch Commanders . . . . . . . . . . . . . . . . . . 350
419 - Mobile Data Terminal Use . . . . . . . . . . . . . . . . 351
420 - Portable Audio/Video Recorders . . . . . . . . . . . . . . 354

EXHIBIT D-4

Copyright Lexipol, LLC 2025/02/26, All Rights Reserved.
Published with permission by Scotts Valley Police Department

# Training Record

Name: STOEBERL, NICHOLAS

POST ID: [redacted]

Generated On: 11/8/2025 5:26:28 AM

Year: 2025

| Course Title: | CCN/Presentation: | Date: | CPT: | Status: |
|---|---|---|---|---|
| Human Trafficking | 291 | 10/03/2025 | 2 | COMPLETED |
| Initial Response to Critical Incidents | 261 | 07/11/2025 | 2 | COMPLETED |
| Mental Health: Responding to Individuals In Crisis | 292 | 06/13/2025 | 2 | COMPLETED |
| PSP: Strategic Communications | 9181-25599-24343 | 06/08/2025 | 4 | COMPLETED |
| Beyond Bias: Racial & Identity Profiling Update | 9181-25595-24308 | 05/04/2025 | 4 | COMPLETED |
| Vehicle Pursuit Policy | 9181-25587-24210 | 01/26/2025 | 2 | COMPLETED |
| Use of Force: Totality of the Circumstances | 280 | 01/19/2025 | 2 | COMPLETED |
| AB 392: CA Use of Force Standards What You Need to Know | 9181-55000-24203 | 01/19/2025 | 1 | COMPLETED |

Year: 2024

| Course Title: | CCN/Presentation: | Date: | CPT: | Status: |
|---|---|---|---|---|
| Gun Violence Restraining Orders (GVRO) | 9181-25594-24148 | 11/25/2024 | 1 | COMPLETED |
| Autism Recognition and Response | 223 | 10/07/2024 | 2 | COMPLETED |
| Ethical Decision Making | 252 | 09/22/2024 | 2 | COMPLETED |
| Hate Crimes: Identification and Investigation | 278 | 06/08/2024 | 2 | COMPLETED |
| Domestic Violence Response Update | 9181-25505-23311 | 05/06/2024 | 2 | COMPLETED |
| Use of Force: Totality of the Circumstances | 280 | 01/24/2024 | 2 | COMPLETED |
| De-escalation: Enhancing Strategies for Everyday Encounters | 289 | 01/01/2024 | 2 | COMPLETED |

EXHIBIT D-6

Training Record

Year: 2023

| Course Title: | CCN/Presentation: | Date: | CPT: | Status: |
|---|---|---|---|---|
| PSP: Strategic Communications | 9181-25599-23184 | 12/31/2023 | 4 | COMPLETED |
| Human Trafficking | 291 | 12/20/2023 | 2 | COMPLETED |
| AB 392: CA Use of Force Standards What You Need to Know | 9181-55000-23173 | 12/20/2023 | 1 | COMPLETED |
| Law Enforcement Response to Terrorism (LERT) | 9181-25591-23173 | 12/20/2023 | 8 | COMPLETED |
| Beyond Bias: Racial & Identity Profiling Update | 9181-25595-23076 | 09/14/2023 | 4 | COMPLETED |

# Training Record

**Name:** TOL, SJON

**POST ID:** [redacted]

**Generated On:** 11/8/2025 5:28:52 AM

**Year: 2025**

| Course Title: | CCN/Presentation: | Date: | CPT: | Status: |
|---|---|---|---|---|
| High-Technology Crimes | 9181-25514-25094 | 10/02/2025 | 4 | COMPLETED |
| Human Trafficking | 291 | 09/11/2025 | 2 | COMPLETED |
| De-escalation: Enhancing Strategies for Everyday Encounters | 289 | 08/09/2025 | 2 | COMPLETED |
| Gun Violence Restraining Orders (GVRO) | 9181-25594-24329 | 05/25/2025 | 1 | COMPLETED |
| Initial Response to Critical Incidents | 261 | 05/09/2025 | 2 | COMPLETED |
| Mental Health: Responding to Individuals In Crisis | 292 | 05/03/2025 | 2 | COMPLETED |
| PSP: Strategic Communications | 9181-25599-24295 | 04/21/2025 | 4 | COMPLETED |
| Beyond Bias Supervisor Support | 9181-25596-24277 | 04/03/2025 | 1 | COMPLETED |
| Vehicle Pursuit Policy | 9181-25587-24268 | 03/25/2025 | 2 | COMPLETED |
| Use of Force: Totality of the Circumstances | 280 | 02/21/2025 | 2 | COMPLETED |
| AB 392: CA Use of Force Standards What You Need to Know | 9181-55000-24235 | 02/20/2025 | 1 | COMPLETED |

**Year: 2024**

| Course Title: | CCN/Presentation: | Date: | CPT: | Status: |
|---|---|---|---|---|
| Cyber Exploitation | 275 | 09/23/2024 | 2 | COMPLETED |
| Beyond Bias Supervisor Support | 9181-25596-24085 | 09/23/2024 | 1 | COMPLETED |
| De-escalation: Enhancing Strategies for Everyday Encounters | 289 | 07/28/2024 | 2 | COMPLETED |
| Everyday Leadership | 254 | 07/24/2024 | 2 | COMPLETED |
| Gun Violence Restraining Orders (GVRO) | 9181-25594-24008 | 07/08/2024 | 1 | COMPLETED |
| Social Media | 247 | 07/01/2024 | 2 | COMPLETED |

Training Record

| | | | | |
|---|---|---|---|---|
| Training Officer Skills | 222 | 07/01/2024 | 2 | COMPLETED |
| Critical Incident Management (SEMS and NIMS) | 154 | 06/10/2024 | 2 | COMPLETED |
| Autism Recognition and Response | 223 | 05/31/2024 | 2 | COMPLETED |
| Peace Officer Certification and Decertification | 9181-25531-23319 | 05/14/2024 | 1 | COMPLETED |
| Ethical Decision Making | 252 | 05/13/2024 | 2 | COMPLETED |
| Best Practices of Good Training | 9181-25504-23313 | 05/08/2024 | 2 | COMPLETED |
| PSP: Strategic Communications | 9181-25599-23313 | 05/08/2024 | 4 | COMPLETED |
| Hate Crimes: Identification and Investigation | 278 | 04/15/2024 | 2 | COMPLETED |
| Domestic Violence Response Update | 9181-25505-23285 | 04/10/2024 | 2 | COMPLETED |
| Use of Force: Totality of the Circumstances | 280 | 01/23/2024 | 2 | COMPLETED |
| AB 392: CA Use of Force Standards What You Need to Know | 9181-55000-23206 | 01/22/2024 | 1 | COMPLETED |
| Elder and Dependent Adult Abuse | 268 | 01/22/2024 | 2 | COMPLETED |

**Year: 2023**

| Course Title: | CCN/Presentation: | Date: | CPT: | Status: |
|---|---|---|---|---|
| De-escalation: Enhancing Strategies for Everyday Encounters | 289 | 12/02/2023 | 2 | COMPLETED |
| Law Enforcement Response to Terrorism (LERT) | 9181-25591-23154 | 12/01/2023 | 8 | COMPLETED |
| HS Sovereign Citizen Extremists | 253 | 12/01/2023 | 2 | COMPLETED |
| Officer Wellness | 290 | 09/28/2023 | 2 | COMPLETED |
| Everyday Leadership | 254 | 09/09/2023 | 2 | COMPLETED |
| Beyond Bias: Racial & Identity Profiling Update | 9181-25595-23064 | 09/02/2023 | 4 | COMPLETED |
| Learning Portal Tutorial: Course Environment | 9181-03846-23056 | 08/25/2023 | 0 | COMPLETED |

EXHIBIT D-7

E



(k) Establishing a system to prevent tampering with, deleting, or copying recordings, and to ensure chain of custody integrity.

(l) Designating the persons responsible for downloading the recorded data from the BWC.

434.3.2 MEMBER RESPONSIBILITIES

Every member issued a BWC is responsible for its proper use, safekeeping, and maintenance (Penal Code § 832.18).

At the beginning of each shift or period of BWC use, the member should inspect their assigned BWC to confirm it is charged and in good working order. As part of the inspection, the member should perform a function test by activating the BWC and recording a brief video stating their name, identification number, assignment, and the date and time.

Members should wear their assigned BWC on their outermost garment positioned at or near chest level and as close to the center of their body as practicable. Members are responsible for ensuring there are no obstructions and that the BWC remains in a position suitable for recording.

When a BWC is not in the physical possession of the member to which it is assigned, it should be placed on the charging dock and stored in a secure location.

Members shall report any malfunction or damage to the BWC coordinator or on-duty supervisor as soon as practicable and, if possible, obtain a functioning BWC to use either temporarily while repairs are being made to the member's BWC or as a permanent replacement.

**434.4 BWC USE**

The following guidelines apply to the use of BWCs:

(a) Only agency-issued BWCs should be used without the express consent of the Chief of Police or the authorized designee.

(b) BWCs should only be used by the member or members to whom it was issued unless otherwise authorized by a supervisor.

(c) The use of agency-issued BWCs shall be strictly limited to agency-related activities (Penal Code § 832.18).

(d) Members shall not use BWCs or BWC media systems for which they have not received prior authorization and appropriate training.

(e) Members shall immediately report unauthorized access or use of BWCs or BWC media systems by another member to their supervisor or the Chief of Police.

434.4.1 PROHIBITIONS

BWCs should not be used to record:

(a) Routine administrative activities of the Department that do not involve interactions with the public. Care should be taken to avoid incidentally recording confidential documents that the Department has a duty to keep secure (i.e., criminal justice information).

EXHIBIT E-5

Copyright Lexipol, LLC 2025/02/26, All Rights Reserved.
Published with permission by Scotts Valley Police Department

***DRAFT***

Welcome, Chloe Graham - Scotts Valley Police Department (DC0090) | Logout

Schedule View Edit Tools Reports Set Up Manager Personal Help

Posted Through: 01/03/2026 Post... Select Shift Select Explanation

Schedule: 2025.2 06/28-01/03-Jayson Rutherford

8/13/2025

Note:

| | | |
|---|---|---|
| 1 | Patrol A-Days | |
| 2 | Pidcock, Jesse<br>S4 | |
| 3 | King, Kevin<br>075 | Training 8 Hrs<br>ARIDE San Martin |
| 4 | Graff, Larson<br>79 | |
| 5 | Standen, Benjamin<br>063 | |
| 6 | Patrol A-Nights | |
| 7 | Galli, Chris<br>S3 | |
| 8 | Harrison, Vitani<br>073 | |
| 9 | Welsh, Derek<br>076 | |
| 10 | Patrol B-Days | |
| 11 | Tol, Sjon<br>S5 | Sergeant Day Shift |
| 12 | Stoeberl, Nicholas<br>068 | Patrol Day Shift |
| 13 | Garcia, Ivan<br>078 | Patrol Night Shift<br>Swap for Lipari K9 training |
| 14 | Patrol B-Nights | |
| 15 | Roberts, Meredith<br>S1 | Sergeant Night Shift |
| 16 | Lipari, Nicolas<br>059 | *Training 4 Hrs<br>K9 Training |
| 17 | Banke, Michael<br>077 | Sick Leave |
| 18 | Investigations | |
| 19 | Drozek, Pascale<br>S2 | Detective Sergeant |
| 20 | Ahrens, Patrick<br>054 | Training 8 Hrs<br>CHIA Conference |
| 21 | Roberts, Aaron<br>052 | Detective |
| 22 | Brown, Forrest<br>064 | Detective<br>SCCACT |
| 23 | Admin Patrol | |

**8/13/2025**
**Shift:**
Patrol Night Shift (19:00 to 07:00)
**Note:**
Swap for Lipari K9 training
**Updated 08/01/2025 12:07 by Garner, Scott**

EXHIBIT E-1

# Watch Commanders

## 418.1 PURPOSE AND SCOPE

Each patrol shift must be directed by supervisors who are capable of making decisions and communicating in a manner consistent with departmental policies, procedures, practices, functions and objectives. To accomplish this goal, a Sergeant heads each watch.

## 418.2 DESIGNATION AS ACTING WATCH COMMANDER

When a Sergeant is unavailable for duty as Watch Commander, in most instances the senior qualified officer in charge shall be designated as acting Watch Commander. This policy does not preclude designating a less senior officer in charge as an acting Watch Commander when operational needs require or training permits.

EXHIBIT E-2

Copyright Lexipol, LLC 2025/02/25, All Rights Reserved.
Published with permission by Scotts Valley Police Department

On Wednesday, September 17, 2025 at 10:06:41 AM PDT, Peter Esho <peter.esho@santacruzcountyca.gov> wrote:

G

Hi Mr. Harris,

It's my understanding that the packet you receive today will include an itemized list. I just checked on the BWC/dashcam and the 911/CAD and we still have not received them from SVPD. These requests typically take at least a couple weeks for SVPD to process and send to our office, so I do appreciate your patience on getting those items. Please feel free to check in with me sometime next week on the status of those items and I will be happy to check again.

Best,

Peter Esho

EXHIBIT G-1

AXON

## CASE AUDIT TRAIL

**Dept.:** Santa Cruz County District Attorney (CA)
**Case ID:** 25V-00717
**Unique ID:** 14157386-97E4-4ACF-9873-4AA2FD538DA8

**Report Generated by**
**Name:** Johnsen, Eric (DAT340)
**Username:** EJohnsen
**Local Timezone:** Pacific Daylight Time (UTC -07:00)
**Generated on:** 25 Sep 2025 11:25:34
**Audit data current as of:** 25 Sep 2025 11:25:31
**Audit Trail Date Range:** 11 Sep 2025 - 25 Sep 2025

| # | Date | Time | User | Activity |
|---|---|---|---|---|
| 1 | 12 Sep 2025 | 16:40:09 (-07:00) | System | Created |
| 2 | 12 Sep 2025 | 16:40:09 (-07:00) | System | Case copy created at agency Santa Cruz County District Attorney (CA) |
| 3 | 12 Sep 2025 | 16:40:15 (-07:00) | Partner Share | Evidence 'Axon Capture Photo 2025-08-13 172820 5730' (unique ID: 'CBC8E96B43FE45A38DA7D63808BA5EBB', original Evidence Title: 'Axon Capture Photo 2025-08-13 172820 5730') Added to Case |
| 4 | 12 Sep 2025 | 16:40:16 (-07:00) | Partner Share | Evidence 'Axon Capture Photo 2025-08-13 172849 5730' (unique ID: '040E697439DF4AD495A6DF7930FF4CE2', original Evidence Title: 'Axon Capture Photo 2025-08-13 172849 5730') Added to Case |
| 5 | 12 Sep 2025 | 16:40:16 (-07:00) | Partner Share | Evidence 'Axon Capture Photo 2025-08-13 182627 5730' (unique ID: '1771EEA927444CD7BBBEDC343BF01F35', original Evidence Title: 'Axon Capture Photo 2025-08-13 182627 5730') Added to Case |
| 6 | 12 Sep 2025 | 16:44:22 (-07:00) | Partner Share | Evidence 'Axon Body 3 Video 2025-08-13 1540 X60AE054J' (unique ID: 'AF79CC12ABBE4E0E814D38ABF207F331', original Evidence Title: 'Axon Body 3 Video 2025-08-13 1540 X60AE054J') Added to Case |
| 7 | 12 Sep 2025 | 16:44:25 (-07:00) | Partner Share | Evidence 'Axon Capture Photo 2025-08-13 172819 5730' (unique ID: '0A179122C93E4E0A8F7BAA6FA0574611', original Evidence Title: 'Axon Capture Photo 2025-08-13 172819 5730') Added to Case |
| 8 | 12 Sep 2025 | 16:44:25 (-07:00) | Partner Share | Evidence 'Axon Capture Photo 2025-08-13 172848 5730' (unique ID: |

DEMAND FOR PRODUCTION OF NATIVE BODY-WORN CAMERA FILES, AUDIT LOGS, METADATA, CHAIN OF CUSTODY, AND NOTICE TO PRESERVE EVIDENCE

To: Peter Esho, Assistant District Attorney, Santa Cruz County District Attorney's Office
Cc: Scotts Valley Police Department Custodian of Records (Chloe Graham); Cathie Simonovich, City Clerk; City Manager; City Attorney

From: Tavare-Maquise: Harris
c/o 2460 17th Ave #1135, Santa Cruz, CA 95062
Date:9/17/2025

EXHIBIT G-A

Re: DEMAND – Native Body-Worn Camera (BWC) Files, Associated Metadata/Audit Logs, Chain of Custody, CAD/Dispatch Logs, and Preservation Notice
Incident: August 13, 2025 (Scotts Valley PD – Stoeberl / Sgt. Tol)

Dear Mr. Esho,

This letter demands immediate production of the original, native, unaltered digital files and associated records for all body-worn camera (BWC) and dashcam recordings, and related digital materials, generated by Scotts Valley Police Department officers in connection with the August 13, 2025 incident (the "Incident"). This demand also serves as formal notice to preserve all potentially relevant evidence and to prevent spoliation.

Requested items (produce native files & logs):

1. For each officer device (BWC/dashcam) that recorded the Incident, produce the original native digital file(s) in their native format, not a transcoded or exported copy.
2. The complete audit logs/metadata for each file that record: time/date of recording start and stop; file names and IDs; upload/docking timestamps; serial numbers or unique device IDs; every access, export, redaction, or edit event (user ID, date/time, action taken); and any system-generated events.
3. The chain of custody and evidence handling logs for each digital file, including who transferred, downloaded, viewed, redacted, or exported the file and when; any storage locations and backup copies; and any deletion logs.
4. The original, unredacted video files and separate redaction logs demonstrating what (if anything) was redacted, the legal basis for each redaction, and who performed each redaction.
5. CAD/dispatch logs and any 911 audio or radio recordings associated with the Incident (native files and timestamps), and any logs showing supervisor/watch-commander requests or acknowledgements.
6. Metadata showing synchronization between officer BWC/dashcam files and CAD/dispatch times (time offsets, NTP synchronization records, etc.).
7. Any chain-of-access logs from third-party vendors (e.g., Axon/WatchGuard) if used for storage/hosting of the digital evidence.

EXHIBIT G-A

Legal and constitutional basis:

- The prosecution has a constitutional duty to disclose exculpatory and impeachment evidence under Brady v. Maryland and related California authority. Native files and audit logs are highly material and may contain exculpatory content (statements, timing, context).
- The obligation to preserve evidence arises under due process principles and case law including Trombetta (U.S. Supreme Court). Loss, deletion, or alteration of evidence that could be favorable to the defense constitutes spoliation and may lead to suppression, adverse inference, or dismissal.
- Penal Code §§ 1054.1–1054.5 govern prosecutorial discovery obligations; you must disclose reports, recordings, and other discoverable materials in a timely manner to allow effective preparation for trial.

Preservation demand:

- You and Scotts Valley PD are hereby ON NOTICE to preserve ALL evidence relating to the Incident, including but not limited to native digital video files, audio files, CAD/dispatch logs, associated metadata/audit trails, device inventories, and all records of access or transfer.
- Do not permit any alteration, redaction, deletion, overwriting, or destruction of these materials. If any evidence has been lost, corrupted, or altered, provide a written explanation detailing what occurred, when it was discovered, and who had access.

Timing and production format:

- Please provide written confirmation within five (5) calendar days that you have received and accepted this demand and that preservation measures have been taken.
- Produce the requested native files, audit logs, and chain of custody documentation within fourteen (14) calendar days (or sooner if available). Provide a secure method for transfer (secure upload, encrypted drive, or other agreed secure mechanism).
- If any item is withheld, provide a record-by-record log identifying the item and the explicit legal basis for withholding and who authorized the withholding.

Failure to comply / remedies:

- If production is refused or if materials are missing or altered, I will pursue all available remedies, including a motion to compel, a Trombetta/Brady motion, sanctions for spoliation, and any relief appropriate under state and federal law (including suppression or dismissal).

This demand is made without prejudice to any other rights or remedies, statutory or constitutional, including motions to compel discovery, habeas petitions, civil actions for deprivation of rights, and administrative complaints.

Respectfully, *Tavare Harris*

Tavare-Maquise: Harris
c/o 2460 17th Ave #1135
Santa Cruz, CA 95062
All Rights Reserved, Without Prejudice UCC 1-308

Informal Discovery and Evidence Preservation Demand

From: htavare@yahoo.com (htavare@yahoo.com)
To: dao@co.santa-cruz.ca.us
Date: Monday, August 25, 2025 at 06:32 AM UTC

Re: Case No. unknown
Charge: Penal Code §148(a)(1)
Incident Date: August 13, 2025

Pursuant to Penal Code §§1054.1 and 1054.5, as well as the constitutional disclosure obligations under Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 405 U.S. 150 (1972), I hereby request and demand the preservation and production of the following materials related to the August 13, 2025 incident in Scotts Valley involving Officer Nicholas Stoeberl and other Scotts Valley Police Department personnel:

1. All body-worn camera (BWC) and in-car video recordings from all involved officers, including metadata (time/date stamps, activation logs).
2. CAD/dispatch logs, radio traffic recordings, and call-for-service notes for the incident.
3. All police reports and supplements, including incident, arrest, use-of-force, and medical clearance forms.
4. Use-of-force reports and any internal reviews related to the detention/arrest.
5. 911 calls and audio recordings relating to the incident.
6. Photographs, video, or other media collected by officers at or after the scene.
7. Medical clearance paperwork or hospital discharge documents generated while I was in custody.
8. Names, badge numbers, and contact information of all officers and supervisors present.
9. All Brady/Giglio material concerning Officer Nicholas Stoeberl and any other involved officers, including but not limited to prior sustained findings, dishonesty, excessive force, or misconduct records in the possession of the DA's office or law enforcement agencies.
10. Department policies in effect on August 13, 2025, including use-of-force, detention/ID, and body-worn camera activation policies.

Please consider this both an informal discovery request and a demand to preserve all evidence in its original form. Failure to do so may result in sanctions, evidentiary exclusion, or dismissal under Penal Code §1054.5 and related authority.
Thank you for your attention to this matter. Please confirm receipt of this request in writing.
Respectfully,

______________________________

Tavare-Maquise: Harris
c/o 2460 17th Ave #1135
Santa Cruz, California [95062]
All Rights Reserved, Without Prejudice (UCC 1-308)

Informal_Discovery_Preservation_Request DA.pdf
61.3

EXHIBIT G

*On Thu, Sep 25, 2025 at 11:30 AM, Peter Esho*
*<Peter.Esho@santacruzcountyca.gov> wrote:*

Hi Mr Harris,

I checked with our discovery team on all the other aspects of the video. Timestamps and Officer ID are directly input into the video, so you will have those. Activation/deactivation logs, if they exist, are not something that they have ever sent to us for any case as far as we know. We do have an audit trail for the digital evidence, and I have requested that our discovery team include that document in your discovery package. It is my understanding that the video footage should arrive in its original, native format. Again, if there are any issues with the video that you believe undermine the fairness, accuracy, and completeness of the footage, please let me know once you have reviewed it and we will investigate that.

The 911/CAD evidence will include all related call details, dispatch notes, timing records, and is recorded in the sequence of events as they unfolded.

You will also receive a new receipt log for the new materials, much like you have already received for the initial discovery packet. I appreciate that you are going to maintain a copy, that ensures both sides have accurate records on what has been produced.

If there are any other discovery items you would like, please just let me know.

Thank you,

Peter Esho

*On Thu, Sep 25, 2025 at 10:07 AM, Peter Esho*

*<Peter.Esho@santacruzcountyca.gov> wrote:*

Hi Mr Harris,

I hope you are doing well. Apologies for not responding sooner, as you are aware I was out of the office. I checked this morning and it appears we have received all bodyworn camera video footage and the 911/CAD evidence. I have notified our discovery team to begin preparing a package of that evidence for you to pick up. I would anticipate it may be ready sometime early next week, but will let you know if it is prepared sooner.

I am unfamiliar with what metadata is produced alongside the video footage, but I have never received from any agency, including SVPD, video footage that I believed to be altered or edited in any way. The same is true for the 911 and CAD evidence. If you review all the footage produced and find any reason to believe any of it has been altered or destroyed in any way, please let me know immediately.

Thank you,
Peter Esho

From: htavare@yahoo.com <htavare@yahoo.com>
Sent: Thursday, September 25, 2025 10:01 AM
To: Peter Esho <Peter.Esho@santacruzcountyca.gov>
Subject: Re: Automatic reply: Discovery Demand – People v. Tavare-Maquise Harris, Case No. 25CR03944

From: htavare@yahoo.com <htavare@yahoo.com>
Sent: Thursday, September 25, 2025 10:01 AM
To: Peter Esho <Peter.Esho@santacruzcountyca.gov>
Subject: Re: Automatic reply: Discovery Demand – People v. Tavare-Maquise Harris, Case No. 25CR03944

****CAUTION: This is an EXTERNAL email. Exercise caution. DO NOT open attachments or click links from unknown senders or unexpected email.****

Subject: Discovery Request – Native Body-Worn Camera Footage

Dear Mr. Esho,

This follows my prior communications regarding discovery in People v. Tavare-Maquise Harris (25CR03944).

I understand you were currently out of office, but I ask that this be preserved and docketed for the record.

Please confirm that when produced, the body-worn camera and in-car video will be provided in native, unaltered format with full metadata (timestamps, activation logs, GPS if applicable). Exported clips, summaries, or compressed files are insufficient for forensic review and do not meet discovery obligations.

As noted, my California Public Records Act request for this same footage was received by Scotts Valley PD on August 25, 2025. It remains outstanding. The delay in production is materially prejudicing my defense and undermines my ability to prepare.

I respectfully request confirmation that:

1. The BWC and in-car video will be produced in full, native format.

2. All metadata, activation logs, and associated audit trails will be included.

3. A reasonable timeline for production will be provided.

I appreciate your confirmation so this matter may proceed with full transparency.

Respectfully,
Tavare-Maquise: Harris
c/o 2460 17th Ave #1135
Santa Cruz, CA 95062
All Rights Reserved, Without Prejudice UCC 1-308

EXHIBIT G-4

U.S. Postal Service™
CERTIFIED MAIL® RECEIPT
*Domestic Mail Only*

For delivery information, visit our website at www.usps.com®.

Scotts Valley, CA 95066 CPRA 2

Certified Mail Fee $ $5.30

Extra Services & Fees (check box, add fee as appropriate)
- ☐ Return Receipt (hardcopy) $ $0.00
- ☐ Return Receipt (electronic) $ $0.00
- ☐ Certified Mail Restricted Delivery $ $0.00
- ☐ Adult Signature Required $ $0.00
- ☐ Adult Signature Restricted Delivery $ $0.00

Postage $ $0.78

Total Postage and Fees $ $6.08

0223

Postmark Here
SCOTTS VALLEY
AUG 22 2025
08/22/2025

Sent To City Clerk
Street and Apt. No., or PO Box No. One Civic Center Dr.
City, State, ZIP+4® Scotts Valley CA 95066

PS Form 3800, January 2023 PSN 7530-02-000-9047 See Reverse for Instructions

9589 0710 5270 0074 8669 67

Tavare-Maquise: Harris
c/o 2460 17th Ave #1135
Santa Cruz, California [95062]

Date: August 20, 2025

To:
City Clerk – City of Scotts Valley
One Civic Center Drive
Scotts Valley, CA 95066

CC:
Chief of Police – Scotts Valley Police Department
Risk Management Division – City of Scotts Valley

**Re: California Public Records Act Request – August 13, 2025 Incident**

Pursuant to the California Public Records Act (Gov. Code §§ 6250–6270), I hereby request copies of the following records in relation to my detention and arrest on August 13, 2025, in Scotts Valley:

1. All body-worn camera video/audio from Officer Nicholas Stoeberl, the watch commander, and any other officers present.

2. All dash camera video, GPS logs, and vehicle location records for patrol cars involved.

3. Complete incident and arrest reports, including all supplemental reports.

4. All use-of-force reports filed regarding physical force applied to me during the incident.

5. Dispatch audio recordings, CAD logs, and radio traffic related to this stop.

6. Any sustained findings of misconduct or disciplinary actions under SB 1421 for Officer Nicholas Stoeberl, the responding watch commander, and the unidentified officer present.

7. Current departmental policies concerning: – Stops and enforcement in private parking lots (ordinance 10T-22) – Body-worn camera usage and retention – Use of force protocols

Please provide these records in electronic format to the following email address for convenience: HTavare@yahoo.com

Additionally, I require certified hard copies mailed to my c/o mailing address above to preserve an official record. If any portion is withheld, please identify the specific CPRA exemption relied upon and provide all reasonably segregable portions. I respectfully request a response within the statutory period of ten (10) business days.

Sincerely,

Tavare-Maquise: Harris All Rights Reserved, Without Prejudice (UCC 1-308)

EXHIBIT G-5

Re: Supplemental CPRA Request & Notice of Misconduct and Default – August 13, 2025 Incident

From: htavare@yahoo.com (htavare@yahoo.com)

To: cgraham@scottsvalley.gov

Cc: mlagoe@scottsvalley.gov; kpowell@scottsvalley.gov; csimonovich@scottsvalley.gov; swalpole@scottsvalley.gov

Date: Thursday, September 11, 2025 at 06:20 PM UTC

**Subject:** CPRA – Acknowledgment; No WC Assignment; Overbroad CAD Withholding; Insurance/Bonds

Dear Ms. Graham,

Thank you for acknowledging the policy manual and for stating the Department does not possess any record designating a Watch Commander for August 13, 2025. That resolves the dispute: prior inferences that Sgt. Tol was Watch Commander are unsupported by any assignment record.

This point is important because:

- The **Sergeant Class Specifications (§VI.A.13)** state that a Sergeant *"may relieve and act for a superior officer as assigned."*
- The **Watch Commander Policy (§418.1–418.2)** notes that "a Sergeant heads each watch" but also provides for substitutions and designations.
- The **Organizational Structure (§200.3.1)** lists "Watch Commander" as a distinct level in the chain of command.

EXHIBIT G-6

Together, these provisions confirm that **being a Sergeant ≠ automatically Watch Commander.** Without a duty roster, roll-call entry, or assignment record, Tol's designation as Watch Commander for August 13, 2025 remains unsubstantiated. Substituting inference for proof does not satisfy CPRA.

On **CAD/dispatch**, you confirmed responsive records exist but withheld them under *Haynie*, *Rivero*, Gov. Code § 7922.000, and § 7923.600. Please produce all reasonably segregable portions as required under Gov. Code § 7922.525, including non-investigatory metadata such as:

- Incident number(s)
- Call type codes
- Unit IDs
- Timestamps (receive/dispatch/en-route/on-scene/clear)
- Disposition codes
- Any supervisor/Watch Commander request/acknowledgment fields

If you continue to assert exemptions, please provide a **record-by-record justification/log** identifying each record withheld and the specific statute applied, with date, author, type, and a brief description sufficient to assess the claim. Blanket exemptions are improper.

On **bonds/coverage**, thank you for confirming the City does not hold individual officer bonds. Please instead produce the City's risk financing and coverage records applicable to SVPD personnel, including but not limited to:

- Joint Powers Authority (JPA) membership agreements
- Insurance declarations or certificates of coverage
- Self-insurance resolutions under Gov. Code §§ 990 et seq.
- Any blanket public official bond
- Claims handling instructions

Please respond within ten (5) calendar days, or confirm in writing if any of the above records do not exist.

H

*Bias-Based Policing*

five years, or sooner if deemed necessary, in order to keep current with changing racial, identity, and cultural trends (Penal Code § 13519.4(i)).

**401.8 REPORTING TO CALIFORNIA DEPARTMENT OF JUSTICE**

The Operations Commander or Services Commander shall ensure that all data required by the California Department of Justice (DOJ) regarding complaints of racial bias against officers is collected and provided to the Services Supervisor for required reporting to the DOJ (Penal Code § 13012; Penal Code § 13020). See the Records Bureau Policy.

Supervisors should ensure that data stop reports are provided to the Services Supervisor for required annual reporting to the DOJ (Government Code § 12525.5) (See Records Bureau Policy).

EXHIBIT H-1

Copyright Lexipol, LLC 2025/02/26, All Rights Reserved.
Published with permission by Scotts Valley Police Department

A1 | Incident #

| Row | Incident # | Unit | Primary Unit | Disp Date | Disp Time | Enrt Date | Enrt Time | Onscene Date | Onscene Time | Clear Date | Clear Time | Disp->Clear Time | Disp->OS Time | Enrt->DS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | 250813002 | 068 | T | | | | | 08/13/2025 | 08:15:11 | 08/13/202 | 08:32:31 | 0 | 0 | |
| 3 | 250813003 | 068 | T | 08/13/202 | 09:33:48 | 08/13/202 | 09:33:50 | 08/13/2025 | 09:38:06 | 08/13/202 | 09:56:42 | 22.9 | 4.3 | 4.26666667 |
| 4 | 250813003 | 068 | T | 08/13/202 | 10:16:39 | | | | | 08/13/202 | 10:16:41 | 0.0333333333 | 0 | 0 |
| 5 | 250813003 | 068 | T | 08/13/202 | 09:56:48 | | | 08/13/2025 | 09:56:48 | 08/13/202 | 10:06:47 | 9.9833333333 | 0 | 0 |
| 6 | 250813003 | 068 | T | 08/13/202 | 14:27:29 | | | 08/13/2025 | 14:27:29 | 08/13/202 | 14:27:32 | 0.05 | 0 | 0 |
| 7 | 250813003 | 068 | T | 08/13/202 | 10:06:50 | | | 08/13/2025 | 10:06:50 | 08/13/202 | 10:09:12 | 2.3666666667 | 0 | 0 |
| 8 | 250813003 | 068 | T | 08/13/202 | 10:16:44 | 08/13/202 | 10:16:46 | 08/13/2025 | 10:21:51 | 08/13/202 | 10:24:28 | 7.7333333333 | 5.1166666667 | 5.08333333 |
| 9 | 250813004 | 068 | T | 08/13/202 | 13:38:24 | | | 08/13/2025 | 13:38:27 | 08/13/202 | 14:22:44 | 44.3333333333 | 0.05 | 0 |
| 10 | 250813004 | 068 | T | | | | | 08/13/2025 | 12:07:20 | 08/13/202 | 12:13:57 | 0 | 0 | |
| 11 | 250813004 | 068 | T | | | | | 08/13/2025 | 12:15:20 | 08/13/202 | 12:20:44 | 0 | 0 | 0 |
| 12 | 250813004 | 068 | T | 08/13/202 | 12:55:02 | 08/13/202 | 12:55:07 | 08/13/2025 | 12:59:23 | 08/13/202 | 13:28:15 | 33.2166666667 | 4.35 | 4.26666667 |
| 13 | 250813004 | 068 | T | | | | | 08/13/2025 | 14:36:00 | 08/13/202 | 14:46:01 | 0 | 0 | |
| 14 | 250813004 | 068 | T | | | | | 08/13/2025 | 15:01:20 | 08/13/202 | 15:03:14 | 0 | 0 | |
| 15 | 250813004 | 068 | T | | | | | 08/13/2025 | 15:13:47 | 08/13/202 | 15:18:01 | 0 | 0 | |
| 16 | 250813004 | 068 | T | | | | | 08/13/2025 | 15:21:41 | 08/13/202 | 15:26:31 | 0 | 0 | |
| 17 | 250813005 | 068 | T | | | | | 08/13/2025 | 15:40:47 | 08/13/202 | 19:09:23 | 0 | 0 | 0 |
| 18 | 250813005 | 068 | F | 08/13/202 | 20:22:37 | 08/13/202 | 20:22:42 | | | 08/13/202 | 20:23:00 | 0.3833333333 | 0 | 0 |
| 19 | 17 | | | | | | | | | | | | | |

| Row | DS->Clear Time | Type | Date | Time | Location | Place | Dispatcher | City | Primary Unit | Primary Officer | Case # | Recd Time | Tow District |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | 17.3333333333 | AREACK | 08/13/202 | 08:15:1 | 151 VINE HILL SCHOOL RD | VINE HILL SCHOOL | 5730 | S VLY | 068 | | | 08:15:11 | |
| 3 | 18.6 | 10.16.08 | 08/13/202 | 09:33:4 | CIVIC CENTER DR/KENT CT | | 5261 | S VLY | 068 | | | 09:30:43 | BASE |
| 4 | 0 | 10.16.08 | 08/13/202 | 09:33:4 | CIVIC CENTER DR/KENT CT | | 5261 | S VLY | 068 | | | 09:30:43 | BASE |
| 5 | 9.9833333333 | 10852 | 08/13/202 | 09:49:0 | 1 CIVIC CENTER DR | SCOTTS VALLEY POLICE DEPARTMENT | 5261 | S VLY | 068 | | 25V- | 09:48:48 | BASE |
| 6 | 0.05 | 10852 | 08/13/202 | 09:49:0 | 1 CIVIC CENTER DR | SCOTTS VALLEY POLICE DEPARTMENT | 5261 | S VLY | 068 | | 25V- | 09:48:48 | BASE |
| 7 | 2.3666666667 | FU | 08/13/202 | 10:04:2 | 1 CIVIC CENTER DR | SCOTTS VALLEY POLICE DEPARTMENT | 5261 | S VLY | 068 | | | 10:03:27 | BASE |
| 8 | 2.6166666667 | V117 | 08/13/202 | 10:16:3 | 462 LOCKEWOOD LN | | 5261 | S VLY | 068 | | | 10:13:55 | BASE |
| 9 | 44.2833333333 | PC | 08/13/202 | 12:06:4 | 8 BEAN CREEK RD | SCOTTS VALLEY MIDDLE SCHOOL | 5261 | S VLY | 068 | | | 12:02:32 | BASE |
| 10 | 6.6166666667 | TRSTOP | 08/13/202 | 12:07:2 | 75 MT HERMON RD | PINNACLE PASS | 5181 | S VLY | 068 | | | 12:06:57 | |
| 11 | 5.4 | TRSTOP | 08/13/202 | 12:15:2 | LA MADRONA DR/ALTENITAS | | 5181 | S VLY | 068 | | | 12:14:55 | BASE |
| 12 | 28.8666666667 | 415D | 08/13/202 | 12:54:1 | 1501 BEAN CREEK RD | | 5181 | S VLY | 068 | | | 12:48:23 | BASE |
| 13 | 10.0166666667 | AREACK | 08/13/202 | 14:36:0 | 361 KINGS VILLAGE RD | SKATE PARK | 5730 | S VLY | 068 | | | 14:36:00 | |
| 14 | 1.9 | BS | 08/13/202 | 15:01:2 | 4402 SCOTTS VALLEY DR | ADORABLE FRENCH BAKERY | 5261 | S VLY | 068 | | | 15:01:15 | BASE |
| 15 | 4.2333333333 | BS | 08/13/202 | 15:13:4 | 135 S NAVARRA DR | | 5261 | S VLY | 068 | | | 15:13:36 | BASE |
| 16 | 4.8333333333 | AREACK | 08/13/202 | 15:21:4 | 6340 NB SR 17 | POLO RANCH | 5730 | S VLY | 068 | | | 15:21:41 | |
| 17 | 208.6 | TROTHER | 08/13/202 | 15:40:4 | 270 MT HERMON RD | TARGET | 5261 | S VLY | 068 | | 25V- | 15:40:34 | |
| 18 | 0 | THEFT | 08/13/202 | 20:21:5 | 222 MT HERMON RD | NOB HILL FOODS | 5331 | S VLY | 070 | | 25V- | 20:20:31 | |

068 Status

Sheet 1 / 1 PageStyle_068 Status STD Sum=0

PageStyle_068 Status STD Sum=0

EXHIBIT H-2

MS Sans Serif 10

A1 Inc #

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q | R |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Inc # | Type | Date | Day of | Time | Location | Place | Dispatch | City | Primary | Primary | Case # | Recd | Disp | Enrt | OS | Clear | Tow |
| 2 | 25081300 | AREACK | 08/13/20 | Wednesday | 15:21: | 6348 NB SR 17 | POLO RANCH | 5730 | S | 068 | 5730 | | 15:21:41 | | | 15:21:4 | 15:26:31 | |
| 3 | 25081300 | TROTHE | 08/13/20 | Wednesday | 15:40: | 270 MT HERMON | TARGET | 5261 | S | 068 | 5730 | 25V- | 15:40:34 | | | 15:40:4 | 19:55:01 | |
| 4 | 25081300 | 10.00.01 | 08/13/20 | Wednesday | 15:49: | 101 CIVIC CENTER | EMERALD HILL APARTMENTS | 5261 | S | 076 | 1004 | | 15:47:55 | 17:06:11 | 17:06:13 | 17:11:2 | 17:21:48 | BASE |
| 5 | 25081300 | INFO | 08/13/20 | Wednesday | 16:40: | 1 CIVIC CENTER | SCOTTS VALLEY POLICE | | S | | | | 16:39:39 | | | | 16:56:46 | BASE |
| 6 | 4 | | | | | | | | | | | | | | | | | |

CAD Logs

Sheet 1 / 1 PageStyle_CAD Logs STD Sum=0

EXHIBIT H-3

# SCOTTS VALLEY POLICE DEPARTMENT

## CAD INCIDENT REPORT

**2508130050**

Page 1

09/12/2025

| Location | Cross Streets | City |
|---|---|---|
| TARGET, 270 MT HERMON RD | LOCKEWOOD LN/SKYPARK | SCOTTS VALLEY |

| Incident Type | Call Taker | Dispatcher |
|---|---|---|
| TROTHER - TRAFFIC STOP W REPORT, ETC., | 5261 | 5261 |

| Date | Priority | Primary Unit | Beat | Fire Zone | Area | Map | Source | Channel |
|---|---|---|---|---|---|---|---|---|
| 08/13/2025 | 1 | O68 | | | S | N20-B | OFFICER INITIATED | |

| Caller Name | Caller Address | Caller Phone |
|---|---|---|
| | | |

| Dispositions | Weapon | Alm Level | Case Number |
|---|---|---|---|
| Arrest Made | | | 25V-00717 |

| Vehicles | Associated Incidents |
|---|---|
| 2005 Dodge, 7XBW327/CA | |

**Incident Times**

| | |
|---|---|
| Received | 15:40:34 |
| Created | 15:40:46 |
| Dispatched | |
| En Route | |
| On Scene | 15:40:46 |
| Closed | 19:55:01 |
| Rcvd-Closed | 4:14:27 |

**Special Circumstances**

| Persons | Sex | DOB | Race | DL |
|---|---|---|---|---|
| Harris, Tavare Maquise | M | 11/17/1976 | | B3004268/CA |

| Unit Times | Officers | Dispatched | Enroute | On Scene | Clear | Disp-On Scene | Enrt-On Scene | On Scene-Clear | Disp-Clear |
|---|---|---|---|---|---|---|---|---|---|
| O68 | 5730 | | | 15:40:47 | 19:09:23 | N/A | N/A | 3:28:36 | 3:28:36 |
| S5 | 5162 | 15:41:24 | 15:41:27 | 15:55:50 | 16:03:37 | 14:26 | 14:23 | 07:47 | 22:13 |

**Incident Comments**

Officers conducted a traffic stop and the driver exited the vehicle and refused to identify himself. The subject continued to refuse to identify himself, and resisted while being placed in handcuffs. He was cleared at Dominican Hospital and booked into county jail.

| TIME | # | EVENT | BY |
|---|---|---|---|
| 15:40:46 | 1 | O68 Traffic Stop at Target, 270 Mt Hermon Rd, Scotts Valley, CA | 5261 |
| 15:40:47 | 2 | O68 ONSCEN. Target, 270 Mt Hermon Rd, Scotts Valley, CA | 5261 |
| 15:40:47 | 3 | O68 10-29: 7XBW327/CA | 5261 |
| 15:40:47 | 4 | O68 DMV check: 7XBW327/CA | 5261 |
| 15:40:47 | 5 | O68 APB Keyword Query: 7XBW327 | 5261 |
| 15:41:24 | 6 | S5 DISP. Target, 270 Mt Hermon Rd, Scotts Valley, CA | 5261 |
| 15:41:27 | 7 | S5 ENRT. | 5261 |
| 15:43:41 | 8 | O68 10-27: HARRIS,JENE - | 5261 |
| 15:47:54 | 9 | sovereign citizen refusing to ID | 5261 |
| 15:50:19 | 10 | one detained in cuffs | 5261 |
| 15:54:01 | 11 | S5 10-27: B3004268 | 5261 |
| 15:54:01 | 12 | S5 APB Name Query: HARRIS,TAVARE | 5261 |
| 15:54:01 | 13 | S5 Wanted Check: HARRIS,TAVARE - 11/17/1976 | 5261 |
| 15:54:01 | 14 | S5 Missing Persons Check: HARRIS,TAVARE - 11/17/1976 | 5261 |
| 15:54:01 | 15 | S5 APPS: HARRIS,TAVARE - 11/17/1976 | 5261 |
| 15:54:10 | 16 | one ic 1554 | 5261 |
| 15:55:50 | 17 | S5 ONSCEN. | 5261 |
| 16:03:33 | 18 | O68 ENRT. DOM W IN CUSTODY | 5261 |
| 16:03:37 | 19 | S5 CLR. Freed | 5261 |
| 16:03:41 | 20 | O68 Case number 25V-00717 assigned to 2508130050 | 5261 |
| 16:05:01 | 21 | Incident type changed from TRSTOP to TROTHER | 5261 |
| 16:24:55 | 22 | O68 OUT AT. DOMINICAN | 5261 |
| 18:02:26 | 23 | O68 ENRT. CJ | 5261 |
| 18:09:45 | 24 | O68 OUT AT. | 5261 |
| 19:09:23 | 25 | O68 CLR. Freed | 5331 |

CAD Incident 2508130050 Page 2

| TIME | # | EVENT | BY |
|---|---|---|---|
| 19:09:23 | 1 | O68 Incident returned to pending status | 5331 |
| 19:43:16 | 2 | Officer conducted an enforcement stop for equipment violations. The subject exited the | 5730 |
| | 3 | vehicle without prompting and refused to identify himself multiple times over. A supervisor | |
| | 4 | was called and the driver refused to identify himself to them. The subject was handcuffed | |
| | 5 | while actively resisting and complained of shoulder pain. The subject was cleared at | |
| | 6 | Dominican Hospital after multiple X-rays were negative for significant injury. The subject | |
| | 7 | was transported at CJ. Refer to report. | |
| 19:55:01 | 8 | Closed - Disposition AM | 5331 |
| 20:07:53 | 9 | HARRIS, TAVARE MAQUISE (11/17/1976) B3004268/CA added to incident | 5331 |

CONTROLLED DOCUMENT - SVPD CONFIDENTIAL
EXHIBIT H-4
TIAL

DOCUMENT - SVPD CONFIDENTIAL

EXHIBIT H-5

# SCOTTS VALLEY POLICE DEPARTMENT

## CAD INCIDENT REPORT

**2508130049**

Page 1

11/14/2025

| Location | Cross Streets | City |
|---|---|---|
| POLO RANCH, 6348 NB SR 17 | SANTAS VILLAGE RD | SCOTTS VALLEY |

| Incident Type | Call Taker | Dispatcher |
|---|---|---|
| AREACK - AREA CHECK | 5730 | 5730 |

| Date | Priority | Primary Unit | Beat | Fire Zone | Area | Map | Source | Channel |
|---|---|---|---|---|---|---|---|---|
| 08/13/2025 | 3 | O68 | | | N | M23-B | OFFICER INITIATED | |

| Caller Name | Caller Address | Caller Phone |
|---|---|---|
| | | |

| Dispositions | Weapon | Aim Level | Case Number |
|---|---|---|---|
| Closed Otherwise | | | |

| Vehicles | Associated Incidents |
|---|---|
| | |

**Incident Times**

| | |
|---|---|
| Received | 15:21:41 |
| Created | 15:21:41 |
| Dispatched | |
| En Route | |
| On Scene | 15:21:41 |
| Closed | 15:26:31 |
| Rcvd-Closed | 04:50 |

Special Circumstances

| Persons | Sex | DOB | Race | DL |
|---|---|---|---|---|
| | | | | |

| Unit Times | Officers | Dispatched | Enroute | On Scene | Clear | Disp-On Scene | Enrt-On Scene | On Scene-Clear | Disp-Clear |
|---|---|---|---|---|---|---|---|---|---|
| O68 | 5730 | | | 15:21:41 | 15:26:31 | N/A | N/A | 04:50 | 04:50 |

**Incident Comments**

| TIME | # | EVENT | BY |
|---|---|---|---|
| 15:21:41 | 1 | O68 Incident initiated at Polo Ranch, 6348 Nb Sr 17, Scotts Valley | 5730 |
| 15:21:41 | 2 | O68 ONSCEN. Polo Ranch, 6348 Nb Sr 17, Scotts Valley | 5730 |
| 15:26:31 | 3 | O68 CLR. Disposition: CO | 5730 |
| 15:26:31 | 4 | O68 CLR. | 5730 |
| 15:26:31 | 5 | O68 Closed - Disposition CO | 5730 |
| [ 09/10/2025 ] 01:00:58 | 6 | Incident type changed from ARSCK to AREACK | 5311 |

DOCUMENT - SVPD CONFIDENTIAL

# SCOTTS VALLEY POLICE DEPARTMENT

## CAD INCIDENT REPORT

**2508130050**

Page 1

11/14/2025

| Location | Cross Streets | City |
|---|---|---|
| TARGET, 270 MT HERMON RD | LOCKEWOOD LN/SKYPARK | SCOTTS VALLEY |

| Incident Type | Call Taker | Dispatcher |
|---|---|---|
| TROTHER - TRAFFIC STOP W REPORT, ETC., | 5261 | 5261 |

| Date | Priority | Primary Unit | Beat | Fire Zone | Area | Map | Source | Channel |
|---|---|---|---|---|---|---|---|---|
| 08/13/2025 | | O68 | | | S | N20-B | OFFICER INITIATED | |

| Caller Name | Caller Address | Caller Phone |
|---|---|---|
| | | |

| Dispositions | Weapon | Aim Level | Case Number |
|---|---|---|---|
| Arrest Made | | | 25V-00717 |

| Vehicles | Associated Incidents |
|---|---|
| 2005 Dodge, 7XBW327/CA | |

**Incident Times**

| | |
|---|---|
| Received | 15:40:34 |
| Created | 15:40:46 |
| Dispatched | |
| En Route | |
| On Scene | 15:40:46 |
| Closed | 19:55:01 |
| Rcvd-Closed | 4:14:27 |

Special Circumstances

| Persons | Sex | DOB | Race | DL |
|---|---|---|---|---|
| | | | | |

| Unit Times | Officers | Dispatched | Enroute | On Scene | Clear | Disp-On Scene | Enrt-On Scene | On Scene-Clear | Disp-Clear |
|---|---|---|---|---|---|---|---|---|---|
| O68 | 5730 | | | 15:40:47 | 19:09:23 | N/A | N/A | 3:28:36 | 3:28:36 |
| S5 | 5162 | 15:41:24 | 15:41:27 | 15:55:50 | 16:03:37 | 14:26 | 14:23 | 07:47 | 22:13 |

**Incident Comments**

Officers conducted a traffic stop and the driver exited the vehicle and refused to identify himself. The subject continued to refuse to identify himself, and resisted while being placed in handcuffs. He was cleared at Dominican Hospital and booked into county jail.

This is the trigger mechanism for all Scotts Valley Police vehicles for the AXON recording system:

## Fleet 3 Hub

These settings determine which 12V inputs activate Fleet 3 cameras and log status in the Fleet 3 Hub Audit Trail.
Brake, lights, & siren inputs are overlaid during video playback in Axon Evidence.

| INPUT | LABEL ⓘ | RULE | CAMERAS |
|---|---|---|---|
| 5 | - | - | - |
| 6 | - | - | - |
| 7 | - | - | - |
| 8 | Rear Door Driver Side | Log status and activate: 10s delay | Front, Interior |
| 9 | Rear Door Passenger Side | Log status and activate: 10s delay | Front, Interior |
| 10 | K9 Door | Log status and activate: 10s delay | Front, Interior |
| 11 | Weapon Rack 1 | Log status | - |
| 12 | Light Bar Code 2 (L) | Log status and activate: No delay | Front, Interior |
| 13† | Siren (S) | Log status | - |
| 14‡ | Brakes (B) | Log status | - |

† Signal delays require the latest firmware to support. Inputs 11 & 12 are best to use for lightbars. See the Axon product guides on Signal Configuration for more information.
‡ Brakes label is only configurable on inputs 13 and 14. Brake status only logs information for playback overlay.

### Fleet 3 Reactivation Sensitivity

Determines how sensitive Fleet 3 cameras are to repeated activation from the 12V input. Detailed explanation of behavior is available in the Fleet 3 User Manual.

- (selected) Cameras are less sensitive to reactivation. This is the default and legacy behavior. Cameras activate once per session.
- ( ) Cameras are more sensitive to reactivation. Cameras activate whenever an input is triggered.

- Vehicle #88 is a 2023 Ford Explorer, black and white in color. It is currently equipped with the following equipment:

- **MDT**
- AXON Fleet 3 recording system
  - Front mounted camera/microphone installed on the interior of the passenger side windshield near the visor.
  - Rear camera specific to recording the rear passenger compartment.
  - All of the system hardware/software for the AXON system is proprietary through AXON.
- The emergency siren/switch module that is utilized in vehicle #88 is a Soundoff Signal BluePRINT 400 series control module.

- The radio installed in the vehicle is a Kenwood radio system.



EXHIBIT H-6

**Scotts Valley Police Department**

1 Civic Center Dr, Scotts Valley, CA 95006 • (831) 440-5670 • Fax (831) 438-6930

DATE: April 14th, 2026

TO: Tavare Harris

FROM: Services Supervisor Chloe Graham

RE: Request for Records

EXHIBIT H-7

I am writing to acknowledge receipt of your amended request, received by The City of Scotts Valley on 4/7/26, for the following information, see my response below in red:

**"Upon further review of timestamped video evidence, I have identified a device time offset (time zone discrepancy) and am clarifying the correct date and timeframe associated with the incident. To ensure accuracy and account for any potential variance, I am requesting records for the following: Date: February 20, 2026 Time: Approximately 9:04PM – 11:04 PM (Pacific Time) Locations: - Near N: 37.04782, W: -122.03169 (Target, Mt. Hermon Rd) - Near N: 37.04821, W: -122.0168 (Scotts Valley Dr. corridor) Requested Records:**

**1. CAD logs for all SVPD units in the area during this timeframe**

I have determined that the Scotts Valley Police Department does not possess records responsive to item 1. There were no officers responding in the areas you defined during the timeframe that you requested.

**2. AVL/GPS vehicle location data for patrol units operating within a reasonable radius**

I have determined the Scotts Valley Police Department possess records responsive to item 2. I respectfully deny your request at this time. The requested information is exempt from disclosure under *Haynie v. Superior Court* (2001) 26 Cal.4th 1061, 1070-1072 and *Rivero v. Superior Court* (1997) 54 Cal.App. 4th 1048, 1052. Furthermore, pursuant to Government Code Section 7922.000: "the facts of the particular case the public interest served by not disclosing the record clearly outweighs the public interest served by disclosure of the record." As well as Government Code § 7923.600, as "records of complaints to, or investigations conducted by, or records of intelligence information or security procedures of . . . [a] local police agency. The record that you are requesting is investigatory and is exempt.

**3. Body-worn camera (BWC) and dash camera footage for any units present or operating in the area**

I have determined that the Scotts Valley Police Department does not possess records responsive to item 3. There were no officers responding in the areas you defined during the timeframe that you requested.

**4. Radio communications and dispatch audio associated with any units in the area**

I have determined that the Scotts Valley Police Department does not possess records responsive to item 4. There were no officers responding in the areas you defined during the timeframe that you requested.

**5. Any records identifying officers present, responding, or operating in the area during this timeframe**

I have determined that the Scotts Valley Police Department does not possess records responsive to item 5. There were no officers responding in the areas you defined during the timeframe that you requested, but there were two officers on duty that shift, Officer Stoeberl and Officer Lipari.

Sincerely,

Chloe Graham

**Subject: Consolidated CAD / CPRA Record – Key Discrepancies & Admissions for Review**

Hi Grace,

I've uploaded a single consolidated PDF titled "Harris 9th Request Follow Up – CAD & CPRA Record." I wanted to highlight several discrepancies and admissions reflected in the CAD records and CPRA correspondence so you can evaluate their significance from a discovery, integrity, or suppression standpoint.

EXHIBIT H-8

A. Key discrepancies & admissions in the consolidated CAD / CPRA record

1. SVPD admits the originally provided CAD number was wrong

SVPD now formally states that CAD #2508130049 was NOT the incident associated with my arrest, and that the correct CAD for the August 13 Target stop is #2508130050.

Why this matters:
This confirms that incorrect or misleading CAD information was previously provided, and that a correction was required after the fact.

---

**2. The "wrong" CAD (2508130049) shows a documented post-incident edit**

The CAD printout for 2508130049 (described by SVPD as an unrelated area check) explicitly shows:

"Incident type changed from ARSCK to AREACK"

Edit date: 09/10/2025

With a user ID listed

Why this matters:
Even though SVPD now characterizes this CAD as "unrelated," the document itself demonstrates a post-incident modification of the event classification, which supports concerns about CAD edits or reclassification after the fact.

---

**3. SVPD refuses to produce CAD change logs for the actual arrest CAD (2508130050)**

For the CAD associated with my arrest, SVPD:

Acknowledges responsive records exist

Refuses to release the complete CAD event history and edit/change log

Cites investigatory exemptions and directs production through DA discovery instead

Why this matters:
They are effectively stating:

> "Yes, edit histories exist — but we will not disclose them."

This reflects records-integrity shielding, not a denial that edits occurred.

---

**4. Contradictory positions on emergency lights & data sources**

SVPD states that:

CAD / RMS / MDT systems do not track emergency light or siren activation

Axon dash camera does capture emergency light activation

Axon data exists, is preserved, but will not be released via CPRA

That Axon data was turned over to the DA

Why this matters:
This creates a single technical choke point:

> If emergency light activation is legally relevant, Axon is the only objective proof — and it is being withheld from CPRA and routed exclusively through discovery.

This directly parallels the Axon-related issues in my August 13 stop.---

**5. Inconsistency regarding Axon materials**

SVPD simultaneously states that:

Axon dashcam data exists and captures light activation

The data has not been reviewed

The data is preserved

The data was turned over to the DA

Yet also states: “I have never provided you any items from Axon”

Why this matters:
This reflects fragmented custodial responsibility over Axon evidence and reinforces the need for:

Native Axon files

Audit / access logs

Clear chain-of-custody documentation---

I’m not drawing legal conclusions from this, but I wanted to provide the consolidated record and highlight these points in case they are relevant to discovery integrity, impeachment, suppression, or pattern analysis. Please let me know how you’d like to proceed or if you want anything further organized.

Vehicle Maintenance

EXHIBIT I-A

Page 1

Attachments

Assigned Inventory

Audit

**Vehicle Info**

ID 87

Type

Year 2021

Make FORD

Model EXPLORER

License 1632325

Colors BLK WHI

Height Feet Inches

Length Feet Inches

Width Feet Inches

Weight Lbs

**Admin**

VIN/Serial [redacted]

Assigned To SERGEANT USE

Acquired 01/27/2022

Mileage/Hours 57024

Date 07/08/2026

Reg Expires 12/31/2099

Modem ID

Status

Inactive

Note

**Maintenance**

Last Service 04/13/2026 In for service

Next Service Mileage/Hours 59500

Next Svc Desc

Date of Last Maint Reminder

Maintenance Cost to Date $8,137.09

Date of Last Speed Calibration

Speed Calibration Expires

| Date | Text | Service By | Officer | Mileage | Cost |
|---|---|---|---|---|---|
| 7/3/2026 | Signed on duty by 1040 at 05:45:55 Version: 19.42.4 | | Yoon, Fred | 56,818 | |
| 7/2/2026 | Unit Logged Off - Officer Roberts, A at 21:32:49 | | Roberts, Aaron | 56,777 | |
| 7/2/2026 | Signed on duty by 5600 at 17:55:16 Version: 19.42.4 | | Roberts, Aaron | 56,777 | |
| 7/2/2026 | Unit Logged Off - Officer Yoon at 17:46:33 | | Yoon, Fred | 56,777 | |
| 7/2/2026 | Signed on duty by 1040 at 14:08:11 Version: 19.42.4 | | Yoon, Fred | 56,744 | |
| 7/2/2026 | Signed on duty by 1040 at 06:42:09 Version: 19.42.4 | | Yoon, Fred | 56,744 | |
| 7/1/2026 | Unit Logged Off - Officer Yoon at 18:39:32 | | Yoon, Fred | 56,744 | |
| 7/1/2026 | Signed on duty by 1040 at 10:20:54 Version: 19.42.4 | | Yoon, Fred | 56,725 | |

Prev Save Cancel Add History Delete Maint History Only Position to Date Print Next

H

A117:E117 | 3/13/2025

| | Date | Text | Service By | Officer | Mileage | Cost |
|---|---|---|---|---|---|---|
| 109 | 8/17/2025 | Unit Logged Off - Officer Stoeberl at 18:51:14 | | Stoeberl, Nicholas | 81,505 | |
| 110 | 8/17/2025 | Signed on duty by 5730 at 18:50:30 Version: 19.32.2 | | Stoeberl, Nicholas | 81,502 | |
| 111 | 8/17/2025 | Signed on duty by 5730 at 08:56:56 Version: 19.32.2 | | Stoeberl, Nicholas | 81,502 | |
| 112 | 8/16/2025 | Unit Logged Off - Officer Stoeberl at 19:12:34 | | Stoeberl, Nicholas | 81,502 | |
| 113 | 8/16/2025 | Signed on duty by 5730 at 06:51:22 Version: 19.32.2 | | Stoeberl, Nicholas | 81,469 | |
| 114 | 8/15/2025 | Unit Logged Off - Officer Stoeberl at 18:55:57 | | Stoeberl, Nicholas | 81,469 | |
| 115 | 8/15/2025 | Signed on duty by 5730 at 06:51:45 Version: 19.32.2 | | Stoeberl, Nicholas | 81,442 | |
| 116 | 8/14/2025 | Signed on duty by 5730 at 07:32:41 Version: 19.32.2 | | Stoeberl, Nicholas | 81,288 | |
| 117 | 3/13/2025 | Signed on duty by 5730 at 07:42:22 Version: 19.32.0 | | Stoeberl, Nicholas | 81,288 | |
| 118 | 8/13/2025 | Signed on duty by 5800 at 04:43:32 Version: 19.32.0 | | Harrison, Vitani | 81,139 | |
| 119 | 8/13/2025 | Signed on duty by 5800 at 02:28:34 Version: 19.32.0 | | Harrison, Vitani | 81,139 | |
| 120 | 8/13/2025 | Signed on duty by 5800 at 00:48:45 Version: 19.32.0 | | Harrison, Vitani | 81,139 | |
| 121 | 8/12/2025 | Signed on duty by 5800 at 18:59:20 Version: 19.32.0 | | Harrison, Vitani | 81,139 | |
| 122 | 8/12/2025 | Signed on duty by 5800 at 04:35:37 Version: 19.32.0 | | Harrison, Vitani | 81,139 | |
| 123 | 8/11/2025 | Signed on duty by 5800 at 18:44:37 Version: 19.32.0 | | Harrison, Vitani | 81,139 | |
| 124 | 8/11/2025 | Unit Logged Off - Officer Harrison at 06:36:54 | | Harrison, Vitani | 81,139 | |
| 125 | 8/11/2025 | Signed on duty by 5800 at 05:30:48 Version: 19.32.0 | | Harrison, Vitani | 81,139 | |
| 126 | 8/11/2025 | Signed on duty by 5800 at 02:57:45 Version: 19.32.0 | | Harrison, Vitani | 81,139 | |
| 127 | 8/10/2025 | Signed on duty by 5800 at 18:48:46 Version: 19.32.0 | | Harrison, Vitani | 81,139 | |
| 128 | 8/9/2025 | Unit Logged Off - Officer Stoeberl at 19:23:58 | | Stoeberl, Nicholas | 81,139 | |
| 129 | 8/9/2025 | Signed on duty by 5730 at 06:58:41 Version: 19.32.0 | | Stoeberl, Nicholas | 81,098 | |
| 130 | 8/8/2025 | Unit Logged Off - Officer Stoeberl at 18:44:53 | | Stoeberl, Nicholas | 81,098 | |
| 131 | 8/8/2025 | Signed on duty by 5730 at 06:55:14 Version: 19.31.0 | | Stoeberl, Nicholas | 81,065 | |
| 132 | 8/7/2025 | Unit Logged Off - Officer Stoeberl at 18:50:10 | | Stoeberl, Nicholas | 81,065 | |
| 133 | 8/7/2025 | Signed on duty by 5730 at 09:08:23 Version: 19.31.0 | | Stoeberl, Nicholas | 81,050 | |
| 134 | 8/7/2025 | Signed on duty by 5800 at 07:15:07 Version: 19.31.0 | | Harrison, Vitani | 81,030 | |
| 135 | 8/7/2025 | Signed on duty by 5800 at 02:54:32 Version: 19.31.0 | | Harrison, Vitani | 81,030 | |
| 136 | 8/6/2025 | Signed on duty by 5800 at 23:16:46 Version: 19.31.0 | | Harrison, Vitani | 81,030 | |
| 137 | 8/6/2025 | Signed on duty by 5800 at 19:02:54 Version: 19.31.0 | | Harrison, Vitani | 80,795 | |

Unit 85

Sheet 1 / 1 | PageStyle_Unit 85 | STD | Sum=0

EXHIBIT H-9

**RE: Automatic reply: Discovery Demand – People v. Tavare-Maquise: Harris, Case No. 25CR03944**

From: Peter Esho (peter.esho@santacruzcountyca.gov)
To: htavare@yahoo.com
Date: Thursday, September 25, 2025 at 05:07 PM UTC

Hi Mr. Harris,

I hope you are doing well. Apologies for not responding sooner, as you are aware I was out of the office. I checked this morning and it appears we have received all bodyworn camera video footage and the 911/CAD evidence. I have notified our discovery team to begin preparing a package of that evidence for you to pick up. I would anticipate it may be ready sometime early next week, but will let you know if it is prepared sooner.

I am unfamiliar with what metadata is produced alongside the video footage, but I have never received from any agency, including SVPD, video footage that I believed to be altered or edited in any way. The same is true for the 911 and CAD evidence. If you review all the footage produced and find any reason to believe any of it has been altered or destroyed in any way, please let me know immediately.

Thank you,
Peter Esho

---

HM Harris, Tavare M
To: , Cc: Kristen, and 3 others · Thu Jan 8 at 3:58 PM

*On Thu, Jan 8, 2026 at 2:57 PM, Chloe Graham <cgraham@scottsvalley.gov> wrote:*

Good evening,

Regarding your questions and statements in the below email:

**1. Written identification of all Axon materials, audit logs, CAD change histories, and related records that have been provided by SVPD to any outside agency, including the District Attorney's Office;**

The district attorney's office has been provided with the Axon body camera footage from Sgt Tol and Officer Stoebert, as well as their dash camera footage, and any photos that were taken. They were also provided a copy of the case and a copy of the CAD. I spoke to the District Attorney's office yesterday and they informed me they have provided your attorney with all of this.

Case ID 25V 00717 [redacted]

Partner Agencies

0 1 0 0

| Recipient Name | Item Count | Includes | Sharing Method | Duration | Status | Added On |
|---|---|---|---|---|---|---|
| Mailbox, DAT_Evidence (DAT_EVD) — Santa Cruz County District Attorney (CA) | 22 items | - | Copy of case | - | Completed | Sep 12 2025 |

EXHIBIT I-5

# SCOTTS VALLEY POLICE DEPARTMENT

## CAD INCIDENT REPORT

**2511060025**

Page 1

12/08/2025

CONTROLLED DOCUMENT - SVPD CONFIDENTIAL

| Location | Cross Streets | City |
|---|---|---|
| EL PUEBLO RD | | SCOTTS VALLEY |

| Incident Type | Call Taker | Dispatcher |
|---|---|---|
| TRSTOP - TRAFFIC STOP | 5261 | 5261 |

| Date | Priority | Primary Unit | Beat | Fire Zone | Area | Map | Source | Channel |
|---|---|---|---|---|---|---|---|---|
| 11/06/2025 | | O68 | | | | | OFFICER INITIATED | |

| Caller Name | Caller Address | Caller Phone |
|---|---|---|
| | | |

| Dispositions | Weapon | Aim Level | Case Number |
|---|---|---|---|
| Verbal Warning | | | |

| Vehicles | Associated Incidents |
|---|---|
| | |

**Incident Times**

| | |
|---|---|
| Received | 16:49:10 |
| Created | 16:49:24 |
| Dispatched | |
| En Route | |
| On Scene | 16:49:24 |
| Closed | 17:00:46 |
| Rcvd-Closed | 11:36 |

**Special Circumstances**

| Persons | Sex | DOB | Race | DL |
|---|---|---|---|---|
| | | | | |

EXHIBIT J

| Unit Times | Officers | Dispatched | Enroute | On Scene | Clear | Disp-On Scene | Enrt-On Scene | On Scene-Clear | Disp-Clear |
|---|---|---|---|---|---|---|---|---|---|
| O68 | 5730 | | | 16:49:25 | 17:00:46 | N/A | N/A | 11:21 | 11:21 |

**Incident Comments**

mc stop



## Default – August 13, 2025 Incident

Inbox

cgraham@scottsvalley.gov
To: me · Cc: M..., and 3 others · Tue, Sep 16, 2025 at 1:01 PM

Tavare-Maquise Harris,

You are entitled to summary information under the CPRA. I have attached our California Public Records Act Summary Disclosure Form, pursuant to Government Code § 7923.610, this is what we are required to release. I have provided you with everything that I will provide. To get the other items you are requesting you need to follow up with ADA Peter Esho and follow the SC DAO's instructions.

**Chloe Graham**
Services Supervisor
Scotts Valley Police Department
One Civic Center Drive • Scotts Valley, CA 95066 • 831.440.5670
www.scottsvalleypd.com • www.facebook.com/ScottsValleyPD

Peter Esho
To: me · Fri, Sep 12, 2025 at 1:24 PM

**up, as they require advance notice to our discovery clerks.** The video footage from the officers, as well as the 911 records, have been requested and will be available to pick up once Scotts Valley PD produces them to our office. We will put those records on a flash drive for you to pick up once they are available. **Please understand that these items may take a few weeks for us to receive and process, and you are welcome to follow up via email on the status of those records. Once they are received, we will schedule a day and time for you to pick them up.**

As for the incident/arrest reports and use-of-force reports – that is something that our office has no control over, nor do we have the ability to provide that information if it were available to us. A request for this information requires you to file a formal motion with the court and serve to Scotts Valley PD. They will respond to your motion and a judge will determine what information, if any, exists and/or is available for disclosure.

As for Brady, exculpatory, and impeachment evidence – at this time there is no Brady evidence in this matter. The same is true for exculpatory statements and impeachment evidence. In the event any of that information is brought to our office's attention, you will be notified as soon as possible and it will be produced in the same manner as all other evidence we are able to provide.

Please let me know if there is anything else you are requesting.

Thank you,
Peter Esho

EXHIBIT J-2

## RE: Supplemental CPRA Request & Notice of Misconduct and Default – August 13, 2025 Incident

From: htavare@yahoo.com (htavare@yahoo.com)
To: cgraham@scottsvalley.gov
Cc: mfagoe@scottsvalley.gov, kpowell@scottsvalley.gov, csimonovich@scottsvalley.gov, swalpole@scottsvalley.gov
Date: Tuesday, September 16, 2025 at 03:33 PM UTC

Subject: CPRA – Summary received; produce segregable CAD/BWC & bonds/risk coverage (Gov. Code §§ 7922.525, 7923.610)

Dear Ms. Graham,

Thank you for the § 7923.610 summary sheet. Please note:

§ 7923.610 requires release of basic incident/arrest information even during an active case;

It does not eliminate SVPD's duty under § 7922.525 to release reasonably segregable portions of other records, nor the duty under §§ 7922.530 / 7922.535 to provide a record-specific justification for each withheld item.

Accordingly, please produce within five (5) calendar days the following segregable portions (even if you continue to withhold narratives/video pending prosecution):

1. CAD/dispatch: incident number(s), call type codes, timestamps (receive/dispatch/en-route/on-scene/clear), unit IDs, disposition codes, and any supervisor / watch-commander request/ack fields.

2. BWC/dashcam metadata: camera assignment to unit/officer, activation/deactivation timestamps, file names/IDs, and upload/docking timestamps (Policy 420 requires these exist).

3. Officer bonds / risk financing (previously requested): if individual officer bonds do not exist, please confirm and produce the City's blanket public-official bond (if any), JPA membership agreements, liability declarations/certificates, self-insurance resolutions under Gov. Code §§ 990–990.8, and claims-handling instructions.

5. If any item above is withheld, please provide a record-by-record log identifying the record, the specific statute relied upon (e.g., § 7923.600 et seq.), and how disclosure of that record—not the category—would interfere with a pending investigation or other protected interest.

Requiring me to obtain "permission" from the District Attorney is not a CPRA requirement. CPRA duties run to the agency that holds the record. I will continue to pursue criminal discovery with the SCDAO, but that does not relieve SVPD of its independent CPRA obligations.

If SVPD is withholding at the specific request of SCDAO, please provide that request in writing (or identify the DA contact who asserted it) so I can address it directly while preserving my CPRA rights with SVPD.

Please confirm receipt and your production timeline.

Respectfully,
Tavare-Maquise Harris
c/o 2460 17th Ave #1135, Santa Cruz, CA 95062
All Rights Reserved, Without Prejudice UCC 1-308

Yahoo Mail: Search. Organize. Conquer

Name: Tavare Harris | DOB: 11/17/1976 | Legal Name: Tavare Harris



# MRI Elbow Right Without Contrast

Collected on Oct 28, 2025 3:40 PM

If you have questions or concerns regarding your test results, contact the clinician who ordered the test.

Ace Alvarez, PA 11/3/2025, 4:16 PM

Hello Tavare,
Here is your MRI of your elbow. I have looked at it with the surgeon and he agrees that you have a partial tear of a ligament in your elbow. This will take time to scar down and heal. This can take many weeks. You can rehab this with physical therapy.
I will place a referral and they will call you. For now, no heavy lifting until about 3-4 month out from injury.
Take care
acelina

Right shoulder X-ray: Unremarkable (08/14/2025)
Right elbow X-ray: Unremarkable (08/14/2025)
Right wrist X-ray: Unremarkable (08/14/2025)



EXHIBIT J-3

## Results





### Impression

IMPRESSION:

Subacute tear of posterior lateral aspect of the annular ligament and posterior lateral aspect of lateral ulnar collateral ligament. Radial collateral ligament proper appears intact.

Electronically Signed by: Albert Lu, MD 10/28/2025 3:48 PM

### Narrative

INDICATION:Pain, twisting injury

COMPARISON: 8/27/2025 radiographs

TECHNIQUE: MRI of the right elbow was performed. Sequences obtained include axial, coronal, sagittal T1 and PD fat-sat.
FINDINGS:

The common extensor tendon is normal. Subacute tear of posterior lateral aspect of the annular ligament and posterior lateral aspect of lateral ulnar collateral ligament. Radial collateral ligament proper appears intact.

The common flexor tendon is normal. The anterior and posterior bundles of the ulnar collateral ligament are intact.

Normal alignment across radiocapitellar and ulnohumeral joints. Minimal osteoarthritis across the ulnohumeral joint. Mild elbow joint effusion.

Normal signal and appearance of ulnar nerve through the cubital tunnel. Intact distal biceps and brachialis tendons.

Triceps tendon is intact.



Authorizing provider: Ace Alvarez, PA
Reading physician: Albert Lu, MD
Study date: Oct 28, 2025 3:31 PM
Collection date: Oct 28, 2025 3:40 PM
Result date: Oct 28, 2025 3:48 PM
Result status: Final

MyChart® licensed from Epic Systems Corporation© 1999 - 2026